AGREEMENT BETWEEN

SKANSKA USA BUILDING INC.

and

SmithGroupJJR

for the

**DC Water New Headquarters Building**

ARTICLE 1

This Agreement is made this 17day of **April** in the year 2015 by and between the

DESIGN/BUILDER

**SKANSKA USA BUILDING INC.**
**(hereinafter "Skanska" or "Design/Builder")**
**700 King Farm Blvd, Suite 200**
**Rockville, MD 20850**

and the

DESIGNER

**SmithGroupJJR**
**(hereinafter "Designer")**
**1700 New York Avenue NW, Suite 100**
**Washington, DC 20006**

for Design Services in connection with the following

PROJECT

**DC Water New Headquarters Building**
**(hereinafter the "Project")**
**Main & O St. Site**
**Washington, DC**

CONTRACT No.   340060

whose Owner is

**District of Columbia Water and Sewer Authority**
**5000 Overlook Avenue, SW**
**Washington, DC 20032**

Notice to the parties shall be given at the above addresses.

Designer Agreement
[04.2012 ed. Rev. 0]

**EXHIBIT A**

**ARTICLE 2**
General

**2.1     Mutual Obligations and Common Purposes**

**2.1.1**     Design/Builder and Designer agree to work together on the basis of trust, good faith and fair dealing and shall take actions reasonably necessary to enable each other to perform this Agreement in a timely, efficient and economical manner and to permit each party to satisfy its obligations under this Agreement and the Contract Documents for the price each party has committed to.

**2.1.2**     Design/Builder and Designer, in order fully to understand the requirements of the Project, have reviewed the Contract Documents to permit Designer, for Designer's Fee it is being paid hereunder, to design the Project consistent with this Agreement, the Contract Documents, and Design/Builder's Project Budget and Project Schedule

**2.1.3     Post Award Project Briefing.**  Designer and Design/Builder agree to meet within seven (7) days of execution of this Agreement to further refine the Parties' execution plan to deliver Owner's Project within the Project Budget and Project Schedule.  In furtherance thereof, parties shall finalize the Design Execution Plan and prepare for implementation all other necessary procedures which will permit Design/Builder, its Design Consultants, Subcontractors, and Sub-Subcontractors and Designer and its Consultants to jointly achieve the project objectives within the Project Schedule.

**2.2     General Provisions**

**2.2.1**     Design/Builder has agreed in its Design-Build Agreement with Owner to procure the services of licensed design professionals to provide the architectural and engineering services required to complete the design of the Project in accordance with this Agreement and the Owner's requirements as stated in the Design-Build Agreement between Owner and Design/Builder, including all Contract Documents.

**2.2.2**     Designer, through itself and its Consultants, has agreed to provide Design Services (as defined in Section 2.3.9) required by this Agreement and the Contract Documents which are incorporated by reference into this Agreement.

**2.2.3**     Designer agrees to the extent applicable to the execution of its obligations hereunder to be bound to Design/Builder in the same manner as Design/Builder is bound to Owner, including the terms and conditions under which Designer's Services are to be performed, which include, but are not limited to, obligations, remedies, administrative procedures, and technical terms and conditions set forth in the Design-Build Agreement.

**2.2.4**     To the same extent as Design/Builder under the Design-Build Agreement, Designer is entitled to rely upon information furnished or made available by Owner.  Notwithstanding the foregoing, Designer shall as necessary for the performance of its Designer's Services investigate existing conditions or facilities, make measured drawings thereof, and verify the accuracy of drawings or other information furnished by others.

**2.2.5**     Designer, to the extent applicable in the performance of its Design Services shall have the same rights and obligations that Design/Builder by the Contract Documents has against, and to, Owner.  To the extent of any conflict involving the scope of services required by the Contract Documents and the Design Services required of the Designer hereunder, the provision imposing the greater obligation on Designer shall govern.

**2.3     Basic Definitions**

    .1     *Basis of Design Documents* shall have the meaning set forth in Section 3.3.1 of this Agreement.

    .2     *Construction Documents* shall mean all drawings and specifications required to complete the Work.  The Construction Documents shall: (a) include and establish the quality and quantities of materials and systems required per the Contract Documents; (b) comply with all applicable codes, laws and regulations enacted at the time the Construction Documents are prepared; (c) comply with other requirements of the Contract Documents to permit execution by the design professional of the Design Certification set forth in the Contract Documents; and (d) enable all necessary permits, variance and licenses to be obtained and otherwise permit the Design/Builder's procurement of the Work.

    .3     *Consultant* is a qualified, licensed design professional who is not an employee of Designer, but is retained directly by Designer, to furnish professional services required under the Contract Documents and this Agreement.

.4     *Contract Documents* shall mean the Contract Documents as defined in the Design-Build Agreement and which may include, but is not limited to the Design-Build Agreement including the General Terms of Contract, the Owner's solicitation and Request for Proposal for the Project ("RFP"), Design/Builder's Proposal as accepted by the Owner, the Owner's Program and Project Criteria, Supplemental Terms and Conditions in Exhibit PS-1, and any other documents defining the Project and included in Exhibit A as attached hereto. The Contract Documents provide a definitive description of the Owner's Project objectives.

.5     *Day* or *Days* shall mean calendar days unless otherwise specifically noted in the Contract Documents.

.6     *Design Consultant* is a qualified, licensed design professional who is not an employee of Design/Builder, but is retained directly by Design/Builder, or employed or retained by anyone under contract with Design/Builder, Subcontractor or Sub-Subcontractor, to furnish professional services required under the Contract Documents.

.7     *Design Documents* shall mean collectively, the Design Development Documents and the Construction Documents.

.8     *Design Development Documents* shall mean all necessary design drawings, specifications, and detailed calculations as called for in the Contract Documents, all of which shall further define the Project by fixing and describing the Project size and character, and other appropriate elements incorporating systems which include, but are not limited to, the structural, architectural, mechanical and electrical systems.

.9     *Design Execution Plan* shall be the plan and schedule to deliver all Designer's Services as agreed to by Design/Builder.

.10     *Design Services* or *Designer's Services* shall be to provide all necessary architectural and engineering services required by the Design/Builder for the Project, including those required by the Contract Documents, all Basic Services provided hereunder at Section 3.4 et seq., and any Additional Services as may be authorized in writing by the Design/Builder. The services include, but are not limited to coordination of all Design Services with the Owner and Design/Builder, Design Consultants retained by Design/Builder, Subcontractors of the Design/Builder including any Subcontractors having design-build responsibilities of their own, and any Sub-Subcontractors.

.11     *Design Submissions* shall mean those Design Development and Construction Documents to be reviewed and/or approved by the Design/Builder and/or Owner and their respective consultants which are required by this Agreement and the Contract Documents.

.12     *Design-Build Agreement* refers to the executed contract between Owner and Design/Builder.

.13     *Designer Agreement* or *Agreement* refers to this Agreement, which Agreement may be modified from time to time, and all Exhibits to this Agreement as identified at Article 11, including, but not limited to the Contract Documents.

.14     *Designer's Fee* shall mean the agreed to compensation for Designer for all of Designer's Services as set forth at Section 6.1.1 of this Agreement.

.15     *Hazardous Materials* are any materials, wastes, substances and chemicals deemed to be hazardous under applicable Legal Requirements, or the handling, storage, remediation, or disposal of which are regulated by applicable Legal Requirements.

.16     *Legal Requirements* are applicable federal, state and local laws, codes, ordinances, rules, regulations, orders and decrees of any government or quasi-government entity having jurisdiction over the Design/Builder's Work or the Design Services in connection with the Project.

.17     *Owner* shall mean the person or entity identified as such in Article 1 and includes the Owner's Representative as identified in the Design-Build Agreement.

.18     *Owner's Project Criteria* are criteria developed by or for Owner to describe Owner's program requirements and objectives for the Project, including use, space, price, time, site and expandability requirements, submittal requirements and other requirements governing Design/Builder's performance of the Work. Owner's Project Criteria may include conceptual documents, design criteria, performance requirements and

other Project-specific technical materials and requirements.

.19    *Project* is identified in Article 1 and is the building, facility and/or other improvements to be completed pursuant to the Design-Build Agreement.

.20    *Project Budget* is Design/Builder's budget for the design and construction cost of the Project as accepted by the Owner.

.21    *Project Schedule* is the time for performance as agreed to by Design/Builder and Owner and attached hereto as Exhibit B.

.22    *Proposal* shall mean the technical response and cost estimate for the Project as accepted by Owner and developed by Design/Builder in collaboration with, and in reliance upon information provided by Designer.

.23    *Schedule of Values* shall have the meaning set forth in Section 6.6.1 of this Agreement.

.24    *Site* is the land or premises on which the Project is located.

.25    *Subcontractor* is any person or entity retained by Design/Builder as an independent contractor to perform a portion of the Work and shall include materialmen and suppliers.

.26    *Substantial Completion* is defined as the date when the Project is substantially complete in accordance with the Contract Documents.

.27    *Work* is Design/Builder's design, construction and other services required by the Contract Documents, including procuring and furnishing all materials, equipment, services and labor reasonably inferable from the Contract Documents. Designer's Services constitute an intricate part of Design/Builder's Work.

**2.4    Extent of Agreement.**  This Agreement represents the entire agreement between Design/Builder and Designer and supersedes all prior negotiations, representations and agreements, either written or oral.

**2.5    Independent Contractor.**  Designer is an independent contractor retained by Design/Builder.  Nothing in this Agreement shall be construed as creating the relationship of principal and agent or employer and employee or a partnership between Design/Builder and Designer.

**2.6    Injury Free Environment.**  Designer is dedicated to providing a safe and injury free environment and expects its employees, Consultants and all others under Designer's control to hold environmental health and safety as a top priority.  In furtherance thereof, Designer shall obligate and require its separate contractors to comply with Design/Builder's Safety and Health Management Program.

## ARTICLE 3
## DESIGNER'S RESPONSIBILITIES

**3.1    Standard of Care.**  Designer and its Consultants shall perform all Design Services in accordance with all Legal Requirements, satisfying the requirements called for in the Contract Documents including the Project Budget and Schedule and this Agreement, and further agree to execute the Design Services with the care and skill ordinarily used by members of the profession practicing under similar conditions at the same time and locality of the Project.  Notwithstanding the foregoing, if the Contract Documents contain performance standards for aspects of the Designer's Services, the Designer agrees that it will perform all applicable Services so as to achieve such standards.

**3.2    Deviations from the Standard of Care.**  In performing its Designer's Services, Designer acknowledges the importance of meeting the Standard of Care while accounting for the Project Criteria requirements of the Owner and the Project Schedule and Project Budget.  Any deviation to the Standard of Care shall require specific written approval of Design/Builder. Designer agrees to specifically identify each variation to such standards prior to Design Documents being submitted to Design/Builder or the Owner for review or approvals.  Where requested by Design/Builder, for each such variation Designer shall furnish to Design/Builder, an alternative design for said portion of work which meets the Owner's Project Criteria.

3.3     **Basis of Design.**

3.3.1     Design/Builder and Designer acknowledge that the Project Schedule and Design-Build Agreement not to exceed price or lump sum price will be or, if established at the time of contract award, was, developed based upon the Basis of Design Documents which include the following in the form such documents existed at the time Design/Builder commits to a not to exceed or lump sum price with the Owner: (a) Owner's project solicitation documents, including all addenda and other modifications thereto, and (b) the design furnished by Designer which revised, modified, advanced or otherwise expounded upon the design set forth in the Owner's Project solicitation documents (including, but not limited to design calculations performed for equipment, system or design element sizing; additional design features or embellishments; and/or additional design detail providing design definition to performance based design criteria) (collectively, the "*Basis of Design Documents*"). The Parties intend that the Project will be designed and constructed in accordance with the Basis of Design Documents.

In performing the Design Services, Designer shall avoid deviations from the quality or quantity parameters underlying the Basis of Design Documents and the Design-Builder's price and schedule commitments to Owner, unless such changes are first authorized in writing by Design/Builder, or required by a change in law, provided that in the event of a change to the Design to account for a change in law, Designer shall advise Design/Builder of such requirement as soon as Designer discovers said requirement. Design-Builder and Designer acknowledge that the purpose of this Section 3.3 is to provide Design/Builder with Construction Documents that will allow Design/Builder to construct the Project within the quality and quantity parameters underlying the Basis of Design Documents and the Design/Builder's price and schedule commitments to Owner for the design and construction of the Project. Design/Builder shall promptly notify Designer if it believes that Designer has deviated from the Basis of Design Documents without prior authorization and Designer shall work with Design/Builder to correct all deviations to the Basis of Design Documents in a manner that mitigates the impact of any such deviations, including, but not limited to the re-sequencing of Design Services.

Nothing herein shall make Designer responsible for Design/Builder's mistakes or miscalculations of market conditions that are contrary to the quality, quantity or cost parameters underlying Design/Builder's price and schedule commitments with the Owner provided the same do not arise as a result from a change to the Basis of Design Documents not requested by Design/Builder or a breach of Designer's Standard of Care in performing its services. Nothing in this Section 3.3 shall be construed to modify the Standard of Care set forth in Article 3.1.

3.3.2     **Schedule Considerations.**  Designer acknowledges that the time within which its Design Services are to be performed must be strictly adhered to for Design/Builder to meet its obligations within the Project Schedule and that each milestone date must be met by the Designer. Designer acknowledges further that all tasks and sub-tasks of the Design Execution Plan will support Design/Builder in meeting its responsibilities under the Project Schedule. Designer shall at all times give due consideration to the fact that the work of Design/Builder and its Subcontractors and Sub-Subcontractors is dependent upon the proper and timely completion of its Design Services. Designer acknowledges that with regard specifically to the Substantial and Final Completion Dates and any milestone dates required by the Project Schedule and/or the Design-Build Agreement, time is of the essence for Designer's performance.

3.4     **Designer's Personnel & Consultants.**  Designer shall at all times supply and promptly pay for a sufficient number of properly skilled employees, agents or Consultants to efficiently and properly perform its Design Services in accordance with the Project Budget and Project Schedule, and any modifications thereto issued by Design/Builder, in order to achieve the Project's Substantial and Final Completion Dates and any other interim milestone dates required by the Design-Build Agreement. Prior to engaging any Consultant, Designer shall notify Design/Builder. Designer shall not engage any Consultant reasonably objected to by Design/Builder. Upon request, Designer shall afford Design/Builder reasonable access to all documents constituting any Consultants' scope of services, schedule of services and work plan. Neither the Design Agreement nor any agreement between Designer and Consultant shall create any contractual relationship between any Consultants and either Owner or Design/Builder, nor any payment or other obligation on the part of either Owner or Design/Builder to any Consultant. Notwithstanding the existence of any consultant agreement, Designer shall be fully responsible for ensuring the performance of the Design Services and responsible for any and all errors, acts or omissions as if no such consultant agreement exists. Each contract, purchase order or other agreement entered into by Designer in connection with the Design Services shall be assignable and shall be assigned to Contractor upon written request following Designer default or termination of this Agreement.

3.5     **Basic Services.**  The Designer's Basic Services consist of:

- Design Development Documents (3.6 *et seq.*);
- Design Administration Services (3.7 *et seq.*);
- Government Authorization and Submissions (3.8 *et seq.*);
- Construction Documents (3.9 *et seq.*);
- Bidding and Negotiation Assistance (3.10 *et seq.*);
- Construction Administration (3.11 *et seq.*);
- Project Closeout Services (3.12 *et seq.*); and

Designer Agreement
[04.2012 ed. Rev. 0]

- Other Basic Services as more fully set forth in this Agreement at Section 3.13 and the Contract Documents.

**3.6     Design Development Documents.**  Based on the Basis of Design Documents, including, but not limited to the Project requirements set forth in the Contract Documents including, but not limited to the Owner's Project Criteria, the Designer (except where it is determined by Design/Builder to be the responsibility of a Subcontractor or Design Consultants) shall prepare all Design Development Documents, including all interim submissions and revisions required by the Contract Documents and/or Design/Builder.  Designer agrees that all Design Development Documents shall be prepared in sufficient time with the Project Schedule to all for review and approval by the Design/Builder, the Owner and any governmental or regulatory authorities. Where professional design services or certifications by a design professional related to systems, materials or equipment are required by the Contract Documents to be completed by a design professional other than Designer, Designer shall specify all appropriate performance and design criteria that such services must satisfy.  Neither review nor approval by Design/Builder or Owner shall be deemed to be an assumption of responsibility by Design/Builder or Owner for any error, inconsistency or omission in the drawings and specifications or other documents prepared by, or other Design Service provided by Designer, its employees, subcontractors, agents or Consultants.

**3.6.1     Scope, Form & Quantity.**  Designer, as part of its preparation of Design Development Documents shall prepare all necessary design drawings, specifications, and detailed calculations as called for in the Contract Documents, all of which shall further define the Project by fixing and describing the Project size and character, and other appropriate elements incorporating, at a minimum, structural, architectural, civil, landscaping, mechanical and electrical systems.  The Designer shall provide the Design Development Documents in the form and quantity called for in the Contract Documents.  The Designer agrees to provide additional sets of these documents to the Design/Builder as may be necessary in connection with design reviews and approvals that are required in connection with the Project.

**3.6.2     Design Development Schedule.**  Designer shall provide the Design Development Documents in the time set forth in the Project Schedule.  Designer acknowledges that in agreeing to provide the Design Development Documents within the times prescribed by the Project Schedule, Designer has accounted for a reasonable period of review and approval by Design/Builder, Owner and, as appropriate, governmental or regulatory bodies having authority over the Project.  Upon written request by Design/Builder, Designer shall provide the work plan it developed for resource allocation of its personnel and Consultants.

**3.6.3     Design Monitoring Meetings.**  The Designer and Design/Builder agree that prior to submission of any Design Submissions to the Owner, the Design/Builder and Designer, along with any Consultants required by Design/Builder, will hold regular design monitoring meetings for the purpose of monitoring the design to check to see that the Design Development Documents are being prepared consistent with the requirements as set forth in the Contract Documents and the Design/Builder's pricing and other assumptions used in preparing the Project Budget and Project Schedule.  To this end, Designer agrees that from time to time Design/Builder may (but is not obligated to) station an employee in Designer's offices (or its Consultants' offices) to address any questions Designer (or its Consultants) have regarding the requirements of the Design-Build Agreement, and any assumptions Design/Builder made in connection therewith.  Similarly, Designer agrees that Design/Builder may require that an employee or Consultant of Designer be stationed at the Site with sufficient authority and knowledge of the Project to respond timely to questions Design/Builder may have regarding the Design Development Documents or Project.

**3.6.4**     If the Design/Builder or Owner reject any Design Development Document because it does not comply with the requirements of the Design-Build Agreement, or is not consistent with the Project Budget, or because of errors, mistakes, or omissions in the Design Development Documents, Designer shall redesign so as to cause no delay in the Project Schedule, and at no additional fee or other expense to Design/Builder.  Designer's obligation to correct errors, defects and omissions shall be in addition to Design/Builder's other rights, remedies and recoveries under this Agreement and at law.

**3.7     Design Administration Services.**  Designer shall manage and coordinate the professional services provided by its Consultants, Design/Builder and its Subcontractors and Design Consultants, Owner and Owner Consultant's and other members of the Project team.

**3.7.1     Progress Reports.**  As reasonably requested by Design Builder, Designer shall issue periodic progress reports regarding the status of Design Services.  Designer and Design/Builder shall mutually agree upon the schedule, format and scope of Progress Reports.  Notwithstanding the foregoing, all design Progress Reports shall meet the requirements of the Contract Documents, as applicable.

**3.7.2     Design Services Schedule.**  Designer shall submit for the Design/Builder's approval, and periodically update as necessary a schedule for the performance of its Design Services which shall be consistent with the time periods set forth in Exhibit B to this Agreement.

**3.7.3     Project Meetings and Presentations.**  Designer shall attend all progress meetings as required by Design/Builder to discuss with Owner, Design/Builder and others, the Project progress and scheduling.  As required by the Contract Documents,

Designer Agreement
[04.2012 ed. Rev. 0]

Designer shall assist Design/Builder and make presentations to explain the design of Project to Owner, Governmental and Regulatory bodies and, as reasonably requested by Design/Builder or required by the Contract Documents, third parties.

.1 **Design Submission Clarification Meeting(s).** Within 30 days of execution of the Design-Build Agreement or other time as may be provided in the Contract Documents, Design/Builder shall pursue to meet with Owner to clarify, among other things: (a) which Design Documents shall constitute Design Submissions; (b) which Design Submissions shall be subject to Owner approval. Designer shall participate in such meetings clarifying Design Submission requirements.

.2 **Design Submissions requiring Owner Approval.** If applicable under the Contract Documents and following any meetings clarifying Design Submission requirements, Designer shall prepare a writing identifying the Design Submissions requiring Owner Approval as agreed to by the Owner and Design/Builder in consultation with Designer.

**3.8     Governmental Authorizations and Submissions.** Designer shall assist and, as reasonably requested by Design/Builder prepare materials in connection with Design/Builder's responsibility for obtaining all necessary permits, approvals, licenses, and inspection certificates required for the prosecution of the Work by any government, quasi-government or regulatory entity having jurisdiction over the Project. Designer also agrees to exercise reasonable efforts in assisting Owner in obtaining those permits, approvals and licenses that are Owner's responsibility.

**3.9     Construction Documents.** Based on the Contract Documents and approved Design Development Documents, Designer (except where it is expressly stated in writing by Design/Builder to be the responsibility of a Subcontractor or Design Consultant) shall prepare for approval by Design/Builder, Owner, and any governmental authorities, other authorities having jurisdiction over the Project, or other parties which have approval authority pursuant to the Design-Build Agreement, Construction Documents. Designer acknowledges that this responsibility obligates Designer to prepare all interim submissions required by the Contract Documents, and all revisions necessary to secure approvals, setting forth in detail all requirements for construction of the Project. Neither review nor approval by Design/Builder or Owner shall be deemed to be an assumption of responsibility by Design/Builder or Owner for any error, inconsistency or omission in Construction Documents.

**3.9.1     Scope, Form & Quantity.** The Construction Documents shall consist of drawings and specifications that establish the quality level of materials and systems required under the Contract Documents, comply with all applicable codes, laws and regulations enacted at the time the Construction Documents are prepared, and that also comply with other requirements of the Contract Documents to permit execution by the design professional of the Design Certification set forth in the Contract Documents. Designer shall provide the Construction Documents in the form and quantity called for in the Contract Documents. Designer agrees to provide additional sets of these documents to Design/Builder as may be necessary in connection with design reviews and approvals that are required in connection with the Project.

**3.9.2     Construction Document Schedule.** Designer shall provide the Construction Documents in the time set forth in the Project Schedule. Designer acknowledges that in agreeing to provide the Construction Documents within the times prescribed by the Project Schedule, it has accounted for a reasonable period of review and approval by Design/Builder, Owner and any governmental or regulatory body having authority over the Project.

**3.9.3     Construction Document Monitoring Meetings.** The Designer and Design/Builder agree that prior to submission of any Construction Documents being submitted to the Owner, the Design/Builder and Designer, along with any Consultants required by Design/Builder will hold regular design monitoring meetings for the purpose of monitoring the design to check to see that the Construction Documents are being prepared consistent with the requirements as set forth in the Contract Documents and the Design/Builder's pricing and other assumptions used in preparing the Project Budget and Project Schedule. To this end, Designer agrees that from time to time Design/Builder may (but is not obligated to) station an employee in Designer's offices (or its Consultants' offices) to address any questions Designer (or its Consultants) have regarding the requirements of the Design-Build Agreement, and any assumptions Design/Builder made in connection therewith. Similarly, Designer agrees that Design/Builder may require that an employee or Consultant of Designer be stationed at the Site with sufficient authority and knowledge of the Project to respond timely to questions Design/Builder may have regarding the Construction Documents or Project.

**3.9.4** If Design/Builder or Owner reject any Construction Document because it does not comply with the requirements of the Design-Build Agreement, or is not consistent with the Project Budget or Project Schedule, or because of errors, mistakes, or omissions, Designer shall redesign so as to cause no delay in the Project Schedule, and at no additional fee or other expense to Design/Builder. Designer's obligation to correct errors, defects and omissions shall be in addition to Design/Builder's other rights, remedies and recoveries under this Agreement and at law.

**3.10     Bidding and Negotiation Assistance.** Designer, at Design/Builder's request, shall assist Design/Builder in preparing bidding and procurement information, including the preparation of documents necessary to describe the time, place and

Designer Agreement
[04.2012 ed. Rev. 0]

conditions of bidding, proposal forms, forms of agreement and conditions and other procurement information reasonably requested by Design/Builder.

**3.10.1    Procurement Meetings and Clarifications.**  Upon request by Design/Builder, Designer shall attend pre-bid meetings and clarify the scope and intent of the Design Development and/or Construction Documents by preparing written responses to questions from Design/Builder on behalf of prospective contractors and providing clarifications and interpretations of the bidding documents for distribution by Design/Builder.

**3.10.2    Substitutions.**  Designer shall consider requests for substitutions, if permitted by the Contract Documents, and shall prepare and provide to Design/Builder addenda identifying approved substitutions for distribution by Design/Builder to prospective Subcontractors.  In the event the Contract Documents provide for "or equal" products, materials or equipment, such, "or equal" items shall not be considered a substitution.  Upon request by Design/Builder, Designer shall redesign as necessary to incorporate all requested "or equal" products, materials and systems at no additional cost to the Design/Builder.

**3.10.3    Subcontractor Evaluation.**  Upon request of Design/Builder, Designer shall assist Design/Builder in bid validation or proposal evaluation of prospective Subcontractors.

**3.11    Construction Administration.**  During the Construction Phase, Designer shall timely furnish interpretations and clarifications of the Construction Documents by means of additional drawings, Supplemental Instructions, responses to Requests for Information ("RFI"), or otherwise as are necessary for the proper execution and progress of the Project.  All such interpretations, clarifications and RFI responses shall be consistent with the intent of this Agreement and reasonably inferable from the Construction Documents.

**3.11.1    Submittals.**  Design/Builder shall receive Submittals from all Subcontractors and will manage the submittal process, including keeping a Submittal schedule and log, numbering each document, and tracking the status of each item.  Design/Builder shall review the Submittals for general intent and then forward Submittals to Designer for review and assimilation by Designer and its Consultants.  Designer and its Consultants' review of Submittals shall not constitute approval of, or relieve Subcontractors of responsibility for construction means and methods, techniques, accuracy and completeness of details furnished by subcontractors, such as procedures, dimensions, quantities, or safety precautions, but nothing herein is intended to in anyway relieve Designer of its responsibility for the adequacy and completeness of its Construction Documents, including all dimensions and details contained therein, or relieve Designer of the proper performance of any other services required by this Agreement.

.1    **Time for Review.**  Designer shall, consistent with the Project Schedule, timely review and approve or otherwise respond to Subcontractor submittals, including shop drawings, product data and samples.  Designer shall review, approve, or take other appropriate action upon submittals with reasonable promptness so as to cause no delay to the Project, and in accordance with Design/Builder's schedule for same, recognizing that under certain circumstances approvals will be required in a 24 hour time frame.  The time for Designer's review, approval and/or response to Subcontractor submittals shall be not more than 10 calendar days unless otherwise agreed to in writing by the Parties.

.2    **Coordination of Design.**  Designer, as part of its obligation to coordinate its Design Services with the services furnished by Design Consultants or Subcontractors under separate contract with Design/Builder, will review the submittals of said other design professionals or subcontractors, and notify the Design/Builder of any coordination issues that could affect the Project.  If, during the review of a Subcontractor's submittals, Designer identifies conditions not in conformity with the Construction Documents, it shall, as soon as practicable so as to prevent the possibility of construction re-work, advise in writing the Design/Builder of such conditions.

.3    **Designer's Stamp.**  Designer's stamp shall constitute Designer's verification that the Submittals conform with the design intent of the Design-Build Agreement and the Construction Documents, which have been developed by Designer consistent with the requirements of this Agreement, including the Contract Documents.

**3.11.2    Evaluations of the Work.**  Designer and its Consultants shall perform full-time construction monitoring activities ("Quality Control Program").  Designer's construction monitoring activities shall include:

.1    making detailed site observations of the progress and quality of the construction to determine if the construction is being performed in accordance with the (a) Design-Build Agreement, (b) Construction Documents and (c) Project Schedule;

Designer Agreement
[04.2012 ed. Rev. 0]

.2      keeping Design/Builder informed of the quality of the Work and shall endeavor to guard Owner and Design/Builder against deficiencies in the Work; and

.3      notifying Design/Builder with prompt written notice if it becomes aware of any safety violations.

**3.11.3**     **Observation of Nonconforming Work.** Designer shall not have control over or charge of, or be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, nor shall Designer have control over Design/Builder or its Subcontractors. Notwithstanding the foregoing, Designer shall, as soon as practicable so as to mitigate increased costs, advise in writing Design/Builder of any Work which it observes that does not conform to the Construction Documents.

**3.11.4**     **Inspections and Testing.** Whenever Designer considers it necessary or advisable for the implementation of the Construction Documents, Designer shall recommend to Design/Builder that the Work be inspected or tested, whether or not such work is fabricated, installed or completed.

**3.11.5**     **Site Visits.** The trips during construction phase services by the Designer and its Consultants to the project site are described in Exhibit E.

**3.11.6**     **Owner Changes.** Design/Builder shall prepare Change Orders in accordance with the Design-Build Agreement. If required by Design/Builder, Designer shall review, sign or take other appropriate action on a Change Order including preparing and reproducing Construction Drawings and Specifications to describe work to be added, deleted or modified by the Change Order. Designer may, by Designer's Supplemental Instructions, recommend to Design/Builder minor changes in Work not involving an adjustment in the Design-Build Agreement price or an extension of the Project Schedule, and which are consistent with the intent of the Construction Documents.

.1      **Increases to Designer's Cost of Services.** Designer shall inform Design/Builder in writing of any additional costs which would entitle the Designer to a fee for Additional Services in implementing such change prior to either Design/Builder or Designer incurring any additional costs. All Designer Change Orders shall be executed in the form attached hereto as Exhibit G.

**3.11.7**     **Design/Builder Changes.** During the course of design development and completion of the Construction Documents, if Design-Builder requests specific deviations from the Basis of Design Documents which are not otherwise required by the Design-Build Agreement and which require re-design and an increase to Designer's costs and time of performance, said re-design shall constitute an additional service. For all such Changes requested by Design-Builder, Designer shall, as a condition of payment for the additional service, prepare an estimated cost of the Change for Design/Builder's written approval prior to commencement of the service.

**3.11.8**     **Value Engineering Assistance.** Designer recognizes that Design/Builder may have the opportunity to offer value engineering proposals to the Owner that if accepted will entitle the Design/Builder to additional compensation from the Owner because of cost savings realized. Design/Builder will pursue these opportunities with Owner based on Owner's stated desire to seriously consider such value engineering proposals for portions of the Project. Designer agrees to participate in the value engineering process.

**3.12**     **Project Completion.** The Designer shall assist Design/Builder, along with Owner, to conduct inspections to determine if Substantial Completion, testing and balancing, punchlist completion, commissioning, and Final Completion of the Project have been achieved. To this end, from time to time Design/Builder shall prepare punchlists of incomplete and nonconforming items and a schedule for their completion. The Designer shall conduct with Design/Builder and Owner, inspections to verify with Design/Builder that items on the punchlists have been completed or corrected. The Designer further agrees to execute all necessary certificates reasonably required by Owner in connection with the completion of the Project.

**3.13**     **Other Basic Services.** In addition to the foregoing Basic Services, the Designer shall provide as part of its Basic Services all design and design-related services required of Design/Builder under the Contract Documents, which Basic Services include, but are not limited to, the following:

.1      Incorporate drawings, specifications, bulletins, RFI's, ASI's, addendums or other computer generated drawings into the Construction Documents for Record Drawings.

.2      Assist the Design/Builder in the development and delivery of presentations to authorities having jurisdiction over the Project.

.3      Assist the Design/Builder in collecting all written warranties and equipment manuals.

Designer Agreement
[04.2012 ed. Rev. 0]



.4     Review and comment upon the Project Schedule initially approved by the Owner, and any revised monthly updates reflecting the conditions of the Work and the Project.

.5     Provide necessary personnel to satisfy Designer's responsibility under the Quality Control Program.

.6     Subject to Design/Builder's representation in Section 2.2.4 of this Agreement, verify existing as-built conditions, including utilities, based on Owner-supplied information.

.7     Attend and participate in working and partnering sessions reasonably requested by Design/Builder and/or required by the Contract Documents.

**3.14     Additional Services.**  Additional services, if any, shall be provided by Designer and paid for as Additional Services per the rates set forth at Exhibit C hereto, and performed in accordance with a mutually acceptable schedule.  No additional services shall be performed prior to receiving advanced written authorization from Design/Builder.

**3.15     Communication.**  Unless directed in writing to the contrary by Design/Builder, the Designer throughout its provision of Basic Services shall communicate with the Owner, Design Consultants and all Subcontractors and suppliers only through the Design/Builder.  However, the Design/Builder will permit, and the Designer shall attend all necessary design meetings with Owner, Design Consultants and Subcontractors and suppliers to permit Designer to satisfy its Design Services.

**3.16     Qualifications.**  The Designer represents that the Designer and its Consultants are licensed, registered and authorized by law to perform the Services required under this Agreement and the Contract Documents.  Designer further represents that it will comply with all Legal Requirements applicable to its Design Services.

**3.17     Consultants.**  Upon request by Design/Builder, Designer agrees to confer with Design/Builder in the selection of Designer's Consultants, including all licensed architects and engineers.  Designer shall not engage the services of any Consultant without first obtaining the Design/Builder's written approval which shall not be unreasonably withheld.   Such approval by the Design/Builder shall not be deemed to create any contractual relationship between the Design/Builder and any such Consultant, and does not relieve the Designer from responsibility for the services performed by its Consultants.  Designer agrees that each Consultant agreement shall be in a form approved by Designer and Design/Builder, and shall include the obligation of each consultant to be fully bound to the Designer in the same manner as Designer is bound to Design/Builder and as Design/Builder is bound to the Owner for all the requirements of the Contract Documents which are applicable to the Consultant's scope of services.  The Designer shall also include a provision in all of its Consultants' agreements making them freely assignable to Design/Builder or Owner.

**3.18     Designer's Representative.**  The Designer's representatives are **David Varner**, Principal in Charge, and **Sven Shockey**, Project Manger, who are responsible for the performance of the Designer's obligations under the terms of this Agreement.  The Principal in Charge and Project Manager shall not be changed without the prior written approval of Design/Builder.

**3.19     Key Project Personnel.**  The key personnel and Consultants whom the Designer will assign to this Project are as set forth in Exhibit D.  Such personnel and Consultants shall not be changed without the prior written approval of Design/Builder.  Designer acknowledges that its personnel and its Consultants will be replaced if Design/Builder and/or Owner believe such personnel or Consultants are not satisfactorily performing their services.

**3.20     Intellectual Property Obligations.**

**3.20.1     Royalties, Patents & Copyright Fees.**  Designer shall pay known or currently existing royalties and license fees which may be due on the inclusion of any patented or copyrighted materials, methods or systems selected by Designer and incorporated in the Work.  Designer acknowledges that all costs or fees paid or incurred under this Section 3.20.1 are included in the Designer's Fee as set forth in Section 6.1 of this Agreement.

**3.20.2     Intellectual Property Indemnity.**  Designer shall defend any action or proceeding brought against Owner or Design/Builder based on any claim that the Project or Work, or any part thereof, or the operation or use of the Project or Work or any part thereof, violates an intellectual property right including an infringement of any United States patent or copyright, now or hereafter issued.  Designer shall indemnify and hold harmless Owner and Design/Builder from and against all damages and costs, including but not limited to attorneys' fees and expenses awarded against Owner or Design/Builder in any such action or proceeding.  In the event Owner or Design/Builder's use of materials, methods, systems, components, equipment, devices or processes designated by Designer are enjoined, Designer, at its expense, shall secure for Design/Builder and/or Owner the right to continue using said materials, methods, systems, components, equipment, devices or processes, replace the materials, methods, systems, components, equipment, devices or processes with noninfringing materials, equipment devices or processes, modify them so they become noninfringing, or remove the infringing materials, methods, systems, components, equipment, devices or

Designer Agreement
[04.2012 ed. Rev. 0]

processes and refund to Design/Builder all costs and damages associated therewith without prejudice to any other rights Design/Builder may have.

**3.21    Hazardous Materials.** No Construction Document shall call for the use of any Hazardous Materials.

**3.21.1    Hazardous Materials Indemnity.** If it is later determined that the Project is not free of Hazardous Materials, and that the presence of the Hazardous Materials is due to materials or systems called for by the Construction Documents, Designer shall take all necessary abatement action to remove, encapsulate, enclose, repair and/or mitigate the Hazardous Materials condition. All such work, including the replacement or repair of any work damaged or removed in performing the abatement, shall be performed in accordance with all applicable Federal, State, and local laws and regulations, and at Designer's sole cost and expense. Further, Designer shall indemnify, defend and hold harmless Design/Builder from and against any loss or liability sustained by Design/Builder to the extent such loss or liability arises from Designer's design.

## ARTICLE 4
## DESIGN/BUILDER'S RESPONSIBILITIES

**4.1    Information and Services Provided by Design Builder.** To the extent Design/Builder has obtained the information and services from Owner as identified below, Design/Builder shall provide the information and services to Designer. Designer shall be entitled to rely on the accuracy of such information and services to the same extent as the Design/Builder pursuant to the Design-Build Agreement as clarified by Section 2.2.4 herein. The information and services may include, but is not limited to:

.1    Design information set forth by the Owner in its solicitation for the Project, including drawings and specifications;

.2    All necessary information describing the physical characteristics of the Site, including surveys, Site evaluations, legal descriptions, existing conditions, utilities, subsurface and environmental studies, reports and investigations as included at Exhibit H to this Agreement;

.3    Any inspection and testing services and reports referred to in the RFP or solicitation;

.4    Relevant approvals previously acquired by the Owner.

**4.2    Budget and Schedule Information.** As addressed more specifically at Section 3.3.1 and 3.3.2 herein, Design/Builder prepared the Project Budget and Project Schedule in reliance upon information prepared by, among others the Designer. As such, upon request Design/Builder will make available to Designer during the preparation of Design Development and Construction Documents its Subcontractors and the individuals in Design/Builder's organization familiar with the assumptions Design/Builder used in preparing the Project Budget and Project Schedule to assist Designer in meeting its Design Service obligations, including the preparation of the Design Development and Construction Documents from the Basis of Design Documents.

**4.3    Duty to Mitigate.** Design/Builder shall promptly report to the Designer errors, inconsistencies and omissions it discovers in the Construction Documents, however, nothing in this Paragraph shall relieve the Designer of responsibility for errors, inconsistencies and omissions in the preparation of the Construction Documents. The Design/Builder and Owner are not responsible for ascertaining whether the Construction Documents are in accordance with applicable laws, statutes, building codes, rules and regulations, said responsibility being that of the Designer.

**4.4    Owner's Financial Condition.** To the extent permitted by the Design-Build Agreement, Designer shall have the right, upon request, to receive from the Design/Builder such information as the Design/Builder has obtained relative to the Owner's financial ability to pay for the Project.

**4.5    Site Access.** Design/Builder shall afford the Designer reasonable access to the Site at all times.

**4.6    Design/Builder Employees, Subcontractors & Design Consultants.** Design/Builder, and not Designer, is responsible for the acts or omissions of Design/Builder's employees, Subcontractors, and other persons under contract to Design/Builder who are not under the control or authority of the Designer.

**4.7    Design/Builder's Representative.** Design/Builder's Project Executive is **David Coleman**. The Design/Builder's representative for Design Services is **Brian Leier** who is responsible for the performance of the Design/Builder's obligations under the terms of this Agreement.

## ARTICLE 5
## SCHEDULE

Page 11 of 20

**5.0** **Time for Performance.** Designer shall provide the services required by this Agreement in accordance with the Project Schedule attached hereto as Exhibit B.

**5.1** **Delays by Designer.** If the progress or completion of the Project is delayed by reason of any fault, neglect, error, or omission of Designer, Design/Builder agrees to exercise reasonable efforts to mitigate such delay, including resequencing of the work, provided however, there is no additional cost to Owner, Design/Builder, its Design Consultants or Subcontractors. In the event Design/Builder is unable to mitigate the Designer-caused delay, Designer shall compensate Design/Builder for any and all costs, losses, damages and expenses, including reasonable attorney's fees, Design/Builder incurs as a result of Designer's negligent acts, errors or omissions, including but not limited to, damages claims or losses incurred by the Design/Builder under the Design-Build Agreement or its separate Project related agreements, acceleration costs Design/Builder incurs in attempting to overcome the delay caused by Designer or otherwise sustains, and/or extended general condition expenses and other delay costs and damages Design/Builder incurs as a result of Designer's delay.

**5.2** **Design/Builder's Notice Obligations.** Design/Builder shall provide prompt written notice of delay to Designer describing how the Design/Builder's ability to satisfy its requirements to the Owner has been impacted. Design/Builder shall further provide Designer all reasonable opportunities to minimize or overcome the delay.

**5.3** **Owner Delay.** If Designer is delayed in the performance of its Design Services by any fault, neglect, error or omission by Owner, or by changes ordered by the Owner which are due to causes beyond the Designer's reasonable control, Designer agrees to accept as compensation for its damages the time and monetary relief afforded to Design/Builder under the Design-Build Agreement and actually granted by the Owner. Any Dispute arising from an Owner-caused delay and the relief obtained shall be resolved pursuant to Section 9.2 hereunder.

**5.4** **Design/Builder Delay.** If Designer incurs delays in the performance of its Design Services caused solely by any breach, fault, neglect, or error or omission of Design/Builder, the Designer shall at the express direction of the Design/Builder and at Design/Builder's cost work overtime to attempt (to the extent possible) to overcome such delay. Any Dispute arising from a Design/Builder-caused delay shall be resolved pursuant to Section 9.3 herein.

**5.5** **Designer's Notice Obligations.** Regardless of the underlying cause of a delay, if Designer maintains it has been delayed in the performance of its Design Services by an act or omission of Design/Builder, Owner or any party under their control, Designer shall provide Design/Builder, within five (5) days of the inception of the delay, formal written notice describing with specificity how Designer's ability to satisfy its schedule requirements have been impacted. Designer's notice delay shall be provided in accordance with the form required by the Design-Build Agreement.

**ARTICLE 6**
**DESIGNER'S COMPENSATION AND PAYMENTS**

**6.1** **Compensation for Basic Services**

**6.1.1** **Designer's Fee.** For the Design Services set forth in this Agreement, Design/Builder shall compensate Designer its Designer Fee on the following basis:

    .1 **Designer's Services.** For all Design Services described herein, including its Basic Services, including expenses of any kind, the amount of $1,661,250.00.

**6.2** **Scope of Contract Price.** Unless otherwise provided in the Contract Documents, Designer's Fee shall be deemed to include all fees described in Section 3.20.1, and all sales, use, consumer and other taxes related to the Work in connection with this Agreement. It is understood that any adjustments in the Designer's compensation for changes in the Project shall be made, if at all, in writing and pursuant to the terms and conditions contained in this Agreement.

**6.3** Designer agrees that the only compensation or profit that Designer may earn under this Agreement is the compensation provided for in and allowed by this Agreement.

**6.5** **Additional Services**

**6.5.1** Designer shall be compensated for any Additional Services as described herein on the following basis:

Designer Agreement
[04.2012 ed. Rev. 0]



.1    **Lump Sum by Additional Service Proposal.** Designer shall prepare a written Lump Sum Additional Service Proposal for Phase II services (complete design and Construction Administration services.) Upon acceptance of Designer's Lump Sum Proposal by Design/Builder, Designer shall be paid for the Additional Service in accordance with this Section 6.

**6.6    Payments**

**6.6.1    Schedule of Values.** Within ten (10) days after the date of execution of this Agreement, Designer shall submit for Design/Builder's approval Designer's itemized Schedule of Values that allocates the Designer's Fee to the various portions of its services including, certain design deliverables. Upon written approval by the Design/Builder, the Parties agree to affix hereto and incorporate the Schedule of Values as Exhibit I to this Agreement. The Schedule of Values shall be in the form and supported by data to substantiate its accuracy as required by the Contract Documents and as Design/Builder may reasonably require. Upon acceptance by Design/Builder, Designer shall use the Schedule of Values as the basis for its estimates for payment. If it is later determined that the Schedule of Values is unbalanced, the Designer shall revise the Schedule as necessary and submit a revised Schedule of Values for Design/Builder's approval. Designer's submission of the required schedule of values is a condition precedent to Design/Builder's obligation to make payments to Designer.

**6.6.2    Progress Payments.** Consistent with the approved Schedule of Values, Designer shall submit to the Design/Builder for its approval monthly Applications for Payment for Basic and Additional Services, if any. Design/Builder shall include in its Application for Payment the amount the Design/Builder believes is due Designer along with any documentation in the form required to be submitted by Design/Builder to Owner pursuant to the terms of the Contract Documents. With each Application for Payment, Designer shall also submit a release of bond claims for itself and from each of its Consultants, either conditioned upon receipt of the payment requested, or thirty (30) days in arrears for the proceeding payment period. The agreed to form of release is included as Exhibit J(1). Payment to Designer shall be made, within ten (10) days of the Design/Builder's receipt of payment from Owner, of the amount approved by and paid by Owner on the account of Designer's application. Design/Builder's receipt of payment from Owner is an express condition precedent to Design/Builder's obligation to make periodic or final payment to the Designer. Upon receipt of payment from Design/Builder, Designer shall promptly make payments to its Consultants.

**6.6.3    Payment is not a Release.** No progress payment made by Design/Builder shall be deemed evidence of, or construed to be that Designer has satisfied its obligations in connection with all or part of the Work covered by such payment, and Design/Builder shall not by virtue of having made any such payment be deemed to have accepted any Work not meeting the requirements of this Agreement or to have waived any claims against Designer in connection therewith. All payments are provisional and any overpayment by Design/Builder to Designer shall be deemed to be a mistake of fact and shall be promptly repaid to Design/Builder upon demand. The acceptance by Designer of each progress payment from Design/Builder shall constitute a waiver and release by Designer of all claims of any kind against the Design/Builder for payment for Work performed up to the date of Designer's application for payment against which payment was made and accepted.

**6.6.4    Design/Builder Approval.** Design/Builder may decline to approve an Application for Payment if, in its opinion:

.1    The Application is not adequately supported;

.2    The Design Services of Designer have not advanced to the point so indicated;

.3    Designer has failed to perform in accordance with the terms and conditions of this Agreement;

.4    Designer failed to satisfy any amounts payable to Design/Builder by the Designer under the terms of this Agreement; or

.5    If reasonably necessary to protect the Design/Builder due to other defects or deficiencies with respect to the Designer's performance hereunder.

**6.6.5    Notice Obligation for Payment Withholding.** If Designer and Design/Builder cannot agree on a revised amount, Design/Builder shall approve for payment such portion or amount the Design/Builder deems appropriate. Design/Builder shall provide written notice to Designer of the reasons for withholding its approval, and shall provide the Designer with a reasonable opportunity to cure any defaults. When all reasons supporting Design/Builder's withholding of its approval have been removed to Design/Builder's reasonable satisfaction, Design/Builder shall promptly approve the Designer's Application for Payment.

**6.6.6    Retainage.** Design/Builder will not deduct any retainage from Designer's Applications for Payment unless Owner is deducting retainage from Design/Builder's progress payments for the Services, and then only in same amount or percentage

retained from Design/Builder's progress payments. Any retainage will be released to Designer within seven (7) days after Designer-Builder's receipt of such retained amount from Owner.

6.7     **Final Payment.** As a condition precedent to final payment to the Designer, Designer shall:

    .1    Have completed all Designer's Services pursuant to this Agreement;

    .2    Provide to Design/Builder, all deliverables required by the Contract Documents;

    .3    Provide to Design/Builder an affidavit that there are no claims, obligations or liens outstanding in connection with the services provided by or in connection with the Designer's Services which will in any way affect Design/Builder's or Owner's interests (as set forth at Exhibit J(2) of this Agreement), and

    .4    Provide to Design/Builder certificates of insurance confirming that required coverages will remain in effect consistent with the requirements of the Contract Documents.

6.8     **Effect of Final Payment.** Acceptance of final payment shall constitute a waiver of all claims, known and unknown, by Designer for compensation for all services performed by Designer and its Consultants. Design/Builder shall make payment on Designer's properly submitted and accurate final Application for Payment within ten (10) days after Design/Builder's receipt of final payment from Owner, provided all conditions precedent have been met.

6.8.1     Designer shall indemnify, defend and hold harmless Design/Builder for any costs and expenses (including reasonable attorney's fees, costs and expenses) incurred by Design/Builder in satisfying, discharging or defending against any such claim, obligation or lien arising out of Designer's failure to make payment for any services, expenses, or other items furnished in connection with its Design Services, provided that Design/Builder has made payments to Designer in accordance with the terms of this Agreement. Design/Builder shall provide Designer written notice of such claim, obligation, or lien and shall not take steps to discharge same unless Designer has failed or refused to do so within seven (7) days of receiving written notice from Design/Builder.

6.9     **Record Retention.** The Designer shall retain all invoices, checks and other records showing billing and payment for services performed by it and its Consultants for a period of three (3) years, or for such longer period as the Contract Documents may require, following its receipt of Final Payment hereunder. Designer shall maintain books of account with respect to the performance of the Services for a like period; and shall require its Consultants to maintain similar records for the same period of time. Designer and its Consultants shall, at reasonable times and upon request, afford Design/Builder or Owner access to the books and records.

## ARTICLE 7
## INDEMNITY, INSURANCE AND WAIVER OF SUBROGATION

7.1     **Indemnity**

7.1.1     In addition to any liability or obligation of the Designer to the Design/Builder that may exist under any other provision of this Agreement, by law or otherwise, to the fullest extent permitted by law, Designer shall defend, indemnify and hold harmless Design/Builder, Owner, and each of their respective officers, agents, and employees (collectively the "Indemnitees") from and against any and all claims, actions, proceedings, liabilities, losses, damages, costs and expenses, including legal fees and disbursements, which the Indemnitees sustain for bodily injury, sickness or death and property damage or destruction (other than to the Work itself) including economic losses, if any, to the extent resulting from Designer's (or anyone under its control) failure to perform their obligations hereunder, or acts, errors, omissions, or active or passive negligence, regardless of whether it is caused in part by the negligence of the Indemnitees.

7.1.2     The indemnification obligations set forth in Section 7.1.1 shall apply regardless of whether such claim, damage, loss or expense is caused in part by a person indemnified hereunder, and shall not be limited by any limitation on amount or type of damages, compensation or benefits payable by or for Designer under workers' or workmen's compensation acts, disability payment acts or other employee benefit acts. Designer shall not, however, be required to indemnify or hold harmless any Indemnitee for Indemnittee's negligence.

7.2     **Insurance**

7.2.1     Before commencing its work and as a condition of payment, Designer shall purchase and maintain such insurance as will protect it from the claims arising out of its operations under this Agreement, whether such operations are by Designer or any

of its Consultants or subcontractors or anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable. Such insurance shall, at a minimum, cover:

.1     Claims under workers' compensation, disability benefits and other similar employee benefit acts applicable to the Designer or to the Work.

.2     Claims for damages because of bodily injury, occupational sickness or disease, or death of employees under any applicable employer's liability law.

.3     Claims for damages because of bodily injury, or death of any person other than employees.

.4     Claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use therefrom.

.5     Claims for damages because of bodily injury or death of any person or property damage arising out of the ownership, maintenance or use of any motor vehicle.

**7.2.2**     Designer shall maintain the following coverages with minimum amounts by claim/occurrence, minimum aggregate amounts and coverage periods set forth more specifically at Exhibit F to this Agreement, "Designer Insurance Requirements".

.1     Worker's Compensations and Employers Liability Insurance in accordance with the laws of the State in which the Project is located;

.2     Commercial General Liability coverage; and

.3     Comprehensive Automobile Liability.

**7.2.3**     **Professional Liability Insurance.** Designer shall also provide Professional Liability Insurance in a form acceptable to the Design/Builder providing coverage for claims that arise from the negligent errors, omissions or acts of Designer and its Consultants. The policy shall include contractual liability coverage, with minimum limits of $5,000,000.00 per claim, and a $5,000,000.00 policy limit. A Certificate of Insurance confirming the Designer's Professional Liability Insurance shall be furnished annually. The policy or policies providing these coverages shall be continued in effect during the entire period for the Design and Construction of the Project and for 10 years after the Final Completion of the Project.

**7.2.4**     **Certificates of Insurance – Cancellation.** Designer shall furnish to Design/Builder certificates of insurance evidencing the required coverages listed in Sections 7.2.2 and 7.2.3 and upon execution of the Agreement. No policy shall be canceled or allowed to expire without thirty (30) day's prior written notice to the Design/Builder.

**7.2.5**     **Design-Build Exclusions.** All policies under Sections 7.2.2 and 7.2.3 shall specifically delete any Design-Build or similar exclusions or any other language included therein that could compromise coverages because of the Design-Build delivery of the Project.

**7.2.6**     **Premiums and Expenses.** Responsibility for all premiums and deductibles for the insurance coverages required by this Agreement are deemed included in Designer's compensation for Basic Services as listed in Section 6.1.1.1.

**7.3**     **Waiver of Subrogation.** Designer waives all rights against Design/Builder, Owner, Design Consultants, Subcontractors and sub-Subcontractors for loss or damage to the extent covered by insurance, except such rights as they may have to the proceeds of such insurance. If the policies procured by Designer require an endorsement to provide for continued coverage where there is a waiver of subrogation, Designer shall cause them to be so endorsed.

**ARTICLE 8**
**SUPPLEMENTATION AND TERMINATION**

**8.1**     **Termination for Convenience.** Design/Builder may upon written notice to Designer, without cause and without prejudice to any other right or remedy, elect to terminate the remaining Design Services for Design/Builder's convenience. The termination shall be effective in the manner specified in Design/Builder's notice. If Owner terminates, in whole or in part, the contract with Design/Builder for any reason, then Design/Builder may terminate this Agreement by giving seven (7) day's advance written notice to Designer ("Termination Notice"). Upon receipt of such termination notice, Designer shall stop all Design Services affected by the termination notice. In the event of termination as provided in this Paragraph 8.1, Designer shall be compensated to the extent that Owner pays Design/Builder for Designer's Services, it being understood that Design/Builder's receipt of payment from the Owner is an express condition precedent to Design/Builder's obligation to make payment to

Page 15 of 20

Designer. Designer agrees that its request for compensation shall be provided in the form required under the Contract Documents and shall be submitted to Design/Builder not later than 20 days after the issuance of the Termination Notice or such shorter time as may be required by the Contract Documents. Designer shall take the steps necessary to preserve and protect all Design Services in progress and shall use its best efforts to mitigate its costs in connection with the termination. Design/Builder shall pay Designer a termination payment as Designer's sole and exclusive remedy in connection with Design/Builder's convenience termination. The termination payment shall be comprised of: (i) amounts invoiced and due for Work performed but not yet paid; (ii) payment for Work satisfactorily completed but not yet invoiced by Designer prior to the termination; (iii) retainage held by Design/Builder at the date of termination; and, (iv) all reasonable, actual termination costs incurred by Designer in terminating the Work (but excluding any and all costs and expenses incurred by Designer from and after the date of termination for those of its employees who are not directly performing required termination activities); provided that if the termination was effected by Design/Builder due to the elimination or termination of work by Owner under the Design-Build Agreement or other Owner action, or as a result of the order of a court or public authority, then Designer's termination payment shall be limited to the amount paid by Owner to Design/Builder for the terminated Work under the Design-Build Agreement, less Design/Builder's costs to obtain that amount from Owner. In no event shall Designer be entitled to recover any profit or overhead on Design Services not yet performed. Designer's termination payment under this Section 8.1 will constitute its final payment for the Design Services and will be processed and become due to Designer in accordance with Article 6.

**8.2      Termination for Cause.** If Designer: (i) persistently fails to comply with applicable Legal Requirements, (ii) persistently fails to timely pay, without cause, its Consultants, (iii) persistently fails to prosecute the Design Services with promptness and diligence, (iv) persistently fails to provide qualified licensed design professionals, (v) fails to perform its material obligations under this Agreement and the Contract Documents, or (vi) is adjudged a bankrupt, or if it makes a general assignment for the benefit of its creditors, or if a receiver is appointed on account of its insolvency, the Design/Builder may provide seven (7) days advance notice of its intent to terminate the Designer's further performance of the affected Design Services, or the Agreement in its entirety. If the Designer has not, prior to the expiration of the seven (7) day notice period, cured, or commenced reasonable efforts to cure such deficiency, then Design/Builder may, without further notice or opportunity to cure, declare all or part of the Agreement terminated for default and commence to perform the Design Services terminated. In such case, Designer shall not be entitled to receive any further payment until the services are finished, nor shall it be relieved from the obligations assumed hereunder. In addition, upon declaration in part or in whole of the Design Services being terminated, Designer shall immediately deliver to Design/Builder all Design Development and Construction Documents and all sepias and copies of all completed or partially completed programs, requirements, drawings, plans, sketches, models, reports, calculations, specifications, computer assisted design documents, results of programs, computer discs, diskettes or tapes, charts, photographs, other data compilations from which information can be obtained or translated and other information or documents which Designer would have been required to deliver to Design/Builder had such termination not occurred. Designer shall also execute and deliver such papers and take all such steps, including the providing of releases from or the assignment of its contractual rights in consulting contracts as Design/Builder may, at its discretion, request or require for the purpose of fully vesting in Design/Builder or the Owner the rights and benefits of Designer under such obligations or commitments.

**8.2.2      Termination for Cause – Designer Payment.** Upon completion of the Project, Designer shall pay Design/Builder the additional amount, if any, of completing the Design Services (the amount in excess of the Designer's Fee), plus any damages, including if applicable, damages recoverable by Owner for delays in completion caused by Designer's default, together with any actual damages to Design/Builder caused by the Designer's default, and amounts previously paid to Designer, exceed the amount of Designer's stated compensation. If there is no such excess, Design/Builder shall pay Designer any portion of Designer's compensation which has not previously been paid and which was owed to Designer at the time of termination, so long as the total amount paid by Design/Builder for completing the Services, including all costs incurred by Design/Builder as a result of any delay in completion and all amounts paid to Designer do not exceed the amount of Designer's stated compensation.

**8.3      Supplementation.** In addition to any other remedy available to Design/Builder under this Agreement, if Design/Builder determines that Designer has fallen behind in the progress of its Design Services or is in danger of falling behind at its then current rate of progress, or is responsible for any Project Schedule delays due to the delivery of late, incomplete or otherwise insufficient design deliverables or any other failure to perform its Design Services in accordance with this Agreement, Design/Builder may require Designer to prepare a corrective action plan as set forth herein. Within forty-eight (48) hours of such written notice from Design/Builder, Designer shall submit for Design/Builder's approval a corrective action plan composed of a recovery schedule and resource plan to demonstrate the manner by which Designer will implement the required steps to complete its Design Services in accordance with this Agreement including, as necessary the submission of or revision to any interim and final design deliverables within the time required by this Agreement and the Project Schedule. Designer will implement the corrective action plan immediately upon Design/Builder's approval. If Design/Builder determines that Designer's plan will not attain the required rate of progress or otherwise correct the issue, Designer will agrees to take the steps Design/Builder reasonably requests to overcome the issue (including, if appropriate an agreement to supplement its Services with additional resources), all without additional cost to the Design/Builder. If Designer fails to submit or otherwise fails to follow an approved corrective action plan, Design/Builder may, following twenty-four (24) hour notice to Designer take all steps Design/Builder deems necessary address the issue including, but not limited to terminating the Agreement in accordance with Section 8.2 herein. Design/Builder may deduct from any payment due Designer or collect directly from Designer on demand all damages incurred or

Designer Agreement
[04.2012 ed. Rev. 0]

suffered by Design/Builder in connection with Designer's failure to perform its Design Services in accordance with the Project Schedule and the Standard of Care.

## ARTICLE 9
## DISPUTE RESOLUTION

**9.1**     **Disputes.**  All claims, disputes or other matters in controversy between Design/Builder and Designer relating to or arising out of the performance of this Agreement ("Disputes") shall be resolved in accordance with the provisions of this Article 9.

**9.2**     **Disputes Involving the Owner**

**9.2.1**     Disputes for which either Design/Builder or Designer contend that the Owner is responsible ("Owner Disputes") shall be resolved pursuant to the dispute resolution clause set forth in the Contract Documents.  Both Design/Builder and Designer agree to cooperate in the presentation, prosecution and/or defense of Owner Disputes.  If after a request for an extension of time or additional compensation from Designer, Design/Builder believes that the event causing the delay or additional compensation is the responsibility of Owner, then Design/Builder will cooperate with and assist Designer in presenting a request for an extension of time or additional compensation to the Owner.

**9.2.2**     Design/Builder and Designer each agree to accept the time and monetary relief allowed for under the Contract Documents and actually obtained from the Owner, if any, as well as all other aspects of the final decision following appeal or the expiration of the time for appeal, as full and final resolution of any Owner Dispute.

**9.2.3**     In the event Design/Builder asserts a claim against Owner involving Designer, each party shall bear its own costs for outside counsel and third-party consultants retained to prosecute claims against the Owner and for any other litigation costs.  Each party shall present its portion of the claim to the Owner.  In the event that the Owner contends that the Contract Documents have been breached, or otherwise asserts a claim or set-off against Design/Builder, the party determined to be responsible for the breach either by settlement or by the trier of fact shall be responsible for all costs occasioned by the breach, including reasonable attorneys fees and court costs.  In the event the trier of fact fails to determine the relative degrees of fault of the Design/Builder and Designer in connection with any claim by the Owner, then the Design/Builder and Designer agree that the allocation of fault shall be determined pursuant to Paragraph 9.3, Disputes Not Involving the Owner.

**9.3**     **Disputes not Involving the Owner**

**9.3.1**     All Disputes other than Owner Disputes, shall be resolved in accordance with this Paragraph 9.3 ("Non-Owner Disputes").  If either Designer or Design/Builder believes that it is entitled to relief against the other for any event arising out of or related to the Design Services or the Project, such party shall provide written notice to the other party of the basis for its claim for relief.  Such notices shall be in accordance with the specific notice requirements contained in applicable sections of the Contract Documents and, if possible, be made prior to incurring any cost or expense.  In the absence of any specific notice requirement, written notice shall be given within a reasonable time, not to exceed ten (10) days, after the occurrence giving rise to the claim for relief or after the claiming party reasonably should have recognized the event or condition giving rise to the request, whichever is later.

**9.3.2**     **Field Dispute Resolution.**  Design/Builder and Designer will first attempt to resolve Non-Owner Disputes and disagreements at the field level through discussions between Design/Builder's Representative and Designer's Representative.

**9.3.3**     **Senior Executive Dispute Resolution.**  If a Non-Owner Dispute or disagreement cannot be resolved through Design/Builder's Representative and Designer's Representative, Senior Executives from Design/Builder and Designer shall, upon the request of either party, meet as soon as conveniently possible, but in no case later than thirty (30) days after such a request is made, to attempt to resolve such Dispute or disagreement.  Prior to any meetings between the Senior Executives, the parties will exchange relevant information that will assist the parties in resolving their dispute or disagreement.

**9.3.4**     **Mediation.**  In the event discussions are unsuccessful in resolving the Non-Owner Dispute at a project and Senior Executive level, then such Non-Owner Dispute shall be submitted to non-binding mediation, which shall be conducted by an impartial third party Mediator agreed to by both parties, or failing said agreement, the Mediator will be designated by the American Arbitration Association pursuant to the Construction Industry Mediation Rules.  The mediation will be governed and conducted pursuant to a mediation agreement negotiated by the parties, or failing such agreement, the mediation will be governed by procedures requested by the Mediator.  In the event the parties cannot resolve their differences through mediation, the parties agree to resolve their disputes by Litigation in accordance with Section 10.3 of this Agreement.



**9.4**     **Continued Performance.** Pending the final resolution of any Owner or Non-Owner Dispute between Design/Builder and Designer, Designer shall continue to perform all Design Services and Design/Builder shall continue to pay amounts due Designer that are not subject to the Dispute, provided Design/Builder has received said funds from the Owner.

**9.5**     **Waiver of Jury Trial.** DESIGN/BUILDER AND DESIGNER SPECIFICALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY COURT WITH RESPECT TO ANY CONTRACTUAL, TORTIOUS OR STATUTORY CLAIM, COUNTERCLAIM OR CROSS CLAIM AGAINST THE OTHER ARISING OUT OF OR CONNECTED IN ANY WAY TO THE PROJECT OR THIS AGREEMENT BECAUSE THE PARTIES HERETO, BOTH OF WHOM HAVE HAD THE OPPORTUNITY TO DISCUSS THIS AGREEMENT AND THIS PARAGRAPH WITH COUNSEL OF THEIR OWN CHOOSING, BELIEVE THAT THE COMPLEX COMMERCIAL AND PROFESSIONAL ASPECT OF THEIR DEALING WITH ONE ANOTHER MAKE A JURY DETERMINATION NEITHER DESIRABLE NOR APPROPRIATE.

**9.6**     **Cost of Dispute Resolution.** The prevailing party in any dispute against the other arising out of or relating to this Agreement or its breach that is resolved by litigation, shall be entitled to recover from the other party reasonable attorney's fees, costs and expenses incurred by the prevailing party in connection with such litigation. The Court will determine the costs to be awarded.

**ARTICLE 10**
**MISCELLANEOUS PROVISIONS**

**10.1**     **Ownership and Use of Design and Construction Documents.** To the extent not inconsistent with the Owner's rights under the Contract Documents, the Designer shall retain its ownership rights in its design, drawing details, specifications, databases, computer software, and other proprietary property. Intellectual property developed, utilized, or modified in the performance of the Designer's Services (collectively referred to as Design Documents) shall remain the property of the Designer to the extent not inconsistent with Owner's right under the Contract Documents. Designer agrees that it will grant Owner all rights to its design, drawings details, specifications, data bases, software, and other proprietary intellectual property required by the Contract Documents. In addition, Designer hereby grants Design/Builder, upon Design/Builder's payment to the Designer of amounts properly due under this Agreement, or upon Design/Builder's Termination for Cause as provided in this Agreement at Section 8.2 *et seq.*, a royalty-free, license to use the Design and Construction Documents in connection with completing the Project. Upon request for the same by Design/Builder and for no additional cost above Designer's Fee, Designer shall provide Design/Builder all Design and Construction Documents in whatever form reasonably requested, including the documents in their native, electronic format. Designer shall include a similar requirement in its contracts with its Consultants.

**10.1.1**     **Integrated Use of 3D Models.** In recognition of the potential benefits to accrue from the utilization of 3D modeling software as an improved communication and collaboration tool, Designer agrees that should such modeling software become the basic tool for design of the Project that the Design/Builder and his Subcontractors will be provided the electronic model and subsequent updates of the model for their purposes (e.g., quantity surveys, clash detection, procurement, etc.). Design/Builder acknowledges that the model produced by Designer may not have been constructed to permit Design/Builder and his Subcontractors to utilize the model for all of the intended purposes. Designer acknowledges that Design/Builder may supplement Designer's model with additional database information that will facilitate Design/Builder and his Subcontractors purposes. Designer will be provided copies of all models produced by Design/Builder and his Subcontractors. At the point where design is complete, and construction is ongoing, maintenance of the building model will be assumed by the Design/Builder and Designer agrees to use such model for Construction Administration activities and functions.

**10.1.2**     **Design Development and Construction Document Use Indemnity.** If Designer uses the Design Development and/or Construction Documents on any other project, it shall do so at its sole risk and without liability or legal exposure to Design/Builder, Owner or anyone working through them. Designer further agrees that it shall defend, indemnify and hold harmless the Design/Builder and Owner from and against any and all claims, damages liabilities, losses and expenses, including attorney's fees, arising out of or resulting from such use of the Design Development and/or Construction Documents on another project.

**10.2**     **Assignment.** Neither Design/Builder nor Designer shall assign its interest in this Agreement without the prior written consent of the other, except as to the assignment of proceeds.

**10.3**     **Governing Law, Jurisdiction and Venue.** This Agreement shall be governed by and construed in accordance with the laws of the state in which Design/Builder's home office out of which the Project being performed is located, excluding the conflicts of laws principles thereof; provided, however, in the event the Design/Builder and Owner have elected to have the laws of another state govern the Design-Build Agreement, then this Agreement shall be governed by and construed in accordance with the laws of such state, excluding the conflicts of laws principles thereof. Subject to Article 9, for any action or proceeding involving claims and disputes between Design/Builder and Designer arising out of or in connection with the Agreement or the Work, Design/Builder and Designer expressly and unconditionally agree that the presiding federal or state in the district or state in which Design/Builder's home office out of which the Project is being performed is located shall have exclusive jurisdiction

Page 18 of 20

over the action or proceeding. If Design/Builder elects to resolve a claim or dispute by arbitration, the arbitration shall be venued in the state and county in which Design/Builder's home office out of which the Project being performed is located.

**10.4    Joinder in Related Proceedings.** In the event Design/Builder is involved in a separate arbitration, litigation, mediation or other legal proceeding in which any aspect of the Designer's Services or entitlement to payment is at issue, or questions of law or fact common to the Designer's performance under this Agreement are involved, or if complete relief cannot be afforded in such proceeding without the Designer's participation therein, Designer hereby consents, upon written demand by Design/Builder: (a) to its consolidation or joinder in that proceeding; (b) to the applicability of any rules or procedures applicable to such proceeding; and (c) hereby waives any objections to the location or forum in which the proceeding is pending. In the event Designer has initiated litigation against Design/Builder at the time Design/Builder's demand for consolidation or joinder is received, and that proceeding cannot be consolidated with the proceeding in which the Design/Builder is separately involved, Designer agrees to dismiss or, in the event dismissal would prejudice Designer's rights, stay the litigation.

**10.5    Severability.** Designer acknowledges that Design/Builder conducts business on a nationwide basis and that it is Design/Builder's intent that the requirements of this Agreement comply with and are fully enforceable under the laws of all jurisdictions where it conducts business. The parties agree that if any provision of the Agreement is determined by a court to be unenforceable in whole or in part under Applicable Law, that determination shall not affect the validity and enforceability of the remainder of the Agreement and that only the provision (or part thereof) in question shall be deemed unenforceable. Accordingly, in the event that any one or more of the provisions of the Agreement shall be found to be illegal or unenforceable, the remaining provisions of this Subcontract shall remain in full force and effect, and such term or provision shall be deemed stricken to the extent and in the jurisdictions necessary for compliance with Applicable Law.

**10.6    Consequential Damages Mutually Waived.** If applicable and to that extent which is provided for under the Design-Build Agreement between Design/Builder and Owner, neither the Design/Builder nor Designer shall be liable to the other for any consequential loss or damages, as the same may be defined under the Design-Build Agreement, whether arising in contract, warranty, tort (including negligence), strict liability or otherwise. For the purposes of clarification, any damages or additional costs incurred by the Design/Builder under the Owner Contract due to delays for which the Designer is responsible are expressly agreed by the Parties to not constitute consequential damages.

**10.7    No Waiver of Performance.** The failure of either party to insist, in any one or more instances, on the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any of its rights, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right with respect to further performance.

**10.8    Titles.** The Article and Section headings in this Agreement have been inserted for convenience of reference only and shall not in any manner affect the construction, meaning or effect of anything contained herein nor govern the rights and liabilities of the parties.

**10.9    Remedies are not Exclusive.** The remedies provided to Design/Builder in the Agreement are cumulative and not exclusive and in addition to any other remedies available to Design/Builder under Applicable Law.

**10.10    Survival.** The applicable provisions of Articles 7, 8, 9 and 10 and any other provision of the Agreement that either: (1) provides for limitation of or protection against liabilities between Design/Builder and Designer; or (2) expressly or by implication comes into or continues in force and effect after Designer's completion of the Work, shall survive termination of the Agreement and Designer's completion of its Design Services.

ARTICLE 11
SCHEDULE OF EXHIBITS

11.1          The following Exhibits are part of this Agreement.

EXHIBIT A     Contract Documents between Owner and Design/Builder
              **The documents comprising Exhibit A are not physically attached hereto, but are available for review and inspection at Design/Builder's offices.**
EXHIBIT B     Project Schedule
EXHIBIT C     Rates Governing Additional Services, effective through life of Agreement
EXHIBIT D     Key Project Personnel
EXHIBIT E     Construction Administration Site visits
EXHIBIT F     Designer Insurance Requirements
EXHIBIT G     Designer Change Order form
EXHIBIT H     Owner Provided Information
EXHIBIT I     Designer's Schedule of Values
EXHIBIT J(1)  Designer's Progress Payment Interim Release and Waiver
EXHIBIT J(2)  Designer's Final Payment Release and Waiver
EXHIBIT PS-1  Supplemental Terms and Conditions

This Agreement is entered into as of the day and year entered in Article 1.

**SKANSKA USA BUILDING INC.**
**DESIGN/BUILDER:**

ATTEST: _____      BY: _____

                                     TITLE: EVP & GM      April 27, 2015

**SmithGroupJJR**
**DESIGNER:**

ATTEST: _____      BY: _____      23 APRIL 2015

                                     TITLE: PRINCIPAL

Designer Agreement
[04.2012 ed. Rev. 0]

# EXHIBIT "B"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015**, by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services at DC Water New Headquarters Building, Washington, DC.**

See attached Phase 1 schedule form the Proposal updated with the NTP of 3/16/15 date.

Designer Agreement Exhibit B – Project Schedule
[08.2007 ed. Rev. 0]

## DC Water Design Design Build New HQ Bldg

| Activity ID | Activity Name | Work Days | Start | Finish |
|---|---|---|---|---|
| **Project Milestones** | | | | |
| MILE1000 | Submit Proposals | 0 | 15-Oct-14 | |
| MILE1050 | Notification of Award to Design Build Team | 0 | | 25-Nov-14 |
| MILE1020 | NTP to Begin Phase I Design Services | 0 | 16-Mar-15 | |
| MILE1030 | Design Build Contract Executed with DC Water for Phase I Services | 0 | | 18-Mar-15 |
| MILE1090 | Submit Draft Basis of Design (NTP +21) | 0 | | 05-Apr-15 |
| MILE1100 | Submit Phase I Schedule (NTP +30) | 0 | | 14-Apr-15 |
| MILE1110 | Basis of Design Approval (NTP +60) | 0 | | 14-May-15 |
| MILE1070 | Schematic Design Complete | 0 | | 16-Jun-15 |
| MILE1080 | Design Development Complete | 0 | | 09-Sep-15 |
| MILE1010 | 80% Submission <180 days from NTP | 0 | | 12-Sep-15 |
| MILE1060 | Phase I Design Acceptance by DC Water | 0 | | 09-Oct-15 |
| MILE1040 | GMP Amendment Executed / NTP to Begin Phase II Design & Construction | 0 | 31-Dec-15 | |
| MILE1060 | Issue 100% Construction Documents | 0 | | 26-Apr-16 |
| MILE1099 | Project Completion (6-30-17) | 0 | | 10-May-17 |
| **Project Phases** | | | | |
| SUMM1000 | Phase I - Bid & Award Period & Contract Execution | 103 | 15-Oct-14 | 18-Mar-15 |
| PHAS1000 | Phase I Services | 201 | 16-Mar-15 | 30-Dec-15 |
| PHAS2000 | Phase II Services | 341 | 31-Dec-15 | 10-May-17 |
| **Sub-Phases** | | | | |
| SUMM1005 | Phase I - Design Development | 227 | 15-Oct-14 | 09-Sep-15 |
| SUMM1010 | Phase I - Project Kick-off | 46 | 16-Mar-15 | 18-May-15 |
| SUMM1020 | Phase I - Schematic Design | 60 | 24-Mar-15 | 16-Jun-15 |
| SUMM1040 | Phase I - 80% Construction Documents | 62 | 15-Jul-15 | 09-Oct-15 |
| SUMM1050 | Phase I - GMP Preparation & Approval | 50 | 19-Oct-15 | 30-Dec-15 |
| SUMM1060 | Phase II - Completion of Design | 80 | 31-Dec-15 | 26-Apr-16 |
| SUMM1070 | Phase II - Subcontracting, Submittals & Procurement | 286 | 01-Dec-15 | 24-Jan-17 |
| SUMM1080 | Phase II - Jobsite Mobilization | 22 | 01-Feb-16 | 02-Mar-16 |
| SUMM1060 | Phase II - HQ Building Foundations, Structure, Enclosure | 238 | 04-Mar-16 | 14-Feb-17 |
| SUMM1110 | Phase II - "O" St Pumping Station Renovations | 42 | 09-May-16 | 07-Jul-16 |
| SUMM1120 | Phase II - Site Work & Site Utilities | 85 | 28-Sep-16 | 25-Mar-17 |
| SUMM1100 | Phase II - HQ Building Interiors and Inspections | 186 | 12-Aug-16 | 10-May-17 |
| **Schematic Design 50%** | | | | |
| **Kick-off** | | | | |
| PHI-1000 | NTP to Begin Phase I | 0 | 16-Mar-15 | |
| PHI-1010 | Kick-off Meetings with DC Water | 5 | 17-Mar-15 | 23-Mar-15 |
| PHI-1100 | Project Kick-off / Hold Meetings with Regulatory Agencies | 20 | 24-Mar-15 | 20-Apr-15 |
| PHI-1300 | Submit Draft Work Plan (<14 Days after NTP) | 0 | | 25-Mar-15 |
| PHI-1200 | Submit Draft Basis of Design Report (<21 Days after NTP) | 0 | | 30-Mar-15 |
| PHI-1110 | Project Prep - Hold Combined Multi-Agency Meetings on Paths Forward | 20 | 21-Apr-15 | 18-May-15 |

DC Water
New Headquarters Building
Working Draft Schedule - Phase I

SKANSKA

| | Date | Revision | Checked | Approved |
|---|---|---|---|---|

Remaining Level of Effort   ◆ MIL.
Actual Work
Remaining Work
Critical Remaining Work

| Activity ID | Activity Name | Work Days | Start | Finish |
|---|---|---|---|---|
| PH1-1000 | Schematic Design (30%) | 60 | 24-Mar-15 | 16-Jun-15 |
| PH1-1130 | CFA Meeting for Concept Approval (1 of 3) | 5 | 24-Mar-15 | 30-Mar-15 |
| PH1-1280 | Meet with DDOE to Present Project and Discuss Requirement | 5 | 31-Mar-15 | 06-Apr-15 |
| PH1-1180 | Meet with ANC | 5 | 19-May-15 | 25-May-15 |
| PH1-1170 | Meet with Capitol Riverfront BID | 5 | 27-May-15 | 02-Jun-15 |
| PH1-1160 | Meet with NCPC (1 of 2) | 5 | 03-Jun-15 | 09-Jun-15 |
| PH1-1185 | DC Water Comment Period on 30% | 28 | 17-Jan-15 | 14-Jul-15 |
| **Design Assist/Bid** | | | | |
| PROC-14A-110 | Bid - Elevators (Design-Assist) | 25 | 05-May-15 | 08-Jun-15 |
| PROC-15A-110 | Bid - Mechanical (Design-Assist) | 25 | 05-May-15 | 08-Jun-15 |
| PROC-16A-110 | Bid - Electrical (Design-Assist) | 25 | 05-May-15 | 08-Jun-15 |
| CURT1000 | Bid - Glazing Curtain Wall (Design Assist) | 25 | 05-May-15 | 08-Jun-15 |
| PROC-02F-110 | Bid - Deep Foundations | 25 | 05-May-15 | 08-Jun-15 |
| PROC-03A-210 | Bid - Structural Steel | 28 | 05-May-15 | 09-Jun-15 |
| PROC-03A-290 | DC Water Approval & Final Contract Negotiations for Design-Assist | 30 | 09-Jun-15 | 21-Jul-15 |
| **Curtain Wall Mock-up** | | | | |
| CURT1110 | DC Water Approval & Final Contract Negotiations for Mock-up | 30 | 09-Jun-15 | 21-Jul-15 |
| CURT1010 | Curtain Wall - Prep & Submit - Mock-up Shop Drawings | 25 | 22-Jul-15 | 25-Aug-15 |
| CURT1030 | Curtain Wall - Approve - Mock-up Shop Drawings | 10 | 26-Aug-15 | 08-Sep-15 |
| CURT1050 | Curtain Wall - Prepare Mock-up Fabrication Drawings | 25 | 09-Sep-15 | 13-Oct-15 |
| CURT1070 | Curtain Wall - Mock-up - Procure Materials | 70 | 14-Oct-15 | 19-Jan-16 |
| CURT1080 | Curtain Wall - Mock-up - Shop Fabrication | 25 | 20-Jun-16 | 23-Feb-16 |
| CURT1090 | Curtain Wall - Mock-up - Construct, Test & Approve | 25 | 24-Feb-16 | 29-Mar-16 |
| **Design Development / 80% Construction Doc's** | | | | |
| PH1-1050 | Design Build Procurement Plan | 200 | 15-Jul-15 | 11-Aug-15 |
| PH1-1070 | Design Development - 80% Construction Doc's | 42 | 15-Jul-15 | 11-Sep-15 |
| PH1-1190 | CFA Update Meeting | 5 | 15-Jul-15 | 21-Jul-15 |
| PH1-1300 | Design-Assist VE/Constructability/Development | 20 | 22-Jul-15 | 06-Sep-15 |
| PH1-1240 | CFA Update Meeting | 5 | 26-Aug-15 | 01-Sep-15 |
| PH1-1210 | Meetings with CIP & HPO | 10 | 02-Sep-15 | 18-Sep-15 |
| PH1-1260 | DC Water Review & Approval of 80% DD | 28 | 12-Sep-15 | 09-Oct-15 |
| PH1-1230 | 80% Submission <180 days from NTP (9/12/2015) | 0 | 12-Sep-15 | |
| PH1-1120 | CFA Hearings and Final Approval | 5 | 17-Sep-15 | 23-Sep-15 |
| PH1-1220 | Acceptance of Phase I Design | 0 | 09-Oct-15 | |
| PH1-1320 | Submit for Permits | 20 | 13-Oct-15 | 09-Nov-15 |
| **Pricing of 80% Work** | | | | |
| PROC-14A-200 | Price - Elevators (Design-Assist) | 20 | 14-Sep-15 | 09-Oct-15 |
| PROC-03A-270 | Price - Cash-In-Place Concrete | 25 | 14-Sep-15 | 16-Oct-15 |
| PROC-07A-210 | Price - Waterproofing | 10 | 14-Sep-15 | 25-Sep-15 |
| PROC-15A-210 | Price - Mechanical (Design-Assist) | 25 | 14-Sep-15 | 16-Oct-15 |
| PROC-16A-200 | Price - Electrical (Design-Assist) | 25 | 14-Sep-15 | 16-Oct-15 |
| CURT1290 | Price - Glazing Curtain Wall (Design Assist) | 25 | 14-Sep-15 | 16-Oct-15 |
| ROOF2130 | Price - Metal Panels | 25 | 14-Sep-15 | 16-Oct-15 |
| PROC-02A-160 | Price - Dewatering | 15 | 14-Sep-15 | 02-Oct-15 |

DC Water
New Headquarters Building
Working Draft Schedule - Phase I



SKANSKA

| | Date | Revision | Checked | Approved |
|---|---|---|---|---|

Remaining Level of Effort ◆ MIL.
Actual Level of Effort
Actual Work
Remaining Work
Critical Remaining Work

| Activity ID | Activity Name | Work Days | Start | Finish |
|---|---|---|---|---|
| PROC-02B-280 | Price - Earth Work | 20 | 14-Sep-15 | 09-Oct-15 |
| PROC-02F-210 | Price - Deep Foundations | 25 | 14-Sep-15 | 16-Oct-15 |
| PROC-03A-220 | Price - Structural Steel | 10 | 14-Sep-15 | 25-Sep-15 |
| PROC-02B-260 | Price - Demolition | 20 | 14-Sep-15 | 09-Oct-15 |
| PROC-02B-300 | Price - Sediment Controls | 15 | 14-Sep-15 | 02-Oct-15 |
| CURT1300 | Price - Precast (if applicable) | 25 | 14-Sep-15 | 16-Oct-15 |
| GMP Submission | | | | |
| PH1-1260 | Prepare & Submit GMP | 30 | 19-Oct-15 | 01-Dec-15 |
| PH1-1270 | DC Water Review & Approval of GMP | 15 | 02-Dec-15 | 22-Dec-15 |
| PH1-2000 | Execute GMP Amendment for Phase II Services | 5 | 23-Dec-15 | 30-Dec-15 |
| PH1-2010 | Phase I Services Complete | 0 | | 30-Dec-15 |

DC Water
New Headquarters Building
Working Draft Schedule - Phase I

Page 3 of 3
Printed 26-Mar-15

SKANSKA

Remaining Level of Effort
Actual Level of Effort
Actual Work
Remaining Work
Critical Remaining Work

| | | Date | Revision | Revision | Checked | Approved |
|---|---|---|---|---|---|---|

# EXHIBIT "C"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015**, by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services** at **DC Water New Headquarters Building, Washington, DC.**

For the purposes of this Exhibit C, the term "Scope" shall mean the Designer Services to be provided by Designer under the Designer Agreement, as applicable.

## I.      PROFESSIONAL SERVICE RATES

Design/Builder may elect to have Designer provide labor (or additional labor) in connection with its Scope. Each specified rate is inclusive of all of Designer's costs and expenses to furnish labor in accordance with all requirements of the Designer Agreement.  If the Design/Build Agreement is a Guaranteed Maximum Price, all payment applications must include approved time cards to substantiate billed hours.

| | Name/Project Role | Rate | |
|---|---|---|---|
| 1. | Principal | $ 206.80 | /hr |
| 2. | Project Manager | $ 191.29 | /hr |
| 3. | Staff Architect | $ 124.08 | /hr |
| 4. | Lighting | $ 155.10 | /hr |
| 5. | LEED | $ 124.08 | /hr |
| 6. | Spec | $ 124.08 | /hr |
| 7. | Code/FP | $ 124.08 | /hr |
| 8. | BIM | $ 170.61 | /hr |
| 9. | Principal MEP | $ 206.80 | /hr |
| 10. | Staff Engineer | $ 130.28 | /hr |
| 11. | Commissioning | $ 161.28 | /hr |
| 12. | MEP LEED | $ 130.46 | /hr |
| 13. | Energy Model | $ 130.46 | /hr |

## II.      REIMBURSABLE EXPENSES

The term "Reimbursable Expenses," as used in this Designer Agreement, shall mean the additional reasonable expenses necessarily, and actually, incurred in connection with Designer's provision of the Designer Services, and which are not already identified as being part of Designer's Basic Services or otherwise included in Designer's Fee in the Designer Agreement, and which shall include, if applicable, only the following items:

a.      Third-party materials/supplies at cost plus ten (10) percent mark-up.
b.      Third-party equipment rentals at cost plus five (5) percent mark-up.
c.      Fees of Designer Sub-consultants (other than those included as part of Designer's Basic Services for this Agreement and included within Designer's Fee) if their employment and scope is authorized in advance by Design/Builder in writing; provided, however, that such Designer Sub-consultants' fees shall be payable at cost, without markup to Design/Builder;
d.      Transportation (at economy or coach rates), tolls, parking, mileage, lodging, meals, and reasonable living expenses for Designer's employees for trips of over fifty (50) miles which are approved in advance by Design/Builder and not otherwise included in Designer's Basic Services;
e.      If applicable, telephone calls, mobile phones, faxes, office supplies, postage, and courier services which are in excess of those required as part of Designer's Basic Services;

Designer Agreement Exhibit C – Additional Services
[08.2007 ed. Rev. 0]



# EXHIBIT "C"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015,** by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services at DC Water New Headquarters Building, Washington, DC.**

    f.    Expenses for reproduction and printing of drawings, specifications, and other documents – but only for those which are subject to the written request and authorization of Design/Builder and only to the extent said reproduction/printing costs are not otherwise included as part of Designer's Basic Services in the Agreement;

    g.    Expenses for photography, renderings, models, and mock-ups, but only for those which are subject to the written request and authorization of Design/Builder and not already included in the Designer Agreement as a Basic Service;

    h.    Statutory fees paid to governmental agencies for security approvals of authorities having jurisdiction over the Project;

    i.    Any other necessary, incurred expense(s) approved in writing and in advance of the costs being incurred by Design/Builder.

**Additional Notes:**

- The above listed items shall only be compensated in connection with services that are not part of the Scope of the Designer Agreement as a Basic Service or otherwise included in Designer's Fee.
- No data processing, word processing, or other secretarial or clerical charges shall be allowed as Reimbursable Expenses without the written consent of Design/Builder.
- Receipts are required for all Reimbursable Expenses. Design/Builder reserves the right to require additional documentation of Reimbursable Expenses, and the right to review and audit all such Reimbursable Expenses at a reasonable time and place in accordance with the Designer Agreement.

**III.**    **ALTERNATES**

Design/Builder may at any time elect to have Designer provide as part of its Scope one or more of the alternates identified in this Exhibit C, Section I. The "ADD" or "DELETE" price identified in connection with an alternate is inclusive of all of Designer's costs and expenses to provide the alternate in accordance with all requirements of the Designer Agreement.

1.    Insert the amount to be added to the Designer Agreement Amount if the Designer is directed to provide payment and performance bonds if not required, or if in excess of those required by the Designer Agreement.

    ADD $N/A

2.    Insert the amount to be added to the Designer Agreement Amount for sales and use taxes on labor and material, if tax exemption certificates are not provided, or an Owner material purchase plan is not utilized so that the payment of such taxes is required.

        a.    Labor        ADD $_____

        b.    Material    ADD $_____

3.    Additional Items:

        i.  Description:

    ADD/DEDUCT $_____

# EXHIBIT "D"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015**, by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for Design Services at **DC Water New Headquarters Building, Washington, DC.**

| Project Position | Designer Representative |
|---|---|
| Principal | **David King** |
| Principal-in-Charge | **David Varner** |
| Project Manager – Design Principal | **Sven Shockey** |
| Project Architect | **Dayton Schroeter** |
| M/E/P Engineering Principal | **Don Posson** |
| | |

Page 1 of 1

## EXHIBIT "E"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015,** by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services** at **DC Water New Headquarters Building, Washington, DC.**

This section will be further defined when the project moves into Phase II – Construction.

Designer Agreement Exhibit E – Construction Site Visits
[08.2007 ed. Rev. 0]

# EXHIBIT "F"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015,** by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services at DC Water New Headquarters Building, Washington, DC.**

## DESIGNER INSURANCE REQUIREMENTS

### SECTION I:    DEFINITIONS

As used in this Exhibit F:

(a) "Project" means the project that is the subject of the Designer Agreement.

(b) "Scope" means the scope of Design Services to be provided by Designer under the Designer Agreement.

(c) "State" means a state of the United States or the District of Columbia or the Commonwealth of Puerto Rico, as applicable.

Capitalized terms used in this Exhibit F and not defined in the Designer Agreement shall have the meanings generally ascribed to such terms in the commercial insurance industry in the United States.

### SECTION II:    STANDARD INSURANCE COVERAGES

Designer shall comply with the following:

1.  Standard Insurance Coverages: Designer shall secure and maintain from the earlier of commencement of professional activities in connection with the Scope or the effective date of the Designer Agreement the minimum insurance coverages and limits required by this Exhibit F. Failure of the Design/Builder to identify deficiencies in any insurance provided by Designer shall not relieve Designer from any insurance obligations. Required coverages are as follows:

    1.1   Workers Compensation and Employer's Liability:

    Worker's Compensation Insurance and Employer's Liability Insurance (including occupational disease) to cover statutory benefits and limits under the Worker's Compensation laws of any applicable jurisdiction in which the Scope is to be performed, and Employers' Liability Insurance with minimum limits of five hundred thousand dollars ($500,000) each accident; five hundred thousand dollars ($500,000) for disease, each employee and five hundred thousand dollars ($500,000) disease, policy limit.

    Policy coverage terms and conditions to include:
    - USL&H – where applicable.
    - Jones Act – where applicable.
    - All states endorsement – where applicable.
    - Employers Liability/Stop Gap Liability if work is performed in the State of Washington, Wyoming, Ohio, North Dakota or the Commonwealth of Puerto Rico.
    - For the attainment of Workers Compensation in monopolistic states and Puerto Rico, coverage must be secured through the state fund of that state.
    - Certificate must clearly identify that coverage applies in the State in which the Project is located.

    1.2   Commercial General Liability Insurance:

    Commercial General Liability Insurance ("CGL") written on ISO form CG 00 01 Edition date 10/01 or prior ISO edition occurrence form or equivalent for hazards of: (a) Construction Operation,



# EXHIBIT "F"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015**, by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services at DC Water New Headquarters Building, Washington, DC.**

(b) Subcontractors and Independent Contractors, (c) Products and Completed Operations applicable to the Additional Insured (with Completed Operations coverage to remain in force from the date of final completion of the Scope until the expiration of the statute of repose of the State in which the Project is located). The insurance shall include: (1) Contractual Liability coverage sufficient to meet the requirements of the Designer Agreement (including defense costs and attorney's fees assumed under contract, which shall be payable in addition to the limit of liability); (2) Personal Injury Liability (with the standard contractual and employee exclusions deleted); (3) Notice and Knowledge of Occurrence; and (4) no subsidence exclusion.

If marked as required, Designer's CGL insurance is required to provide the following coverages:

| | Required | |
|---|:---:|:---:|
| | Yes | No |
| Mold | ☐ | ☒ |
| EIFS | ☐ | ☒ |
| Operations (performed within) 50' of railroad property | ☐ | ☒ |
| Residential operations | ☐ | ☒ |
| Pollution Coverage (Exhibit Q Required) | ☐ | ☒ |

If the Designer's CGL insurance excludes any of the required coverages, a separate policy acceptable to Design/Builder must be obtained.

For each insurance category checked 'Yes' above, Designer's CGL insurer and/or broker will evidence, through Policy endorsement, or provide written confirmation, that such coverage is intact, even if each respective insurance certificate lists that type of coverage and describes its liability limits.

The insurance shall have the following minimum limits of liability, which shall be available to the Project:

| | |
|---|---|
| EACH OCCURRENCE | $ 2,000,000 |
| PRODUCTS-COMP/OP AGG. | $ 3,000,000 |
| PERSONAL & ADV INJURY | $ 2,000,000 |
| GENERAL AGGREGATE | $ 3,000,000 |

The general aggregate coverage limits shall be per project general aggregate and shall be evidenced on Designer's Certificate of Insurance.

1.3     Commercial Auto Liability Insurance:

Commercial Automobile Liability insurance covering all owned, leased and non-owned vehicles used in connection with the Scope with limits of: $1,000,000 combined single limit per accident for bodily injury and property damage. The policy must include coverage for bodily injury, death and property damage arising out of ownership, maintenance or use of any motorized vehicle on or off the site of the Project, and Contractual Liability coverage. If hauling of hazardous waste is part of the Scope, Automobile Liability Insurance with a $1,000,000 combined single limit per occurrence for bodily injury and property damage applicable to all hazardous waste hauling vehicles, and include MCS 90 endorsement and the ISO Form CA 9948 (Pollution Liability Broadened Coverage for Business Automobile).

# EXHIBIT "F"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015,** by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services at DC Water New Headquarters Building, Washington, DC.**

If CGL 12/04 or later edition is provided, the CA0051 1204: Mobile Equipment Subject to Motor Vehicles Laws shall also be provided. This additional endorsement is not required if the 2006 ISO Auto form is provided.  )}

1.4    Commercial Umbrella Liability Insurance:

Commercial Umbrella Liability Insurance for bodily injury and property damage liability over Designer's primary Employer's Liability, Commercial General Liability and Commercial Automobile Liability with limits available to the Project in the amount of $5,000,000 each occurrence and aggregate. All coverages and terms required under the Commercial General Liability, Automobile Liability and Employers Liability (sections 1.1, 1.2, and 1.3 above) must be included on the Umbrella Liability policy.

Higher limits may be required by Design/Builder or Owner on a project by project basis.

Designer's Umbrella Liability Policy shall evidence, through a policy endorsement, that it will provide liability coverage in excess of all available underlying coverage before any primary or excess coverage held by any Additional Insured or Indemnified Party is utilized.

1.5    Leased Employee Liability:

If Designer leases one or more employees through the use of a payroll, employee management or other company, Designer must directly procure workers compensation/employer's liability insurance. The insurance shall be written on a "Minimum Premium" or "If Any" policy form. In addition, the workers compensation/employer's liability coverage provided **to and for the leased employees** by the payroll, employee management or other company must be evidenced and include an Alternate Employer/Leased Employee Endorsement, naming Designer as the alternate employer. The employer's liability must be scheduled under a $5,000,000 umbrella (except in states where employer's liability is unlimited).

1.6    Property Insurance:

Property Insurance coverage for tools and equipment owned, leased or used by the Designer in the performance of the Scope. The Property Insurance shall extend to equipment, materials and supplies stored off the Project site or in transit to the Project site to be furnished as part of the Scope and incorporated into the Project.

1.7    Professional Liability Insurance:

|  | Required |  |
|---|---|---|
|  | Yes | No |
|  | ☒ | ☐ |

If marked as required, the Scope involves professional services and Professional Liability Insurance is required covering liability for claims that arise from the errors, omissions or acts of the Designer or any entity for which the Designer is legally responsible, in the provision of professional services. The policy shall be primary and non-contributory, with the insuring agreement to read: "to pay on behalf of" and shall be effective (retroactively, if applicable) from the date of commencement of all professional activities in connection with the Scope. The coverage shall be maintained for a period of Ten (10) years following completion of the Services. Minimum limits are $5,000,000 per claim/annual aggregate for the Designer and $5,000,000 per claim/annual aggregate for Designer's Consultants. A copy of the policy shall be provided to the Design/Builder.

Coverages shall **not** include any exclusions or other limitations related to:

# EXHIBIT "F"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015,** by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services at DC Water New Headquarters Building, Washington, DC.**

- scope of the services.
- delays in project completion and cost overruns.
- who can notify the carrier of a claim or potential claim.
- mold, fungus, asbestos, pollutants or other hazardous substances.

1.8   Riggers Liability Required:

|  | Required |
|---|---|
| Yes | No |
| ☐ | ☒ |

If marked as required, the Scope involves the rigging, hoisting, lowering, raising or moving of property or equipment and Riggers Liability Insurance is required to insure against physical loss or damage to the property or equipment.

1.9   Aircraft/Watercraft:

|  | Required |
|---|---|
| Yes | No |
| ☐ | ☒ |

If marked as required, the Scope involves the use of any owned, leased, chartered or hired aircraft or watercraft of any type and Aircraft Liability Insurance or Watercraft Liability Insurance, as applicable, is required in an amount of not less than $10,000,000 per occurrence, including Passenger Liability for bodily injury and property damage.

2.   Insurer Requirements:  Each insurer providing insurance coverage as required in this Exhibit F shall be a licensed admitted insurer authorized to issue such coverages in each State in which any part of the Scope is performed.  The insurer shall be acceptable to Design/Builder and shall have an AM Best rating of "A-X" or better.

3.   Certificate of Insurance: Prior to commencing its performance and throughout the warranty period under the Designer Agreement, Designer shall provide Design/Builder a current certificate of insurance evidencing the coverages required by this Exhibit F (a sample Certificate of Insurance is attached for reference purposes).

4.   Consultants: Before permitting any Consultant to perform Scope under the Designer Agreement, the Designer shall require the Consultant to maintain insurance in like form and amounts to that required herein.  Designer shall be responsible to ensure that Consultants maintain insurance in like form and amounts and shall provide evidence of same to Design/Builder if requested.

5.   Notice of Cancellation: All insurance coverages required by this Exhibit F shall contain a provision that the coverage afforded hereunder cannot be cancelled, non-renewed, allowed to lapse, or have any restricted modifications added unless at least thirty (30) days prior written notice has been given to the Design/Builder.

6.   Additional Insureds: All insurance required by this Exhibit F (excluding only Workers Compensation Insurance and Professional Liability Insurance) shall name Indemnified Parties as Additional Insureds and any other parties as required by the Owner Contract, and shall be primary and non-contributory to any insurance maintained by Indemnified Parties and Additional Insureds and any other parties as required by Owner Contract, all of which shall be stated on the Certificate of Insurance provided by the Designer.  The General Liability Additional Insured Endorsement shall be on Form CG 2010 11/85, or CG 20 10 10/01 plus CG 20 37 10/01, or equivalent and shall include ongoing and completed operations.  **Evidence, by endorsement or**



## EXHIBIT "F"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015**, by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services at DC Water New Headquarters Building, Washington, DC.**

policy language, of Additional Insured and Primary and Non-Contributory coverage must be provided with the certificate of insurance for General Liability.

7.  Deductibles/Denial of Claims: Designer shall be responsible, at no additional cost to Design/Builder, for the payment of any deductibles or self-insured retention in connection with the insurance coverages required by this Exhibit F both for itself and all Additional Insureds. Any self-insured retention or deductible in excess of $25,000 must be declared at the time Designer submits its bid and must be specifically approved by Design/Builder prior to execution of the Designer Agreement. Designer shall be responsible for any loss arising out of coverage denial by its insurance carrier.

8.  Dilution of Limits: For those policies containing an aggregate, as soon as incurred loss activity (paid plus reserve) depletes the aggregate by 50% or more, written notice must be sent to the Design/Builder by certified mail return receipt requested.

9.  OCIP/CCIP Program: Designer may be required by Design/Builder to enroll in an Owner Controlled Insurance Program ("OCIP") or Contractor Controlled Insurance Program ("CCIP"). Designer shall strictly comply with all requirements of the program in which it is required to enroll and the Subcontract Amount/Purchase Order Amount shall be reduced by a deduct change order by the amount included therein by Designer for insurance coverage replaced by the OCIP or CCIP.

10. Waiver of Subrogation: All insurance coverages maintained by Designer shall include a waiver of any right of subrogation of the insurers thereunder against Indemnified Parties and Additional Insureds and all of their respective assigns, subsidiaries, affiliates, employees, insurers and underwriters, and of any right of the insurers to any set-off or counterclaim or any other deduction, whether by attachment or otherwise, in respect of any liability of any person insured under any such policy (Workers Compensation – where permitted). Designer further waives all claims and all rights of subrogation against Indemnified Parties' and Additional Insureds' other contractors and all of their respective assigns, subsidiaries, affiliates, employees, insurers and underwriters for loss of, or damage to, Designer's Scope, tools, machinery, equipment, material, supplies, or any other losses within the scope of any insurance maintained by Designer. If any of the Indemnified Parties and Additional Insureds is partially or wholly self insured, then the waiver of subrogation shall apply as if they were in fact covered by their own insurance.

11. No Limitation: The insurance coverages maintained by Designer shall not limit any of Designer's indemnity obligations or other liabilities under the Designer Agreement. Insurance coverages maintained by Designer that exceed the minimum requirements in this Exhibit F shall be applicable to the Designer Agreement.

12. Severability of Interests (Cross Liability): All insurance required by this Exhibit F (excluding only Workers Compensation Insurance and Professional Liability Insurance) shall be endorsed to provide that, in as much as the policy is written to cover more than one insured, all terms, conditions, insuring agreements and endorsements, with the exception of limits of liability, shall operate in the same manner as if there were a separate policy covering each insured. No cross liability exclusion will be accepted. Nor shall there be any restrictions in any policies that limit coverage for a claim brought by an Additional Insured against a named insured.

13. Insurance Policy Review/Exclusions/Copies: Design/Builder has the right to receive copies of all insurance policies upon request. Policies shall not contain any exclusions that are not acceptable to Design/Builder and Owner. If requested by Design/Builder or Owner, all policies must be certified by the insurance carrier as being true and complete. Policies shall not contain any exclusions that are not acceptable to Design/Builder and Owner, in their sole discretion. Design/Builder's right to review and approve all insurance policies will not constitute a waiver of any rights created by or provisions contained in this Exhibit F should they differ from these contained in such policies.



# EXHIBIT "F"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015**, by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services** at **DC Water New Headquarters Building, Washington, DC.**

14. <u>Claims-Made Policies</u>: Except for Professional Liability Insurance, claims-made policies are not acceptable.

15. <u>Effect of Specified Coverages</u>: In specifying minimum requirements herein, neither Contactor nor Owner assert or recommend this insurance as adequate to Designer's requirements. Designer is solely responsible to inform itself of types of insurance it may need beyond these minimum requirements to protect itself from loss, damage or liability.

16. <u>Breach of Insurance Requirements</u>: Designer's failure to obtain and maintain insurance coverages as required by this Exhibit F or any other Exhibit or attachment shall constitute a material breach of the Designer Agreement. In such event, in addition to any and all other rights and remedies contained in the Designer Agreement, (i) Design/Builder may, at its option, terminate the Designer for default; (ii) Design/Builder may, at its option, purchase such coverage and backcharge the premium and associated costs to Designer; and/or (iii) any of the Indemnified Parties or Additional Insureds can require, that Designer and/or its Consultants to pay for all attorney's fees, expenses and liability as a result of any claim or lawsuit for which coverage would have been provided to the Indemnified Parties or Additional Insureds under Designer's insurance program but for a breach by Designer or any of its Consultants. Furthermore, to the extent of their respective interests, the Insurers of those entities that were to be included as Additional Insureds are deemed to be third-party beneficiaries of the insurance procurement obligation and as such have the same rights against the breaching party as the Indemnified Parties or Additional Insureds.

Designer Agreement Exhibit F – Designer Insurance Requirements
[07.2010 ed. Rev. 2]

# EXHIBIT "F"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015**, by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services at DC Water New Headquarters Building, Washington, DC.**

## CERTIFICATE OF LIABILITY INSURANCE

Issue Date (MM/DD/YYYY)

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESETATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| | PHONE (A/C, No, Ext): | FAX (A/C, No): |
| | E-MAIL ADDRESS: | |
| | PRODUCER CUSTOMER ID #: | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| INSURED | INSURER A: | |
| | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F | |

| COVERAGES | CERTIFICATE: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFFECTIVE (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| **GENERAL LIABILITY** | | | | POLICY NUMBER | | | EACH OCCURRENCE | $2,000,000 |
| X | COMMERCIAL GENERAL LIABILITY | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $300,000 |
| | CLAIMS MADE   X   OCCUR | | | PER PROJECT AGGREGATE ENDORSEMENT | | | MED EXP (Any one person) | $5,000 |
| | | | | 50' RAILROAD EXCLUSION ELIMINATED (10/01 & PRIOR OR EQUIVALENT) | | | PERSONAL & ADV INJURY | $1,000,000 |
| X | ISO FORM CG0001 | X | X | | | | GENERAL AGGREGATE | $3,000,000 |
| X | CONTRACT'L LIAB. | | | | | | PRODUCTS - COMP/OP AGG | $3,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | | |
| | POL-ICY   X   PRO-JECT   X   LOC | | | | | | | |
| **AUTOMOBILE LIABILITY** | | | | POLICY NUMBER | | | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| X | ANY AUTO | | | | | | | |
| | ALL OWNED AUTOS | X | X | | | | BODILY INJURY (Per person) | $ |
| | SCHEDULED AUTOS | | | | | | | |
| X | HIRED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| X | NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| **UMBRELLA LIAB**   X   OCCUR | | | | POLICY NUMBER | | | | |
| | CLAIMS-MADE | | | PER PROJECT ENDORSEMENT INCLUDED | | | | |
| EXCESS LIAB | | X | X | | | | | |
| | DEDUCTIBLE | | | | | | EACH OCCURRENCE | $5,000,000 |
| | RENTENTION   $ | | | | | | AGGREGATE | $5,000,000 |
| **WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY** | | | | POLICY NUMBER | | | WC STATU-TORY LIMITS   X    OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED | | | COVERAGE APPLIES IN STATE OF JOBSITE OPERATION UNDER THIS SUBCONTRACT | | | E.L. EACH ACCIDENT | *500,000 |
| | (Mandatory in NH) | Y/N | N/A | X | USL&H COVERAGE IS INCLUDED WHERE NEEDED | | E.L. DISEASE-EA EMPLOYEE | *500,000 |
| | If yes, describe under special provisions below | | | | | | E.L. DISEASE-POLICY LIMIT | *500,000 |
| **OTHER** | | | | | | | *EXCEPT WHERE UNLIMITED | |
| The coverages provided shall be pursuant to insurance requirements contained in the Subcontract., | | | | | | | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

All operations performed under **DC Water New Headquarters Building, Main & O St. Site, Washington, DC 20006. Skanska USA Building Inc. Project Number 1614019.** All insurance (excluding only Workers Compensation Insurance and Professional Liability Insurance) include Owner, Skanska USA Building Inc., Skanska USA Inc., Indemnified Parties, any other parties as required by the Owner Contract, **TBD** and their respective directors, officers, employees and affiliates as Additional Insureds, and shall be primary and non-contributory to any insurance maintained by Additional Insureds. The General Liability Additional Insured Endorsement shall be on Form CG 2010 11/85, or CG 20 10 10/01 plus CG 20 37 10/01, or equivalent and shall include ongoing and completed operations. Waiver of Subrogation applies to all policies for all additional insureds. Umbrella policy applies excess of General Liability, Automobile Liability, and Employers Liability. **Evidence by endorsement, or policy language, of Additional Insured and Primary & Non-Contributory coverage on General Liability and waivers of subrogation on General Liability and Worker's Compensation must be provided with the certificate of insurance.**

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Skanska USA Building Inc.<br>700 King Farm Blvd, Suite 200<br>Rockville, MD 20850 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

Designer Agreement Exhibit F – Designer Insurance Requirements
[07.2010 ed. Rev 2]

POLICY NUMBER:                                    COMMERCIAL GENERAL LIABILITY
                                                            CG 2010 11/85

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.


ADDITIONAL INSURED - - OWNERS, LESSEES OR
CONTRACTORS (FORM B)


This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART


SCHEDULE


Name of Person or Organization:


(If no entry appears above, information required to complete this endorsement will be shown in the
Declarations as applicable to this endorsement)

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization
shown in the Schedule, but only with respect to liability arising out of **"your work"** for that insured by
or for you.



CG 2010 11/85          Copyright, Insurance Services Office, Inc., 1984



ISO | Commercial General Liability Forms | 10/01/01

POLICY NUMBER:                                  COMMERCIAL GENERAL LIABILITY
CG 2010 10/01

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person or Organization: |
| --- |
| |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

A. Section II - Who Is An Insured is amended to include as an additional insured the person or organization shown in the Schedule, but only with respect to liability arising out of your ongoing operations performed for that insured.

B. With respect to the insurance afforded to these additional insureds, the following exclusion is added:

2. **Exclusions**

This insurance does not apply to "bodily injury" or "property damage" occurring after:

(1) All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

(2) That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 2010 10/01                         © ISO Properties, Inc., 2000

Designer Agreement Exhibit F – Designer Insurance Requirements
[07.2010 ed. Rev. 2]



POLICY NUMBER:                              COMMERCIAL GENERAL LIABILITY
                                                      CG 2037 10/01

THIS ENDORSEMENT CHANGES THE POLCY.  PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED -OWNERS, LESSEES OR CONTRACTORS - COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| |
|---|
| **Name of Person or Organization:** |
| **Location And Description of Completed Operations:** |
| **Additional Premium:** |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement)

**Section II - Who is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" at the location designated and described in the schedule of this endorsement performed for that insured and included in the "products-completed operations hazard".

CG 2037 10/01

Designer Agreement Exhibit F – Designer Insurance Requirements
[07.2010 ed. Rev. 2]

## EXHIBIT "G"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015**, by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services** at **DC Water New Headquarters Building, Washington, DC.**

## SKANSKA STANDARD CHANGE ORDER – DESIGNER AGREEMENT

| | |
|---|---|
| To: _____ | Date: _____ |
| Address: _____ | Project No.: _____ |
| _____ | Project Name: _____ |
| _____ | _____ |
| Designer Agreement No.: _____ | |
| Change Order No.: _____ | Cost Code: _____ |

**1. CHANGE IDENTIFICATION:** The following changes are hereby made to the above-referenced Designer Agreement:

*[Describe changes made]*

**2. ADJUSTMENT TO DESIGNER AGREEMENT AMOUNT**: As consideration for the change(s) identified in Section 1, the Designer Fee as agreed in the Designer Agreement is increased / decreased by:

_____ **DOLLARS    (\$ _____ )**

| | | |
|---|---|---|
| Original Designer Fee Amount: | \$ | _____ |
| Net of Previous Change Orders No. 1 through No.    : | \$ | _____ |
| Designer's Fee before this Change Order: | \$ | _____ |
| The Amount of this Change Order: | \$ | _____ |
| Revised Designer Agreement Amount: | \$ | _____ |

**IF NO ADJUSTMENT IS MADE, THE DESIGNER AGREEMENT AMOUNT REMAINS UNCHANGED.**

Designer Agreement Exhibit G – Change Order Form
[08.2007 ed. Rev. 0]



## EXHIBIT "G"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015**, by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services** at **DC Water New Headquarters Building, Washington, DC.**

**3.   ADJUSTMENT TO TIME FOR PERFORMANCE**: In connection with the change(s) noted in Section 1, Design/Builder agrees that Designer's time for performance under the Designer Agreement will be adjusted, if at all, as follows:         )¹

*[If the Change Order extends the schedule, identify the number of days of the extension; if there is a new Substantial Completion date, identify the date; if there is any change to any parts of the Design Services (e.g. submittal review's any change in Design packages, identify the new dates.]*

**IF NO ADJUSTMENT IS MADE, DESIGNER'S TIME FOR PERFORMANCE REMAINS UNCHANGED.**

By executing this Change Order, Designer attests that the Designer Agreement adjustment provided herein is adequate and constitutes compensation in full for all time, costs, overhead, claims, markup, and expenses, direct or indirect, attributable to this or any other prior Change Orders.  Designer further attests that the Designer Agreement adjustment provided herein constitutes compensation in full for any schedule impact, delays, acceleration, or loss of efficiency encountered by Designer and/or its Consultants in the performance of their Services through the date of this Change Order, and for the performance of this and any prior Change Orders by or before the date of Substantial Completion.
**EXCEPT AS EXPRESSLY MODIFIED HEREIN, THE TERMS AND CONDITIONS OF THE DESIGNER AGREEMENT REMAIN UNCHANGED.**

| Design/Builder: <br><br> **SKANSKA USA BUILDING INC.** | Designer: |
|---|---|
| By: _____ <br> (Signature)                              (Date) | By: _____ <br> (Signature)                              (Date) |
| _____ <br> (Printed Name)                          (Title) | _____ <br> (Printed Name)                          (Title) <br> *IF NOT SIGNED AND RETURNED WITHIN TEN (10) DAYS,* <br> *THIS DOCUMENT IS SUBJECT TO CANCELLATION.* |

Designer Agreement Exhibit G – Change Order Form
[08.2007 ed. Rev. 0]

# EXHIBIT "H"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015,** by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services** at **DC Water New Headquarters Building, Washington, DC.**

Supplemental Information files provided by the Owner

- Main and O Street Campus -- Electrical Survey
- New Headquarters Building Geotechnical Report
- LTCP Geotechnical Boring Data
- Original O Street Pumping Station Drawings (1961)
- Street Pumping Station Addition Drawings (1967)
- Street Pumping Station Rehabilitation Drawings (2004)
- Forest City -- First Stage PUD Application and Zoning Map Amendment
- Forest City – Second Stage PUD Application
- Forest City – Supplemental Pre-Hearing (PUD) Submission
- DC Water Draft Division 01 Specifications

Designer Agreement Exhibit H -- Owner Provided Information
[08.2007 ed. Rev. 0]

## EXHIBIT "I"

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015**, by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services** at **DC Water New Headquarters Building, Washington, DC**.

An agreed to SOV will be affix to this agreement in this Exhibit; we are also using this Exhibit to list the Sub consultant Allowances that are in the Design-Build Services Agreement with the Owner for Phase 1.

| | |
|---|---|
| Structural | - $ 292,634.00 |
| Civil | - $ 169,400.00 |
| Landscape | - $ 279,300.00 |
| Acoustic / Vibration | - $   18,000.00 |
| AV | - $   40,500.00 |
| Signage | - $   12,000.00 |
| Reimbursable | - $ 100,000.00 |

Designer Agreement Exhibit I - Designer Schedule of Values
[08.2007 ed. Rev. 0]

## EXHIBIT PS-1

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015,** by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services at DC Water New Headquarters Building, Washington, DC.**

## SUPPLEMENTAL TERMS AND CONDITIONS TO
### Designer Agreement

**Design Agreement between Skanska USA Building Inc. and SmithGroupJJR dated the 17 day of April, 20115 is hereby modified as follows:**

**Section 2.2.3 is amended as follows:**

2.2.3   General Provisions

Designer agrees to the extent applicable to the execution of its obligations hereunder to be bound to Design/Builder in the same manner as Design/Builder is bound to Owner, including the terms and conditions under which Designer's Services are to be performed, which include, but are not limited to, obligations, remedies, administrative procedures, and technical terms and conditions set forth in the Design-Build Agreement, **to the extent that the terms and conditions of the Design/Build Agreement do not exceed the Standard of Care.**

**Section 3.1 is amended as follows:**

3.1   Standard of Care

Designer and its Consultants shall perform all Design Services in accordance with all Legal Requirements, satisfying the requirements called for in the Contract Documents including the Project Budget and Schedule and this Agreement, and **notwithstanding anything to the contrary,** further agrees to execute the Design Services with the care and skill ordinarily used by members of the profession practicing under similar conditions at the same time and locality of the Project.  ~~Notwithstanding the foregoing, if the Contract Documents contain performance standards for aspects of the Designer's Services, the Designer agrees that it will perform all applicable Services so as to achieve such standards.~~

**Section 3.5 is amended as follows:**

3.5   Basic Services

The Designer's **preliminary** Basic Services consist of **the design services necessary to support Design/Builder's Phase I services as described in the Design/Build Agreement, including Designer's preparation and submission of Construction Documents at 80% level of completion and other information and documents reasonably necessary to support Design/Builder's GMP Proposal.  After Owner's acceptance of the GMP Proposal, Design/Builder and Designer will execute an amendment to this Agreement to authorize the remainder of Basic Services contemplated by this Agreement and adjust Designer's compensation accordingly. In such event, the full scope of Basic Services performed under the original Agreement and such amendment will include the following:**

- Design Development Documents (3.6 *et seq.*)
- Design Administration Services (3.7 *et seq.*)
- Government Authorization and Submissions (3.8 *et seq.*)

## EXHIBIT PS-1

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015,** by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services** at **DC Water New Headquarters Building, Washington, DC.**

- Construction Documents (3.9 *et seq.*)
- Bidding and Negotiation Assistance and Submissions (3.10 *er seq.*)
- Construction Administration *(*3.11 *et seq.*)
- Project Closeout Services (3.*12 et seq.*); and
- Other Basic Services as more fully set forth in this Agreement at Section 3.13 and the Contract Documents.

**Section 3.11.1.1 is amended as follows:**

3.11.1.1 Submittals. – Time for Review

Designer shall, consistent with the Project Schedule, timely review and approve or otherwise respond to Subcontractor submittals, including shop drawings, product data and samples.  Designer shall review, approve, or take other appropriate action upon submittals with reasonable promptness so as to cause no delay to the Project, and in accordance with Design/Builder's schedule for same, recognizing that under certain **limited** circumstances approvals will be required in a 24 hour time frame.  The time for Designer's review, approval and/or response to Subcontractor submittals shall be not more than 10 calendar days unless otherwise agreed to in writing by the Parties

**Section 3.21.1 is amended as follows:**

3.21.1   Hazardous Materials Indemnity

If it is later determined that the Project is not free of Hazardous Materials, and that the presence of the Hazardous Materials is due to materials or systems called for by the Construction Documents **that Designer knew or subject to the Standard of Care should have known were Hazardous Materials at the time the Contract Documents were submitted for permitting,** Designer shall take all necessary abatement action to remove, encapsulate, enclose, repair and/or mitigate the Hazardous Materials condition.  All such work, including the replacement or repair of any work damaged or removed in performing the abatement, shall be performed in accordance with all applicable Federal, State, and local laws and regulations, and at Designer's sole cost and expense.  Further, Designer shall indemnify, defend and hold harmless Design/Builder from and against any loss or liability sustained by Design/Builder to the extent such loss or liability arises from Designer's design.

**Section 7.1.1 is amended as follows:**

7.1.1   Indemnity

In addition to any liability or obligation of the Designer to the Design/Builder that may exist under any other provision of this Agreement, by law or otherwise, to the fullest extent permitted by law, Designer shall defend, indemnify and hold harmless Design/Builder, Owner, and each of their respective officers, agents, and employees (collectively the "Indemnitees") from and against any and all claims, actions, proceedings, liabilities, losses, damages, costs and expenses, including legal fees and disbursements, which the Indemnitees sustain for bodily injury, sickness or death and property damage or destruction (other than to the Work itself) including economic losses, if any, to the extent resulting from Designer's (or anyone under its control) **material breach** of failure to perform their obligations hereunder, or **negligent** acts, errors, omissions, or **willful misconduct on a comparative fault basis** active or passive negligence, regardless of whether it is caused in part by the negligence of the Indemnitees.

**Page 2 of 4**

## EXHIBIT PS-1

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015**, by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services at DC Water New Headquarters Building, Washington, DC.**

**Section 8.3 is amended as follows:**

8.3   <u>Supplementation</u>

In addition to any other remedy available to Design/Builder under this Agreement, if Design/Builder **reasonably** determines that Designer has fallen behind in the progress of its Design Services or is in danger of falling behind at its then current rate of progress, or is responsible for any Project Schedule delays due to the delivery of late, incomplete or otherwise insufficient design deliverables or any other failure to perform its Design Services in accordance with this Agreement, Design/Builder may require Designer to prepare a corrective action plan as set forth herein.  Within forty-eight (48) hours of such written notice from Design/Builder, Designer shall submit for Design/Builder's approval a corrective action plan composed of a recovery schedule and resource plan to demonstrate the manner by which Designer will implement the required steps to complete its Design Services in accordance with this Agreement including, as necessary the submission of or revision to any interim and final design deliverables within the time required by this Agreement and the Project Schedule.  Designer will implement the corrective action plan immediately upon Design/Builder's approval.  If Design/Builder **reasonably** determines that Designer's plan will not attain the required rate of progress or otherwise correct the issue, Designer will agree to take the steps Design/Builder reasonably requests to overcome the issue (including, if appropriate an agreement to supplement its Services with additional resources), all without additional cost to the Design/Builder.  If Designer fails to submit or otherwise fails to follow an approved corrective action plan, Design/Builder may, following twenty-four (24) hour notice to Designer take all steps Design/Builder deems necessary address the issue including, but not limited to terminating the Agreement in accordance with Section 8.2 herein.  Design/Builder may deduct from any payment due Designer or collect directly from Designer on demand all damages incurred or suffered by Design/Builder in connection with Designer's failure to perform its Design Services in accordance with the Project Schedule and the Standard of Care.

**Section 10.1.1 is amended as follows:**

10.1.1   <u>Integrated Use of 3d Models</u>

In recognition of the potential benefits to accrue from the utilization of 3D modeling software as an improved communication and collaboration tool, Designer agrees that should such modeling software become the basic tool for design of the Project that the Design/Builder and his Subcontractors will be provided the electronic model and subsequent updates of the model for their purposes (e.g., quantity surveys, clash detection, procurement, etc.).  Design/Builder acknowledges that the model produced by Designer may not have been constructed to permit Design/Builder and his Subcontractors to utilize the model for all of the intended purposes and that such use is at Design/Builder's and his Subcontractors' risk.  Designer acknowledges that Design/Builder may supplement Designer's model with additional database information that will facilitate Design/Builder and his Subcontractors purposes.  Designer will be provided copies of all models produced by Design/Builder and his Subcontractors.  At the point where design is complete, and construction is ongoing, maintenance of the building model will be assumed by the Design/Builder and Designer agrees to use such model for Construction Administration activities and functions.  **Design/Builder acknowledges that under no circumstances shall transfer of the electronic model be deemed a sale by Designer, and Designer makes no warranties, express or implied, of merchantability or fitness for any particular purpose.**

**Section 10.1.2 is amended as follows:**

## EXHIBIT PS-1

Attachment to **Designer Agreement No. 1614019-001** dated **April 17, 2015,** by and between **SmithGroupJJR** and **SKANSKA USA BUILDING INC.** for **Design Services at DC Water New Headquarters Building, Washington, DC.**

10.1.2   Design Development and Construction Document Use Indemnity.

If ~~Designer~~ **either Party** uses the Design Development and/or Construction Documents on any other project, it shall do so at its sole risk and without liability or legal exposure to **the other Party** ~~Design/Builder,~~ Owner or anyone working through them. ~~Designer~~ **The Party reusing the Design Development and/or Construction Documents** further agrees that it shall defend, indemnify and hold harmless the **other Party** ~~Design/Builder~~ and Owner from and against any and all claims, damages liabilities, losses and expenses, including attorney's fees, arising out of or resulting from such use of the Design Development and/or Construction Documents on another project.

**Exhibit "F" to the Design Agreement, entitled "DESIGNER INSURANCE REQUIREMENTSM," is modified as follow:**

**Section 1.7 is amended as follows:**

1.7   Professional Liability Insurance

If marked as required, the Scope involves professional services and Professional Liability Insurance is required covering liability for claims that arise from the errors, omissions or acts of the Designer or any entity for which the Designer is legally responsible, in the provision of professional services. The policy shall be primary and non-contributory, with the insuring agreement to read: "to pay on behalf of" and shall be effective (retroactively, if applicable) from the date of commencement of all professional activities in connection with the Scope. The coverage shall be maintained for a period of ten (10) years following completion of the Services. Minimum limits are $5,000,000 per claim/annual aggregate for the Designer and $5,000,000 per claim/annual aggregate for Designer's Consultants. A copy of the policy shall be provided to the Design/Builder upon Design/Builder's request. **Further, the Designer reserves its right to redact any confidential or proprietary information contained, therein.**

9.   OCIP/CCIP Program

**Delete in its entirety**

| Contractor: | Designer: |
|---|---|
| **SKANSKA USA BUILDING INC.** | **SmithGroupJJR** |
| By: _[signature]_ April 27 2015 | By: _[signature]_ 23 APRIL 2015 |
| (Signature)          (Date) | (Signature)          (Date) |
| STEPHEN SKINNER EVP & GM | John G. Crump PRINCIPAL |
| (Printed Name)      (Title) | (Printed Name)      (Title) |

Exhibit PS-1
Modifications to Skanska's Professional Services Agreement
(06/2006 ed. Rev. 3)