**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

| | | |
|---|---|---|
| SMITHGROUP, INC., | ) | |
| f/k/a SmithGroup JJR, Inc. | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 8:20-cv-02499-LKG |
| | ) | |
| SKANSKA USA BUILDING INC. | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

**SKANSKA USA BUILDING INC.'S MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO**
**SMITHGROUP'S MOTION FOR SUMMARY JUDGMENT**
**AND CROSS MOTION FOR SUMMARY JUDGMENT**
**AS TO SMITHGROUP'S CLAIM FOR EXTENDED CA SERVICES**

Thomas S. O'Leary (USDC MD Bar No. 20442)
Brian R. Dugdale (admitted *pro hac vice*)
Paul A Varela (admitted *pro hac vice*)
Varela, Lee, Metz & Guarino, LLP
1600 Tysons Blvd, Suite 900
Tysons Corner, VA 22102
Tel: 703.454.0170
Fax: 703.454.0169
toleary@vlmglaw.com
bdugdale@vlmglaw.com
pvarela@vlmglaw.com

*Counsel for Defendant/Counterclaim Plaintiff*
*Skanska USA Building Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iii

TABLE OF EXHIBITS .......................................................................................................iv

INTRODUCTION.................................................................................................- 1 -

STANDARD OF REVIEW AND CONTROLLING LAW .......................................... - 2 -

SKANSKA'S OPPOSITION ................................................................................ - 2 -

ARGUMENT .....................................................................................................- 10 -

I.       SmithGroup is Not Entitled to Summary Judgment on Count I of Skanska's Counterclaim. - 10 -

A. There are disputes of material fact regarding the applicable Standard of Care, and whether SmithGroup met the applicable Standard of Care.................................................................... - 11 -

B. There are disputes of material fact regarding SmithGroup's Mechanical Design failures on the Project.   - 12 -

II.      SmithGroup is not Entitled to Summary Judgment on Count II of Skanska's Counterclaim. - 18 -

III.     SmithGroup is not Entitled to Summary Judgment on Count III of Skanska's Counterclaim.- 20 -

A.       Skanska's Delay Expert is Qualified to Offer Opinions on Delays and such Opinions will be Useful to the Trier of Fact in this Present Action. ..........................................................- 20 -

B.       Skanska's Expert Opinions on SmithGroup's Deficient Design and Delays Establish a Causal Link to SmithGroup's Liability for Damages. ...................................................................- 22 -

C.       There is a dispute of material fact as to Skanska's Compliance with the Notice Requirements of the Design Agreement...........................................................................................- 24 -

D.       The Testimony Offered by Anne Marie Tombros in Her Deposition Does Not Invalidate the Opinions Offered by Skanska's Delay Expert. ...................................................................- 25 -

IV.      SmithGroup is not Entitled to Summary Judgment on Count IV of Skanska's Counterclaim.  - 26 -

A.       Skanska Has Established Evidence to Prove that SmithGroup Owes Skanska an Obligation Under Section 5.1 of the Contract. ..............................................................................- 26 -

B.       There is a Dispute of Material Fact Regarding Whether Skanska Failed to Provide Adequate Notice to SmithGroup. .............................................................................................- 27 -

V. CONCLUSION ............................................................................................- 28 -

SKANSKA'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT..............................- 28 -

I. STATEMENT OF UNDISPUTED FACTS..............................................................- 28 -

      A. The Project & Project Delays ................................................................ - 28 -

      B. SmithGroup's Fact Witness Testimony Regarding Extended CA Services. ................... - 31 -

II. DISCUSSION ..............................................................................................- 32 -

      A.SmithGroup Preformed No CPM Analysis in Support of its Delay Claim and therefore Cannot Establish Entitlement to Delay-Related Damages............................................................. - 32 -

      B. SmithGroup Cannot Prove its Delay Claim without an Expert. ...................................... - 34 -

III.CONCLUSION ..............................................................................................- 35 -

## **<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Appeals of States Roofing Corp*., A.S.B.C.A. No. 54860, 55501, 55502, 55505, 10-1 B.C.A. (CCH) ¶ 34356, 2010 WL 292732 (Armed Serv. B.C.A. 2010) ......................................... - 35 -

*E. Coast Repair & Fabrication, LLC v. United States*, 199 F. Supp. 3d 1006, 1030 (E.D. Va. 2016)................................................................................................................................... - 32 -

*Hensel Phelps Constr. Co*., MSBCA 1080 &1167, 4 MSBCA ¶ 306 (1992)......................... - 34 -

*Kirby v. Chrysler Corp*., 554 F. Supp. 743, 752 (D.Md. 1982)............................................... - 34 -

*Mega Constr. Co., Inc. v. United States*, 29 Fed. Cl. 396, 424 (1993) ................................... - 33 -

*Munday v. Waste Mgmt. of N. Am., Inc.*, 997 F. Supp. 681, 687 (D. Md. 1998).................... - 32 -

*Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc.,* 165 Md. App. 262, 277–78, (Md. Ct. Spec. App. 2005) .............................................................................................................. - 25 -

*Rustler Constr., Inc. v. D.C.*, 211 A.3d 187, 192–93 (D.C. 2019) ......................................... - 33 -

*Southern Comfort Builders, Inc. v. United States*, 67 Fed. Cl. 124 (2005)............................ - 33 -

*Univ. Lite Distribs., Inc. v. Nw. Indus., Inc.*, 602 F.2d 1173 (4th Cir. 1979)......................... - 25 -

**Other Authorities**

Dachille, M., CONSTRUCTION LAW DAMAGES, Maryland Construction Law Deskbook (2d ed. (2017), Ch. 9, n. 99 ......................................................................................................... - 35 -

Fed. R. Civ. P. 34 ...................................................................................................................... - 30 -

Fed. R. Civ. P. 56 ........................................................................................................................ - 1 -

## TABLE OF EXHIBITS

**Exhibit**                                                                                    **Pages**

| | | |
|---|---|---|
| Exhibit 1: | Meera Wagman Deposition Testimony | 3, 10, 19, 21, 22, 26-27, 29, 31 |
| Exhibit 2: | Matthew Jantz Deposition Testimony | 3, 4, 8, 9, 13-15 |
| Exhibit 3: | Mark Miller Deposition Testimony | 3-5, 8-9, 13, 28 |
| Exhibit 4: | Donald Posson Deposition Testimony | 4, 8, 13-15 |
| Exhibit 5: | Email Chain dated May 5, 2016 | 4 |
| Exhibit 6: | D. Michael Dowdall Deposition Testimony | 4, 7-9, 12, 14-18 |
| Exhibit 7: | Brian Leier Deposition Testimony | 6, 25 |
| Exhibit 8: | Email from M. Miller to M. Jantz dated November 2, 2018 | 8-10, 24 |
| Exhibit 9: | Letter from M. Miller to S. Shockey dated March 15, 2019 | 8 |
| Exhibit 10: | Email from D. Posson to K. Ricart dated October 24, 2019 | 8 |
| Exhibit 11: | Email from M. Jantz to J. Frengel dated November 1, 2018 | 8 |
| Exhibit 12: | Email from C. Schwartz to J. Ayers dated November 1, 2018 | 9 |
| Exhibit 13: | Kevin Ricart Deposition Testimony | 9, 13-15, 17 |
| Exhibit 14: | Anne Marie Tombros Deposition Testimony | 9, 25 |
| Exhibit 15: | Skanska Letter to SmithGroup dated August 30, 2018 | 10 |
| Exhibit 16: | Email from C. Seager to D. Schroeter dated November 9, 2017 | 10,27 |
| Exhibit 17: | M. Dowdall CV | 15 |
| Exhibit 18: | Skanska / Southland Design Assist Agreement | 3 |
| Exhibit 19: | Christopher Seager Deposition Testimony | 19 |
| Exhibit 20: | Thomas Gaines Deposition Testimony | 20, 23 |
| Exhibit 21: | Secretariat Report dated June 25, 2021 | 24, 30 |
| Exhibit 22: | Secretariat Report dated July 9, 2021 | 24, 30 |
| Exhibit 23: | June 2021 Helmes Report | 30, 31 |
| Exhibit 24: | July 2021 Helmes Report | 31 |

Pursuant to Fed. R. Civ. P. 56 and the Court's January 11, 2022 Amended Scheduling Order [ECF 33], Defendant/Counterclaim-Plaintiff Skanska USA Building Inc. ("Skanska") hereby opposes Plaintiff/Counterclaim-Defendant SmithGroup, Inc.'s ("SmithGroup") Motion for Summary Judgment [ECF 36] ("SmithGroup Motion") and files its Cross Motion for Summary Judgment ("Skanska's Cross Motion").

## **INTRODUCTION**

SmithGroup, from the onset of this Project, has been most focused on aesthetics and appearances, and potential awards and accolades for its architectural design, and far less focused on sound engineering and the process necessary to achieve a properly designed, successful, timely and on-budget project. SmithGroup failed to provide sound design, and to achieve clear contractual requirements such as compliance with the Project Budget and Schedule, falling far short of its obligations in multiple respects.[1] Indeed, the Project suffered massive design failures, cost overruns and delays—finishing over 3 years late and more than $10 million over budget—that Skanska blames in large part on SmithGroup.

SmithGroup refuses to acknowledge the role it played the Project's failures and argues that Skanska's entire Counterclaim should be resolved via its far-ranging Motion. Skanska has made credible, factually supported allegations against SmithGroup related to SmithGroup's performance and there are a multitude of disputed material facts. Whether SmithGroup's design was compliant with its contractual obligations including the applicable Standard of Care, whether SmithGroup complied with its Project Budget and Schedule obligations (which are in fact part of the applicable Standard of Care), and whether SmithGroup caused Project delay—all questions central to

---

[1]In its Motion, SmithGroup included as Footnote No. 1 a reference to the awards the Project has won; this not relevant to the matters at hand in this dispute.  Architectural awards are not persuasive evidence of SmithGroup's compliance with its contractual engineering and design obligations, especially in the face of the multiple and substantial design, schedule and budgetary failures the Project suffered.

resolution of Skanska's claims—are not questions that can be resolved via summary judgment without the Parties' detailed presentation of factual evidence and expert testimony.[2]

By contrast, Skanska's Cross Motion succinctly presents a single issue: it is undisputed that SmithGroup has performed no delay analysis and has no delay expert to testify in support of its delay claim.  SmithGroup therefore cannot prevail on its delay claim as a matter of law.

## STANDARD OF REVIEW AND CONTROLLING LAW

Skanska incorporates by reference the standard of review set forth in SmithGroup's Motion and agrees that Maryland substantive law governs this dispute. SmithGroup Mot. at 2-3.

## SKANSKA'S OPPOSITION
## TO SMITHGROUP'S MOTION FOR SUMMARY JUDGMENT

Skanska responds as follows to SmithGroup's allegedly undisputed facts.

1-4.    Undisputed

5.      Disputed; SmithGroup omits substantive material terms of the Design Agreement.  See Ex. B to SmithGroup's Mot., Contract, Exhibit PS-1, § 3.1.

6-23.   Undisputed.

24.     Undisputed; subject to additional undisputed facts.  The Southland Subcontract sets forth Southland's responsibilities, including design-assist responsibilities, as a subcontractor to Skanska.   SmithGroup at all times retained overall design responsibly under the Design Agreement.  See Ex. B to SmithGroup's Mot., Contract §§ 2.3.10, Art. 3, Ex. PS-1.

25-26.  Undisputed.

---

[2] SmithGroup admits that there are material factual disputes relative to Skanska's Counterclaim, stating ". . . the central issue, at least by Skanska's Counterclaim, is: *why* did those things happen, and *why* does Skanska attribute delay and added construction costs to SmithGroup?" SmithGroup Mot. at 8.  Indeed, *why* the Project suffered design, schedule and budgetary failures, and whether SmithGroup was the cause of those failures, is a dispute of many material facts.

27.     Disputed; Skanska also retained Secretariat's Meera Wagman, who will testify that SmithGroup's failure to complete its design obligations in compliance with the Project Schedule violated the applicable Standard of Care, which includes compliance with the Project Schedule. Ex. 1, M. Wagman Dep. 95:13-96:2; 164:21-165:19.

28-32.  Undisputed.

33.     Disputed.  SmithGroup mischaracterizes the evidence.  Exhibit U shows that SmithGroup proposed an acoustical consultant fee for Phase 2 and that Skanska received the proposal. It *does not* show that Skanska acknowledged Phase 2 would in fact include acoustic design consulting services.  It is undisputed that the Parties did not negotiate and agree to the scope of Phase 2 until July of 2016.  Exhibit U is dated December 2015, and executed contractual scope of SmithGroup's Phase 2 Design Services *never* included a separate fee for an acoustical consultant. Ex. I to SmithGroup's Mot., SmithGroup Change Order 6.

34-35.  Undisputed.

36.     Disputed. Southland was not responsible for establishing the Project approach to HVAC design.  Southland was responsible for making suggestions and generating ideas (*see* Ex. 18, Skanska-Southland Design-Assist Agreement); whereas SmithGroup was responsible for reviewing any such suggestions and incorporating approved ideas into SmithGroup's Design Documents—only *if SmithGroup agreed with them*. See Ex. B to SmithGroup's Mot., Contract §§ 3.7, 3.11.1. If SmithGroup disagreed, SmithGroup could have informed Skanska that it would not accept Southland's suggestions. Ex. 2, Jantz Dep. 88:7-93:25.

37.     Disputed.  Mr. Miller testified that Southland was "to work with Skanska and SmithGroup" to "come up with a mechanical system"—he did not testify as to Southland's contractual responsibility as SmithGroup implies. Ex. OO to SmithGroup's Mot., Ex. 3, Miller Dep. 38:10-

15. SmithGroup is the Designer with complete responsibility finalizing and sealing the design drawings. *See* Ex. B to SmithGroup's Mot., Contract, Art. 3; Ex. 4, Posson Dep. 18:5-18.

38-39.   Undisputed.

40.     Undisputed; subject to additional undisputed facts.   Skanska approved and SmithGroup utilized an acoustical consultant during its Phase 1 design.  Ex. T to SmithGroup's Mot., Initial Acoustics Report; Ex. 2 Jantz Dep., 83:13-85:1. Skanska provided the response to DCW cited by SmithGroup during Phase 1, *before the Phase 2 scope was negotiated and agreed upon*.  See Ex. I to SmithGroup's Mot., SmithGroup Change Order 6. It is also undisputed that the acoustical consultant asked SmithGroup for information regarding the acoustics in order to perform a review of the equipment and potential noise during Phase 1 and that SmithGroup neglected to review its Phase 1 design and equipment selection and noise with the acoustical consultant during Phase 1, when it had the opportunity to do so in May of 2016. Ex. 2, Jantz Dep. 119:22-124:8.  Ex. 5, email chain dated May 5, 2016 (Ex. 7 to Jantz Dep.).   The Parties dispute whether SmithGroup should have, could have, and was responsible for designing sound attenuation measures, and why SmithGroup did not design such measures, notwithstanding the above. Skanska's Counterclaim, Count I; Ex. 3, Miller Dep. 57:1-58:22; Ex. 6, Dowdall Dep. 111:21-116:20; 125:3-126:1.

41.     Undisputed.

42.     Disputed.   Ex J does not show "intention" and Skanska did not "intend" to have SmithGroup retain an acoustical design consultant at that time the document was generated. Ex. X to SmithGroup Mot.; Ex. I to SmithGroup Mot., SmithGroup Change Order 6.  Mr. Miller provided testimony explaining why line items on Skanska's pay applications were in some cases inaccurate; DCW did not allow Skanska to change the line items it is original schedule of values, even after Skanska and SmithGroup had agreed to changes in scope or the actual values changed.  Thus, the

"acoustical design services" item and many other items remained in the schedule of values in Skanska's pay applications despite Skanska and SmithGroup agreeing in July 2016 that Phase 2 of SmithGroup's Design Services would not include the use of an outside acoustical consultant. Ex. 3, Miller Dep., 135:11-143:7.

43.     Undisputed; subject to additional undisputed facts. See responses to Items 40 and 41 above. It is further undisputed that SmithGroup selected the HVAC equipment and completed its entire Phase 2 HVAC design work before approaching Skanska and requesting a change order to review SmithGroup's already completed HVAC design, using an outside acoustical consultant.  Ex. X to SmithGroup's Mot.

44.     Disputed.  Mr. Leier does not use the words SmithGroup quotes—"too late."  Mr. Leier asks Mr. Shockey why the acoustical review was not completed in Phase 1 (when SmithGroup had a budget for acoustical review and selected the majority of the equipment for the design).  Mr. Shockey then confirms to Mr. Leier that SmithGroup agreed to remove the acoustical consultant fee from its Phase 2 Design Services scope, and further confirms that SmithGroup did not anticipate any equipment changes based on the additional requested acoustical review, stating "it is not about changing the equipment, the equipment is fine." Ex. X to SmithGroup's Mot.

45.     Disputed.   Again, SmithGroup mischaracterizes the evidence. Nothing in Ex. X to SmithGroup's Motion indicates that a Phase 2 acoustical review "had always been the plan."  The cited email confirms the opposite: Skanska specifically excluded the Phase 2 acoustical review from SmithGroup's scope and fees for Phase 2 in July 2016.  Ex. X to SmithGroup's Mot.; Ex. 3, Miller Dep. 49:5-52:1.

 46.     Disputed. SmithGroup's mischaracterization of Mr. Leier's testimony is egregious.  Mr. Leier *did not* testify that "acoustical review was standard" in the context of discussions regarding

whether to have an acoustical review performed *after the design was completed*.  Mr. Leier testified generally that he believed an "acoustical *study*" was "standard" on a project such as this.  And indeed, an acoustical study was in fact provided by SmithGroup's acoustical consultant prior to Phase1, but SmithGroup did not follow its recommendations. Further, nowhere in the cited testimony does Mr. Leier state that he was "concerned."  Mr. Leier simply testified that he was asking why acoustical review had not been done during Phase 1. Ex. 7, Leier Dep. 67:6-67:9, 122:8-123:2. Mr. Shockey promptly confirmed that acoustical review had in fact been done during Phase 1, and that the Parties agreed in negotiating Phase 2, that SmithGroup would not have a budget for additional acoustical consultant services.  Ex. X to SmithGroup's Mot.

47.     Undisputed.

48.     Undisputed; subject to additional undisputed facts.  It is also undisputed that SmithGroup selected its equipment and considered sound attenuation during Phase 1, and then agreed to perform Phase 2 without the use of an outside acoustical consultant.  Exs. I, X to SmithGroup's Motion.   Whether SmithGroup could have and should have designed sound attenuation and selected different equipment during Phase 1 or Phase 2 are disputed material facts.  *See* response to No. 40 above.

49.     Disputed. See response to No. 42 above.

50.     Disputed.  Skanska disputes that Mr. Shockey "requested authority" to do anything.  He states in both Exhibits Y and Z, that "We don't have a fee for SMW for phase II, but some review of mech systems noise would be advisable for due diligence."  He did not say the acoustical consultant was "necessary" or "required" or tell Skanska that SmithGroup was unable to design the HVAC System properly without the consultant services, and he did not inform Skanska that

he expected further sound attenuation to be implemented if he received "authority" for additional acoustical review. Ex. 6, Dowdall Dep. 125:3-126:1.

51-52.  Undisputed.

53-56.  Disputed. *See* Response to Nos. 42 and 49 above.

57.     Undisputed.

58.     Disputed.  The Design Agreement requires that SmithGroup "shall notify" Skanska prior to engaging any consultant and states that SmithGroup shall not engage a consultant if "reasonably objected to" by Skanska. Ex. B to SmithGroup's Mot., § 3.4. It is undisputed that SmithGroup never "notified Skanska" that it was engaging an acoustical consultant for Phase 2 and that Skanska therefore never had an opportunity to object to such engagement SmithGroup requested *additional fees* so that it could pay an acoustical consultant at the end of Phase 2, and Skanska did not approve the additional fees.  *See* Ex. X to SmithGroup's Mot.

59-60.  Undisputed; subject to clarification.  See Responses to Items 53-56 above. The implication that Skanska's certification was improper is misleading, as DCW was fully aware what was reflected in the schedule of values contained in Skanska's Pay Applications.

61-62.  Undisputed, but entirely immaterial to Skanska's Motion for Summary Judgment.

63.     Undisputed.

64.     Disputed. Skanska never precluded SmithGroup from utilizing an acoustical consultant at any time.  Skanska simply did not agree to pay SmithGroup additional fees to retain an acoustical consultant after SmithGroup already completed its Phase 2 design.  Ex. X to SmithGroup's Mot. Further, Southland and Skanska were not responsible for the HVAC System design; SmithGroup was. Ex. B to SmithGroup's Mot., Contract §§ 2.3.10, Art. 3, Ex. PS-1.

65.     Undisputed; subject to additional undisputed facts.  Mr. Miller states that performing the certain sound attenuation work before installation would have been a "very economical solution." It is however further undisputed that such work would still have required changes to SmithGroup's Phase 2 Design—which had already been completed—because SmithGroup had not properly designed sound attenuation measures during the design phase. The work was done after installation as opposed to before installation because the deficiencies in the system were not identified until after installation.  Ex. 3, Miller Dep. 57:1-58:22.

66.     Disputed.  SmithGroup "helped" in limited capacity; but also at times refused to cooperate, denied responsibility, delayed resolution of the problems, and refused to reimburse Skanska for the costs of the mitigation measures for which SmithGroup was at fault. Ex. 8, Email from M. Miller to M. Jantz dated Nov. 2, 2018 (Ex. 10 to Shockey Dep); Ex. 9, March 15, 2019 letter from Miller to Shockey (Ex. 13 to Shockey Dep); Ex. 4, Posson Dep., 201:9-202:9; Ex. 10, Email from D. Posson to K. Ricart dated Oct. 24, 2019 (Ex. 11 to Posson Dep.); Ex. 11, Email from M. Jantz to J. Frengel dated November 1, 2018 (Ex. 8 to Jantz Dep.).

67-72.  Undisputed.

73.     Undisputed; subject to additional undisputed facts.  Skanska responded this way because SmithGroup believed condensate drains were not required.  It is undisputed that SmithGroup was incorrect, as the drains were required by code, and that the lack of drains contributed to problems after construction.  Ex. 2, Jantz Dep. 46:18-51:8; Ex. 6, Dowdall Dep. 153:13-173:13.

74.     Undisputed; subject to additional undisputed facts.  *See* response to No. 73 above.

75.     Undisputed; subject to additional undisputed facts. DCW repeatedly demanded that Skanska correct the HVAC System problems that occurred between 2018 and 2021, including the HVAC System's inability to control humidity and indoor condensation leaks—which problems

were related to and exacerbated by the lack of condensate drains. Ex. 12, Email from C. Schwartz to J. Ayers dated November 1, 2018 (Schroeter Dep. Ex. 5); Ex. 8, Email from M. Miller to M. Jantz dated Nov. 2, 2018 (Ex. 10 to Shockey Dep).

76.     Undisputed; subject to additional undisputed facts.  SmithGroup never sought a proper variance from DC building officials in order to legally comply with required code. Ex. 2, Jantz Dep. 55:25-56:9.

77.     Undisputed; however, it is also undisputed that the referenced code never applied to this Project. Ex. 2, Jantz Dep., 49:25-50:6; Ex. 6, Dowdall Dep. 153:13-154:14.

78-80.  Undisputed.

81.     Undisputed; subject to additional undisputed facts. Skanska and SmithGroup worked together to test, adjust and modify the HVAC System to satisfy the Owner through their combined efforts.  Ex. 3, Miller Dep. 55:3-58:22; Ex. 6, Dowdall Dep., 44:8-47:12; Ex. 13, Ricart Dep., 244:8 - 263:15; 284:19-290:20.

82-83.  Undisputed.

84.     Undisputed; subject to additional undisputed facts.  SmithGroup's statement is incomplete. It is also undisputed that it was not Ms. Tombros's responsibility to determine the cause of an impact.  Ms. Tombros generally did not attribute the cause of delay to SmithGroup or anyone else, because it was not her job to identify the cause of the impact, but rather only its delay effect on the Project schedule. Ex. 14, Tombros Dep., 36:18-37:9.

85.     Undisputed; subject to additional undisputed facts. Ms. Tombros attributed delays to DCW when instructed to do so.  She made no independent assessment of responsibility for delays. *Id.*

86-87.  Undisputed; subject to additional undisputed facts. *See* response to No. 85 above.

88-89.  Undisputed.

90.     Disputed. Skanska provided notice of deficiencies and delays related to the HVAC design. Ex. 15, Letter from Skanska to SmithGroup dated August 30, 2018; Ex. 8, Email from M. Miller to M. Jantz dated Nov. 2, 2018 (Ex. 10 to Shockey Dep). Regarding earlier delays and impacts, the Parties discussed items during the course of the Project and in meetings. Ex. 16, Email from C. Seager to D. Schroeter Nov. 9, 2017. Whether the Parties conduct established a course of conduct that obviated the need for additional notice is a question of fact to be resolved at trial.

91.     Undisputed.

92.     Undisputed; subject to clarification. The impact of the change must be analyzed utilizing CPM schedule delay methodology. The length of the response time is undisputed; the actual impact of the change on the Project schedule is disputed. Ms. Wagman testified that the impact was 37 days of delay. Ex. 1, Wagman Dep., 174:5-176:10.

93.     Undisputed.

94.     Undisputed; subject to clarification. *See* Response to No. 92 above.

95.     Disputed. ICON was responsible for selecting and installing its curtainwall system—subject to SmithGroup's review and incorporation into the design documents. *See* Ex. B to SmithGroup's Mot., Contract §§ 3.7, 3.11.1.

## ARGUMENT

I.      **SmithGroup is Not Entitled to Summary Judgment on Count I of Skanska's Counterclaim.**

SmithGroup makes statements in its Motion suggesting Skanska's allegations in Count I of its Counterclaim are unduly "broad," purportedly as a means to establish that the lack of disputed material facts. To the contrary, Skanska's Counterclaim sufficiently identifies

SmithGroup breaches of the Design Agreement and bolstered by the evidence adduced during

discovery it is clear that there are multiple issues of disputed material fact. [3]

> **A.    There are disputes of material fact regarding the applicable Standard of Care, and whether SmithGroup met the applicable Standard of Care.[4]**

SmithGroup's Motion is predicated on SmithGroup having met the applicable Standard of

Care, but nowhere in SmithGroup's Motion does SmithGroup claim it met the <u>actual</u>, full Standard

of Care as set forth in the Design Agreement. Throughout its Motion for Summary Judgment,

SmithGroup fails to accurately cite the contractually required Standard of Care.  For example, in

Section I.B. of its Motion, SmithGroup argues that it "agreed to provide its services 'with the care

and skill ordinarily used by members of the profession practicing under similar conditions at the

same time and locality of the Project.'" SmithGroup Mot., p. 15.  The actual, contractual standard

of care of the Design Agreement, <u>in full</u>, reads as follows:

> Designer and its Consultants shall perform all Design Services in accordance with all Legal Requirements, **satisfying the requirements called for in the Contract Documents including the Project Budget and Schedule and this Agreement**, and notwithstanding anything to the contrary further agree to execute the Design Services with the care and skill ordinarily used by members of the profession practicing under similar conditions at the same time and locality of the Project.

(Emphasis added). Ex. B to SmithGroup's Mot., Contract, Exhibit PS-1, § 3.1.  The Court must

consider the <u>full</u> and proper Standard of Care contained in the Design Agreement in order to

resolve this dispute. SmithGroup agreed to design the Project to satisfy "the Project Budget and

---

[3] Notice Pleading under Fed. R. Civ. P. 8 requires only: (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.  Skanska easily met these requirements.

[4] SmithGroup's Motion presents an inappropriate combination of arguments for exclusion of expert testimony and summary judgment all under one roof; Skanska's Opposition does not track SmithGroup's subheadings exactly, in an effort to present grounds for denial of SmithGroup's Motion as succinctly as possible.

Schedule" of the Design Agreement—a fact SmithGroup fails to acknowledge. SmithGroup's refusal to accurately cite contractually required Standard of Care, while ostensibly defending its compliance with a more general standard of care, should alert the Court to the following: (i) the Parties do not agree on what the applicable Standard of Care is—a disputed material fact in and of itself; and (ii) there are disputed material facts as to whether SmithGroup met the applicable Standard of Care.[5] See Responses to SmithGroup's Undisputed Material Facts ¶¶ 5, 27, 40, 48, 73.

**B.    There are disputes of material fact regarding SmithGroup's Mechanical Design failures on the Project.**

      i.    <u>There are disputes of material fact as to SmithGroup's acoustical design failures.</u>

SmithGroup claims that "Dowdall never attempts to answer the dispositive question: *why* didn't SmithGroup's design provide a solution for these acoustic issues?" SmithGroup Mot. p. 21. This argument is once again demonstrably false and at a minimum establishes issues of disputed material fact. First, Mr. Dowdall testified extensively regarding the "why" SmithGroup's design was deficient—expressing his opinion that SmithGroup failed to properly design sound attenuation measures. For example, Mr. Dowdall states that, "[t]he first thing that [SmithGroup] should do is look at the sound power levels of the box or fan powered terminal unit and the fan coil unit and simply look in the ASHRAE handbook on how to attenuate noise. That's the first place to start because you already know that your units are substantially above the NC level specified for the space." Ex. 6, Dowdall Dep. 88:17-89:2; 110:10-116:20. Mr. Dowdall's Report stated:

> There is no evidence that SmithGroup asked for or received an evaluation of the base design by SM&W. I understand that there was some dispute about the cost of paying SM&W for supplementary reviews, and that SmithGroup did not retain SM&W for a second review because the review was not funded by Skanska. The funding issue is irrelevant in my opinion. Whether SmithGroup had in-house designers capable of reviewing and implementing the ASHRAE recommendations or it retained SM&W,

---

[5] SmithGroup only references portions of the full, applicable Standard of Care in its Motion when it quotes Skanska's Counterclaim, which correctly identifies and references the applicable Standard of Care.

SmithGroup, as the EOR, should have designed the system to the appropriate noise levels, and it did not. This failure to meet the recommended NC 40 sound level is a key error that reverberated throughout the entire HVAC system and the multiple attempts to correct the noise levels."

Ex. KK to SmithGroup's Mot.

Not only did Mr. Dowdall consider the reasons why SmithGroup's design was deficient in relation to acoustics (including SmithGroup's request for additional funding for an acoustical consultant after completion of SmithGroup's Phase 2 design), but he also opined that "the funding issue is irrelevant" and it was SmithGroup's responsibility, as the Designer, to take the actions necessary to ensure its design would include the necessary sound attenuation. *Id.* at p. 7. Thus, Mr. Dowdall answers the "why," effectively opining that the noise levels were too high "[because SmithGroup did not prepare an appropriate acoustical design]."

It is undisputed that the HVAC system, as designed by SmithGroup, produced unacceptable acoustical levels and both Skanska's and SmithGroup's mechanical experts and lay witnesses acknowledge that the noise issues had to be corrected. SmithGroup's Kevin Ricart testified that he found them to be "louder than [he] would have liked" and admitted that SmithGroup, in its design of the HVAC system, "did not include enough attenuation" to ensure the sound levels of the HVAC system as designed would be acceptable. Ex. 13, Ricart Dep. 171:7-172:2; Ex. 4, Posson Dep. 69:18-70:16; Ex. 2, Jantz Dep. 75:2-76:18; 79:23-81:1. Skanska's Mr. Miller testified that the system noise was excessive and rendered the building unusable. Ex. 3, Miller Dep. 32:2-19. However, there is obviously a material dispute regarding whether SmithGroup *is at fault* for the unacceptable noise levels.

There are additional facts that must be established to answer the question of "*why didn't SmithGroup prepare an appropriate sound attenuation design*?"—those facts are clearly disputed. SmithGroup believes Skanska prevented SmithGroup from preparing an appropriate design by not

providing a change order for SmithGroup to retain an acoustical consultant to review its design after completion of its Phase 2 design (SmithGroup's Mot., Undisputed Fact ¶ 64); Skanska posits that it did not prevent SmithGroup from doing anything, and that SmithGroup could have and should incorporated appropriate sound attenuation into its HVAC System design. See response to SmithGroup's Undisputed Fact ¶ 64 above; Ex. 6, Dowdall Dep. 88:17-89:2; 110:10-116:20.

Second, there are disputed material facts regarding whether SmithGroup was even capable of providing an adequate HVAC design that would meet the applicable Standard of Care. SmithGroup's own witnesses present dueling testimony as to SmithGroup's abilities in this regard. Mr. Ricart testified that he believes SmithGroup did not include enough attenuation, but further explained that "SmithGroup on its own *did not have the expertise* to determine the correct amount of attenuation for this unique application" (Emphasis added.) Ex. 13, Ricart Dep.171:14-22, 172:1-5. However, SmithGroup's lead mechanical designer for Phase 1 design, Matthew Jantz, testified that he was familiar and had used on the other projects the sound attenuation design techniques that ultimately were used to mitigate the noise issues—yet the techniques were not implemented on this Project.  Ex. 2, Jantz Dep.80:11 – 83:8; *see also* Ex. 4, Posson Dep. 52:13-59:2. At the very least, it is evident that there are disputed material facts related to SmithGroup's internal capabilities relative to acoustics.

Lastly, Skanska does not lack admissible expert testimony regarding SmithGroup's noise attenuation design as SmithGroup argues in Section I.E of its Motion.  Mr. Dowdall provided in his report and in deposition testimony a detailed description of how he arrived at his conclusions, including review of the correspondence regarding the SmithGroup's "outside consultant defense." Ex. 6, Dowdall Dep. 111:21-116:20; 125:3-126:1. Mr. Dowdall has vast experience regarding mechanical design and as an expert witness.  He is more than qualified to render admissible

- 14 -

testimony that SmithGroup's failure to design proper sound attenuation was a violation of the applicable Standard of Care.  Ex. 17, Dowdall CV.  The Court should not entertain SmithGroup's attempts to cast Mr. Dowdall's testimony as somehow conducive to summary judgment.

        ii.    <u>There are disputed material facts regarding SmithGroup's failure to design code-compliant condensate drains.</u>

SmithGroup argues that "Dowdall's opinion about the condensate drain requirement [on the Project] is . . . based entirely on his interpretation of the then applicable building code . . . ." SmithGroup Mot. at p. 20.  Although interpretation of the applicable mechanical code is certainly relevant, this issue is not one "only" of code interpretation.

Mr. Dowdall testified that the code required the inclusion of condensate drains. Ex. 6, Dowdall Dep. 154:11-14. Whether future iterations of the building code did or did not require condensate drains is irrelevant, because at the time of the design, condensate drains were required. Ex. 6, Dowdall Dep. 166:18-21.  Some SmithGroup witnesses admitted that the applicable code required condensate drains (Ex. 2, Jantz Dep. 49:25-50:6), but that SmithGroup did not need to comply with this code requirement, while others testified that the applicable code did not actually require condensate drains. Ex. 4, Posson Dep. 86:5-22.  Skanska, by contrast, argues that neither discussion during design between SmithGroup and Southland, nor SmithGroup's interactions with the Owner, excuse SmithGroup's failure to design the condensate drains per the code requirement. Ex. 6, Dowdall Dep. 153:13-173:13.  Skanska also believes, and Mr. Dowdall will testify, that the missing condensate drains were a substantial cause of problems on the Project after installation of the HVAC system (*see id.*), while SmithGroup believes they were not. Ex. 13, Ricart Dep. 180:1-187:3.  These are unmistakable disputes of material fact.

Finally, again Skanska does not lack relevant or admissible expert testimony regarding condensate drains as SmithGroup argues in Section IV.D of its Motion. Mr. Dowdall's opinion is

absolutely "relevant," because he opines that the absence of condensate drains contributed to problems on the Project post-construction. Ex. 6, Dowdall Dep. 153:13-173:13; *see also* Ex. KK to SmithGroup's Mot. at §§ 5.2-5.3. These are the very problems it took Skanska multiple years and substantial costs to correct, and for which it seeks damages from SmithGroup.  Moreover, Mr. Dowdall's opinions and testimony make clear that he views the lack of condensate drains as poor design, not simply because it is a code violation, but because it actually can cause physical problems within the building at issue, as it did here. Ex. 6, Dowdall Dep. 153:13-173:13.  Mr. Dowdall's testimony therefore will go directly to whether the lack of condensate drains constitutes a violation of the applicable Standard of Care because it was both a code violation and to whether, in his professional opinion, the lack of condensate drains contributed to the problems that the Project experienced post-construction.

Additionally,  Mr. Dowdall is absolutely "qualified" to render an opinion both as to whether the lack of condensate drains was a code violation (which he does), and that lack of condensate drains was a poor design choice for this Project. Nothing in SmithGroup's morass of contentions regarding what Mr. Dowdall considered investigation (e.g., Southland statements that they do not pipe condensate drains and that there is no practical reason to include them) changes Mr. Dowdall's experience or ability to render his opinion that condensate drains should have been included in SmithGroup's design.[6]

---

[6] SmithGroup's dubious criticism of the credentials of one of the foremost experts in the HVAC design industry, is not only an obvious departure from proper legal argument in support of its Motion for Summary Judgment, but also strains SmithGroup's credibility. In any event, there are no grounds for summary judgment relative to Mr. Dowdall's qualifications to testify regarding SmithGroup's failure to design code-compliant condensate drains.

iii.    There is a dispute of material fact as to SmithGroup's deficient
design related to the DOAS System.

SmithGroup next argues that Mr. Dowdall's analysis of the DOAS system is insufficient to constitute a dispute of material fact.  This is also incorrect.  In its Motion, SmithGroup cites only a portion of Mr. Dowdall's testimony, arguing that Mr. Dowdall's analysis is insufficient. SmithGroup's selective citation of testimony is par for the course with SmithGroup's various attempts to both exclude Mr. Dowdall's testimony and craft a summary judgement narrative, without providing the full, contextualized language of the cited materials for the Court.

Mr. Dowdall testified that, "SmithGroup did get involved . . . and made some changes to the outside air damper settings that fed some fan powered terminal units and some fan coil units on the first and second floor, but to the best of my knowledge they did not modify the difference between the exhaust and the supply at the DOAS." Ex. 6, M. Dowdall Dep. 45:7-13. Asked whether "modification itself would be done by the controls contractor or the building operator," Mr. Dowdall responded: "[y]es, but this was done at the direction of SmithGroup." *Id.* at 45:14-18. Contrary to SmithGroup's Motion, Mr. Dowdall did not limit his opinions to the mere possibility that the equipment may not be capable of operating at targeted conditions, but, testified to the fact that the DOAS system, as designed by SmithGroup, was not properly designed and operative, even after SmithGroup had participated in the most recent testing of the DOAS system. *Id* at 42:5-45:18; 153:13-173:13.  He also testified that the DOAS design contributed to various problems on the Project post-construction—which SmithGroup disputes. *Id.* at 153:13-173:13; *see also* Ex. 13, Ricart Dep. 244:8 - 263:15; 284:19-290:20. In his report, Mr. Dowdall opined in relation to the DOAS system that SmithGroup's failed to design a system that would maintain positive building pressure as required, in violation of the applicable standard of care. Ex. KK to

SmithGroup's Mot. at § 4.3. The expert testimony of Mr. Dowdall is more than sufficient to establish a disputed issue of fact regarding SmithGroup's DOAS system design.

Finally, contrary to SmithGroup's argument in Section IV.C of its Motion, Skanska does not lack "admissible expert testimony" regarding SmithGroup's design of the DOAS system. SmithGroup focuses on Mr. Dowdall's opinion that the DOAS system "may" not be capable of operating to target conditions, but ignores the fact that Mr. Dowdall also makes clear his opinion that the DOAS system *was not* at the time of his opinions operating to target conditions because of SmithGroup design deficiencies. Ex. 6, Dowdall Dep. 42:5-45:18.  As the Parties discovered after multiple years and rounds of investigation, testing and workarounds, there was ultimately a way to operate the system to target conditions—which required changes to the design Sequence of Operation and other adjustments. *Id.* at 39:3-47:15; 153:13-173:13.  Dowdall does not confirm in his testimony that he had "not done sufficient testing, adjustment and analysis"—but rather that *the Parties'* testing, adjustment and analysis regarding changes to the DOAS system were ongoing at the time of his opinion.  His report and testimony are nonetheless clear that in his professional judgment, the DOAS system was not designed and installed with a Sequence of Operations that would result in an operational system. Ex. 6, Dowdall Dep. 30:1-33:8; 174:2-180:8; *see also* Ex. KK to SmithGroup's Mot. at § 4.1-4.3.  Mr. Dowdall's testimony regarding the DOAS design is admissible, and SmithGroup presents no cogent argument that it is a basis for summary judgment.

**II.    SmithGroup is not Entitled to Summary Judgment on Count II of Skanska's Counterclaim.**

SmithGroup's argument that it is entitled to Summary Judgment on Count II of Skanska's Counterclaim fails for at least two reasons.  First, Contrary to SmithGroup's Motion, Count II of Skanska's Counterclaim alleges specific failures on the part of SmithGroup in its implementation of Design Services on the Project, amounting to a breach of the Design Agreement between

SmithGroup and Skanska—and does not allege specifically that there is a violation of the Standard of Care or negligence in any particular component of SmithGroup's design.[7]    Skanska's allegations, and supporting testimony, are sufficient to show issues of disputed material facts as to whether SmithGroup breached the Design Agreement.[8]  Ex. 1, Wagman Dep. 161:14 – 165:15.

Second, SmithGroup again incorrectly argues that Skanska lacks admissible expert testimony to prove deficient Design Services beyond the HVAC Design.  Expert standard of care testimony is not required to prove breach of contract. The evidence is more than sufficient to raise issues of material fact regarding whether SmithGroup complied with the Design Agreement.  Ex. 1, Wagman Dep. 110:6-133-18; 161:14 – 165:15; *see also* Ex. 19, Seager Dep. 93:9-94:16; D. Kopnitsky Affidavit; *see generally* Ex. LL to SmithGroup's Mot .  Moreover, even if "standard of care" or other expert testimony is required under Count II, Skanska has two experts to provide testimony supporting Count II of its Counterclaim, including with regard to the applicable Standard of Care as it relates to compliance with the Project Schedule.

When asked in her deposition whether she was expressing an opinion on deficiencies in the design documents submitted by SmithGroup, Ms. Wagman testified that she was not offering an opinion "from an engineering standard of care perspective," but is in fact offering opinion on the "schedule perspective" of the contractually applicable Standard of Care. Ex. 1, Wagman Dep. 161:14 – 162:8. Ms. Wagman stated that the Standard of Care applicable to the Design Agreement "has an inclusion with respect to project schedule," and restated that she is looking at SmithGroup's failures to meet the applicable Standard of Care from the perspective of how the

---

[7] SmithGroup seemingly attempts to argue that Skanska's Counterclaim fails to state a claim upon which relief may be granted; SmithGroup waived its right to raise such an argument when it failed to file a motion to dismiss with or prior to its Answer, pursuant to Fed. R. Civ. P. 12.
[8] SmithGroup's reference to Skanska's "troubling" allegations regarding work that SmithGroup performed, and the implication that Skanska believes SmithGroup performed actual construction work (SmithGroup Mot. p. 32), is barely worth the trouble of a response. Skanska alleges deficiencies in SmithGroup's *design work*—not construction work.

errors and omissions in SmithGroup's Design Services negatively impacted the Project Schedule, in violation of the Standard of Care. *Id*. at 162:9 – 165:15.  Ms. Wagman is more than qualified to offer this opinion. In addition, Mr. Gaines of Secretariat intends to offer testimony consistent with Secretariat's reports regarding the damages Skanska incurred as  result of SmithGroup's deficient design services. Ex. LL to SmithGroup's Mot., at pp. 71-95; Ex. 20, Gaines Dep. 29:16-40:12.

Skanska has presented relevant, substantive expert testimony on SmithGroup's deficient Design Services, including the testimony regarding the applicable Standard of Care as it relates to schedule delays, as well as expert opinion testimony regarding Skanska's damages, and underlying fact testimony establishing disagreement regarding the adequacy of SmithGroup's performance. This testimony and evidence are admissible and should be heard in court in order for the Court to resolve issues of disputed material fact pertaining to whether SmithGroup breached the Design Agreement and SmithGroup's argument for summary judgment on Count II must be denied.

III.     **SmithGroup is not Entitled to Summary Judgment on Count III of Skanska's Counterclaim.**

A.  **Skanska's Delay Expert is Qualified to Offer Opinions on Delays and such Opinions will be Useful to the Trier of Fact in this Present Action.**

First, SmithGroup again attempts to argue that "[t]he absence of any opinion from a qualified expert that SmithGroup's design deviated from the standard of care" should be cause for summary judgment on Count III of Skanska's Counterclaim. However, as discussed above, Skanska does in fact offer the opinion of Ms. Wagman, a qualified expert, that Design Services, provided by SmithGroup, caused delays to the Project Schedule, in turn breaching the applicable Standard of Care set forth in the Design Agreement.  SmithGroup goes on to argue, simultaneously, that the expert report submitted by Ms. Wagman and Thomas Gaines (both of Secretariat), is replete with "conclusory statements" and presumptions that cannot be considered admissible

opinions, while in the same breath arguing that expert reports are not evidence and cannot be admitted at trial in place of expert testimony. There are no grounds for SmithGroup to broadly claim that the testimony of either of the Secretariat expert witnesses is inadmissible as "unhelpful."

Second, SmithGroup attacks Ms. Wagman's deposition testimony, claiming she, among other things, conceded that she is not a professional engineer and has not formed "any opinion whatsoever about the applicable standard of care for design.[9] SmithGroup's recitation of Ms. Wagman's testimony is accurate.  However, Ms. Wagman's testimony *is* being offered as it relates to delays to the Project Schedule resulting from a poorly executed design process. SmithGroup is therefore incorrect when it claims, "Skanska disclosed no experts to opine on the standard of care or breach save for Dowdall."[10] Ms. Wagman did opine on the correct Standard of Care, as she testified to in her deposition. Ex. 1, Wagman Dep. 161:14 – 165:15.  There are thus no grounds upon which to exclude Ms. Wagman's testimony regarding SmithGroup-caused delays or to grant summary judgment based on Ms. Wagman's testimony.

Third, SmithGroup attempts to discount Ms. Wagman's opinions offered in her report, claiming her opinions are based on "presumed" design errors and/or deficiencies. This is a gross misrepresentation of Ms. Wagman's report.  For example, SmithGroup claims that "[Ms.] Wagman's report claims there were delays in installation of the curtainwall due to *presumed* errors in architectural design." (Emphasis in original) SmithGroup Mot. p. 35. This is an incomplete representation of Ms. Wagman's opinions. Secretariat's May 25, 2021 Report at Section 3.136, actually reads, in relevant part, "it was discovered that a critical connection detail was omitted

---

[9] Once again, SmithGroup continually, throughout its Motion, either purposefully or ignorantly, references and cites to a generic, inapplicable supposed standard of care.

[10] Importantly, not only does SmithGroup continue to ignore the applicable Standard of Care as agreed to in the Design Agreement, but SmithGroup's sole expert offered to opine on whether SmithGroup met the Standard of Care in this matter, Christopher Kirchner, also inexplicably did not consider the Standard of Care established in the Design Agreement. This oversight will be discussed more fully in Skanska's Rule 104 Motion.

from the design drawings." (Emphasis added.) Ex. LL to SmithGroup's Mot. Moreover, Section 3.138, in relevant part, reads, "[i]n Secretariat's view, this is a lack of coordination in the design and submittal review process which resulted in critical path delay and impact which SmithGroup could have avoided. (Emphasis added.) *Id*. This example alone demonstrates that Ms. Wagman's opinions are far from being based merely on presumptions and assumptions, as argued by SmithGroup.  Ms. Wagman's deposition testimony confirms the same. *See, e.g.*, Ex. 1, Wagman Dep. 110:6-133:18.  SmithGroup has asserted no grounds to exclude Ms. Wagman's testimony, or secure summary judgment as to Count III of Skanska's Counterclaim.

**B. Skanska's Expert Opinions on SmithGroup's Deficient Design and Delays Establish a Causal Link to SmithGroup's Liability for Damages.**

SmithGroup next argues that Skanska lacks a causal link between SmithGroup's allegedly deficient design and Skanska's alleged damages, arguing that Mr. Dowdall "offers no opinion that the omission [of features critical to mitigation noise from the HVAC equipment] delayed substantial completion of the project" and that, "[Ms.] Wagman made no effort to attribute any period of delay to any particular error or omission, including those few discussed by [Mr.] Dowdall." SmithGroup Mot. p. 36.  This argument is demonstrably wrong.

In her report, Ms. Wagman states, in the section titled "Noise Issues (HVAC System)," specifically Section 3.196, "[i]n addition to the high temperature and humidity levels, noise issues continued into [Delay] Window VI as well. On 30 October 2019, DC Water confirmed that the temperature and noise issues were still ongoing." Exhibit LL to SmithGroup's Mot. In Section 3.208 of her report, Ms. Wagman continues, stating, "[t]he HVAC as designed did not function in accordance with the needs of the Project, resulting in excess delays and costs. As the documents and timeline of events above indicate, SmithGroup did not provide an HVAC design which allowed for timely and prudent completion of the Project." *Id.* Ms. Wagman did in fact attribute

periods of delay to errors and omissions specific to the HVAC system, and particularly errors and omissions opined on by Mr. Dowdall.

SmithGroup appears to be arguing that multiple expert reports and/or interrelated expert testimony cannot be considered in conjunction with one another to establish "causal linkage" between impacts and damages. This position does not comport with the reality of construction disputes, where there is often an intersection of opinions across technical subject matter, delay and damages experts. As an example, Mr. Dowdall (an HVAC expert but not a schedule or damages expert) has opined on specific design errors and omissions that he attributes to SmithGroup. Ms. Wagman (a schedule expert but not an HVAC design expert), does not opine on the technical design deficiencies that caused the HVAC System problems, but <u>does</u> opine on the delays associated with such HVAC System problems. Likewise, Mr. Gaines (Skanska's damages expert), opines that expenditures Skanska incurred on HVAC-related remediation resulted in a specific Skanska damages. Ex. LL to SmithGroup's Mot. at pp. 79-89; *see also* Ex. 20, Gaines Dep. 29:16-40:12. The expert testimony offered by Skanska is more than sufficient to prevent summary judgment as to Count III of its Counterclaim.

In its Motion, SmithGroup next asserts that: "[n]othing about the opinions [Ms. Wagman and Mr. Gaines] described during their depositions—to be distinguished from the assumption and unsubstantiated conclusions advanced in their joint report—will be helpful to the finder of fact. Both experts should be excluded from trial." First, and as previously discussed, a motion for summary judgment is not the proper vehicle to move the Court for exclusion of experts from trial. If SmithGroup wished to move the Court to exclude Ms. Wagman and Mr. Gaines from trial, it should have done so in the form of a Rule 104 Motion, as contemplated by the Court's Amended

Scheduling Order. [ECF 33]. As SmithGroup failed to make such a motion, it cannot now make these arguments under a motion for summary judgment.

Second, the fact that counsel for SmithGroup was unable to effectively question Ms. Wagman and Mr. Gaines to elicit testimony that would enable SmithGroup to defend against Skanska's counterclaims is no fault of Skanska's or its experts.[11] Skanska disclosed three separate reports by Secretariat, all jointly authored by Ms. Wagman and Mr. Gaines, totaling hundreds of pages of analysis and thousands of pages of exhibits substantiating their opinions. Ex. LL to SmithGroup's Mot.; Ex. 21, Secretariat Report dated June 25, 2021; Ex. 22, Secretariat Report dated July 9, 2021.  SmithGroup had adequate opportunity to depose Skanska's experts and will have adequate opportunity for cross-examination at trial.  SmithGroup's position their opinions should be excluded as "unhelpful to the trier of fact" is incomprehensible and without basis.

### C. There is a dispute of material fact as to Skanska's Compliance with the Notice Requirements of the Design Agreement.

SmithGroup next argues again that Skanska failed to properly notify Skanska of the design issues causing delay in the Project Schedule as required under the Design Agreement.  SmithGroup Mot. p. 38.[12]  This is incorrect.  For example, Mark Miller of Skanska forwarded an email to SmithGroup that he received from the Owner, which outlined that "[t]he fan unit noise, and the air noise from the large perimeter air distribution duct – was loud. On every floor. One end to the other. Including lobby." Ex. 8, Email from M. Miller to M. Jantz dated Nov. 2, 2018. Mr. Miller states, in writing, as required by the Design Agreement notice provision, that "[p]ursuant to our notice letter of August 30, 2018 to [SmithGroup and Southland] regarding HVAC deficiencies, it

---

[11] SmithGroup deposed Mr. Gaines Mr. Gaines for a total of *43 minutes*, with the deposition commencing at 9:37 a.m. and concluding at 10:20 a.m.

[12] The notice provided to SmithGroup in Ex. A to Skanska's Counterclaim, as referenced, was not untimely as implied, as it was sent to SmithGroup the same day Skanska received the corresponding Notice from the Owner.

is incumbent upon each of you to resolve the issues of HVAC functionality." *Id.* Mr. Miller's email continued, notifying SmithGroup that, "[l]iquidated damages continue to accrue and DC Water is not accepting the building because of it." *Id.* This is only one additional example of a document that constitutes notice to SmithGroup, which SmithGroup seemingly argues in its Motion never occurred. There is, at the very least, a dispute of material fact as to whether the Parties adhered to the notice requirements of the Design Agreement.

In addition, as to non-HVAC design issues, the Parties' practice was to discuss potential impacts during the Project, but not to provide formal notice under the Design Agreement.  Ex. 7, Leier Dep. 130:24-131:22.  Skanska believes that the Parties conduct regarding potential impacts to the Project Budget and Project Schedule constitute a course of conduct under Maryland law that obviates the need for strict conformance with contractual notice of potential claims. *See Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc.,* 165 Md. App. 262, 277–78, (Md. Ct. Spec. App. 2005) (noting parties to a contract may waive requirements of the contract by subsequent oral agreement or conduct, notwithstanding any provision in the contract that modifications must be in writing).Whether the Parties conduct established a course of dealing is a question of fact to be resolved at trial. *See Univ. Lite Distribs., Inc. v. Nw. Indus., Inc.*, 602 F.2d 1173 (4th Cir. 1979).

### D.  The Testimony Offered by Anne Marie Tombros in Her Deposition Does Not Invalidate the Opinions Offered by Skanska's Delay Expert.

SmithGroup attempts to argue that deposition testimony provided by Anne-Marie Tombros is a direct indication that Skanska lacks evidence to establish that SmithGroup's errors and omissions in relation to its Design Services caused delays to the Project Schedule. SmithGroup argues that Ms. Tombros "testified during her deposition about a variety of issues  that cause delay on this Project, attributing NONE to SmithGroup." SmithGroup Mot. p. 39. In her deposition, when asked whether it was her job to understand the reason for the impact, Ms. Tombros testified

that she "wasn't required to understand the technical reasons for the change." Ex. 14, Tombros Dep. 36:18-37:1. When counsel for SmithGroup stated that it was not Ms. Tombros' function "to evaluate the reason for the change [in design], just its impact on the schedule," Ms. Tombros confirmed counsel's understanding. *Id.* at 37:9-21.

When asked about the contrasting conclusions offered by Ms. Tombros during the Project and Ms. Wagman subsequent to her analysis, Ms. Wagman explained that Ms. Tombros's time impact analysis is "just a forward looking, projected hypothetical impact of one specific issue," while Ms. Wagman's retrospective analysis, based on the project record as a whole, after-the-fact, allowed her to take into account "everything else that was occurring at the time"—which Ms. Tombros was understandably unable to do. Ex. 1, Wagman Dep. 105:8-106:10.  Nothing contained in Ms. Tombros's testimony invalidates Ms. Wagman's opinions, renders them inadmissible, or warrants summary judgment as to Count III of Skanska's Counterclaim.

IV.    **SmithGroup is not Entitled to Summary Judgment on Count IV of Skanska's Counterclaim.**

A.  **Skanska Has Established Evidence to Prove that SmithGroup Owes Skanska an Obligation Under Section 5.1 of the Contract.**

Skanska does not lack evidence to prove that SmithGroup owes an obligation to Skanska under Section 5.1 of the Design Agreement. SmithGroup owes an obligation thereunder to Skanska based on at least two sets of claims.  First, Skanska intends to offer testimony entered into a negotiated settlement with Owner wherein Skanska was forced to negotiate a heavily discounted payment from Owner due in part to the defective HVAC System design, as well as extensive Project delays related to SmithGroup design deficiencies.  Skanska attributes at least $300,000 paid to the Owner to SmithGroup's design deficiencies. *See* Affidavit of D. Kopnitsky.  Skanska's approach to settling with the Owner is consistent with Ms. Wagman's analysis and anticipated testimony that the Owner suffered schedule impacts based on SmithGroup's provision of deficient

design services, as the Project was completed 3 years later than anticipated. Ex. 1, Wagman Dep. 193:18-199:21.

Second, Skanska intends to offer evidence that it settled a lawsuit with ICON for $650,000, of which Skanska attributes at least $325,000 to SmithGroup's design deficiencies that affected ICON's work. *See* Affidavit of D. Kopnitsky.[13]   Ms. Wagman's opinions confirm the reasonableness of Skanska's approach to settling ICON's lawsuit. Ms. Wagman's review of the project record, to include communications between Skanska and SmithGroup with ICON personnel on the Project, as well as ICON Daily Reports, indicated delays and impacts experienced by ICON resulting from deficient Design Services provided by SmithGroup. Ex. 1, Wagman Dep. 207:14-208:3; Ex. LL to SmithGroup's Mot. at §§ 3.138 & 3.139.

Skanska's pleading and the affidavit of D. Kopnitsky regarding Skanska's damages are sufficient to establish disputes of material fact regarding whether SmithGroup owes Skanska an obligation under Section 5.1.

### B.   There is a Dispute of Material Fact Regarding Whether Skanska Failed to Provide Adequate Notice to SmithGroup.

SmithGroup again argues that Skanska materially breached the Design Agreement by failing to provide SmithGroup the notice required under the Design Agreement related to delays associated with SmithGroup's deficient curtainwall design. SmithGroup Mot. p. 44. However, as with SmithGroup's notice argument addressed above, the record suggests at a minimum a dispute of material fact as to whether sufficient notice was provided. In an email dated November 9, 2017, Chris Seager of Skanska sent an email to Dayton Schroeter of SmithGroup, notifying him of an important, omitted detail in SmithGroup's design of the curtainwall. Ex. 16, Email from Chris Seager to Dayton Schroeter dated Nov. 9, 2017.  Mr. Seager writes:

---

[13] Smith initially noticed the deposition of Mr. Kopnitsky, but then elected not to proceed with it.

> I left you . . . a voice mail in an attempt to discuss a pretty major coordination issue that was just identified regarding the roof curtain wall connection condition" and "there is no roof line structural sections in the contract documents at the curtainwall and thus, this condition appears to have been missed. . . . Please review the structural requirements immediately as we were set to commence curtain wall installations next week and this will all but certainly be a delay to the project's critical path."

*Id.* Mr. Seager notified SmithGroup in writing, of the omission, providing SmithGroup a reasonable opportunity to minimize or overcome the delay.  Further, Mr. Seager referenced in his email that the delay resulting from this omission by SmithGroup "will all but certainly be a delay to the project's critical path," expressly identifying how the delay will affect Skanska's ability to satisfy its requirements to the Owner. Not only did Skanska *not* "materially breach the Design Agreement" by failing to provide proper notice, but Mr. Seager's email demonstrates that Skanska in fact provided the type of timely notice contemplated by Section 5.2 of the Design Agreement. At a minimum, there is a dispute of material fact regarding whether proper notice was provided or otherwise whether the Parties' course of conduct obviated the need for more formal notice; thus "lack of notice" is not grounds for summary judgment as to Count IV of Skanska's Counterclaim.

## V.  CONCLUSION

The evidence establishes multiple disputed material facts pertaining to each of Skanska's causes of action.  Accordingly, Skanska respectfully requests that the Court deny SmithGroup's Motion in its entirety.

### SKANSKA'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT
### AS TO SMITHGROUP'S CLAIM FOR EXTENDED CA SERVICES

## I.    STATEMENT OF UNDISPUTED FACTS

### A.    The Project & Project Delays

1.    Skanska adopts for purposes of its Motion the undisputed Material Facts set forth in SmithGroup's Motion at Nos. 1-4 and the exhibits thereto.

2.    The Project was originally scheduled to be Substantially Complete by December 21, 2017,

which date was Extended by agreement with the Owner to June 1, 2018. Ex. 3, Miller Dep. 78:2-78:8; Ex. H to SmithGroup's Mot., Change Order 16.

3.       Due to a series of delays, the building was not Substantially Complete until January of 2019.  Ex. 1, Wagman Dep. 188:2-10; Ex. JJ to SmithGroup's Mot., Substantial Completion Letter.

4.       The Project was originally scheduled to be Finally Complete by January 19, 2018; however due to the Project delays, the Project was not Finally Complete until March of 2021, more than three years late. Ex. LL to SmithGroup's Mot., §§ 3.18, 3.19.

5.       The Design Agreement contains numerous provisions governing the Parties' rights and responsibilities with respect to the Project Schedule and delays caused by the other Party.  Ex. A to SmithGroup's Mot., Contract, §§ 5.0, 5.3, 5.4; Ex. A, § 2.3.10, Exhibit PS-1 §§ 3.1, 3.2.

6.       The Parties dispute responsibility for Project delays. SmithGroup Complaint at ¶¶ 9, 12; Skanska Answer at ¶¶ 9, 12; Skanska Counterclaim at ¶¶ 9, 10, 27-30.

7.       In Paragraph 9 of its Complaint, SmithGroup alleged as follows, blaming Project delays on Skanska:

> Skanska, through its breach, fault, errors, acts and/or omissions, delayed substantial completion of the project from September 14, 2018 until February 29, 2020. Any delay in the substantial completion of the building was not the fault or cause of SmithGroup.

 *Id.* at ¶ 9.

8.       In Paragraph 12 of its Complaint, SmithGroup further explained that the Project delays SmithGroup attributes to Skanska are the basis for SmithGroup's claim for Extended CA Services. *See id.* at ¶ 12.

9.       SmithGroup's claim for Extended CA Services is a delay claim, in that it is dependent on delays to the Project schedule for which SmithGroup blames Skanska.  *Id*. at ¶¶ 9, 12.

10.      Skanska denied SmithGroup's allegations in its Answer and sought delay damages from

SmithGroup in its Counterclaim. Skanska's Answer at ¶¶ 9, 12; Skanska's Counterclaim at ¶¶ 9, 10, 27-30.

**A.  The Parties' Expert Opinion Testimony Regarding Project Delays.**

11.     Skanska retained Meera Wagman of Secretariat International ("Secretariat") to analyze and provide opinions regarding the Project's critical path and Project delays, and disclosed a report prepared by Ms. Wagman dated May 25, 2021 in accordance with Fed. R. Civ. P. 34 ("Secretariat's May 25, 2021 Report").[14] Ex. LL to SmithGroup's Mot.

12.     Secretariat's May 25, 2021 Report set forth Ms. Wagman's critical path method ("CPM") delay analysis and opinions regarding Project delays in support of Skanska's delay claim. *Id.*

13.     SmithGroup retained Philip Helmes of Socotec to respond to Skanska's delay claim against SmithGroup, and disclosed Mr. Helmes' opinions on Skanska's claims via a report prepared by Mr. Helmes dated June 25, 2021 ("Helmes June 25, 2021 Report"). Ex. 23, Helmes June Report.

14.     Mr. Helmes' June 25, 2021 Report does not contain any analysis or opinions regarding SmithGroup's claim for Extended CA Services against Skanska. Helmes June 25, 2021 Report. *Id.*

15.     Skanska subsequently disclosed two additional reports prepared by Secretariat, including one dated June 25, 2021, which contained Ms. Wagman's analysis and opinions regarding SmithGroup's affirmative claims against Skanska, including SmithGroup's Extended CA Services Claim. Ex. 21, Secretariat Report dated June 25, 2021

16.     Secretariat's June 25, 2021 Report disclosed extensive opinions pertaining to SmithGroup's failure to provide analysis in support of its Extended CA Services claim. Ex. 21, Secretariat's June 25, 2021 Report, 3.1, 3.2, 3.4, 3.8, 4.4.

17.     Secretariat's final report was dated July 9, 2021, in which Ms. Wagman provided analysis

---

[14] Secretariat's Reports also contain analysis and opinions offered by Mr. Tom Gaines regarding Skanska's and SmithGroup's damages that are not relevant to this Motion.

and opinions in response to Mr. Helmes' June 25, 2021 Report regarding Skanska's affirmative claims against SmithGroup. See ¶ 27 above. Ex. 22, Secretariat Report dated July 9, 2021.

18.    SmithGroup subsequently disclosed one additional report prepared by Mr. Helmes dated July 16, 2021, in which Mr. Helmes provided opinions in response to Secretariat's July 9, 2021 Report pertaining only to Skanska's affirmative claims against SmithGroup, but it did not respond to Secretariat's June 25, 2021 Report, wherein Secretariat addressed SmithGroup's affirmative claims including SmithGroup's claim for Extended CA Services. Ex. 24, Helmes July 2021 Report.

19.    At no time did Mr. Helmes provide a report or otherwise disclose opinions in support of SmithGroup's affirmative claims against Skanska, including SmithGroup's claim for Extended CA Services.  Ex. 23, Helmes June Report; Ex. 24, Helmes July 2021 Report ("Helmes Reports").

20.    Ms. Wagman testified extensively regarding Skanska's delay claims in her deposition; Ms. Wagman was not asked questions in her deposition regarding her opinions pertaining to SmithGroup's claim for Extended CA Services. Ex. 1, Wagman Dep.

21.    Mr. Helmes testified in his October 20, 2021 deposition regarding his review of Skanska's delay claim against SmithGroup, confirming that he did not perform his own independent schedule analysis because he " . . . was here to evaluate a claim against SmithGroup based on someone else's schedule analysis, and that was the charge." Ex. 26, Helmes Dep. 49:18-53:17.

22.    Mr. Helmes also testified that he performed no analysis of and had no opinions regarding SmithGroup's affirmative claims against Skanska, including SmithGroup's delay claim for Extended CA Services.  *Id.* at 24:4 – 26:11.

23.    SmithGroup did not disclose any other experts to opine on SmithGroup's delay claim for Extended CA Services against Skanska. Exs. 24 and 25, Helmes Reports.

**B.    SmithGroup's Fact Witness Testimony Regarding Extended CA Services.**

24.    SmithGroup's Sven Shockey calculated SmithGroup's alleged damages pertaining to

Extended CA Services. Mr. Shockey testified that the delayed construction schedule drove SmithGroup's Extended CA Services, resulting in increased labor costs that SmithGroup claims against Skanska. Ex. 26, Shockey Dep. 43:16-54:8; 63:10-68:11.

25.     Mr. Shockey utilized a labor cost report from SmithGroup's internal accounting software to determine the amount of SmithGroup's alleged Extended CA Services damages, charging all of SmithGroup's work on the Project during the Extended CA Services period to Skanska. *Id.* at 43:16-54:8; 63:10-68:11.

26.     Mr. Shockey did not do any CPM analysis of the construction schedule to determine the cause or duration of the schedule impacts that drove SmithGroup's Extended CA Services. *Id.*

## II.     DISCUSSION

### A.     SmithGroup Preformed No CPM Analysis in Support of its Delay Claim and therefore Cannot Establish Entitlement to Delay-Related Damages.

It is undisputed that SmithGroup's claim for Extended CA Services is a delay claim, in that it is dependent on delays to the Project schedule and the resulting extended duration of SmithGroup's performance of CA Services pursuant to the Design Agreement, for which SmithGroup blames Skanska. It is further undisputed that SmithGroup did not perform any critical path method ("CPM") analysis to determine responsibility for Project delays and its delay damages. *See* Statement of Undisputed Facts ¶¶ 19-23.

Courts throughout the country have held that schedule delay analysis is required to prove and recover delay damages.  Where binding case law is limited, as it is in Maryland, this Court may look to other jurisdictions for persuasive authority. *See Munday v. Waste Mgmt. of N. Am., Inc.*, 997 F. Supp. 681, 687 (D. Md. 1998).  For example, in *E. Coast Repair & Fabrication, LLC v. United States*, 199 F. Supp. 3d 1006, 1030 (E.D. Va. 2016), the U.S. District Court for the Eastern District of Virginia held in order for a contractor to carry its burden regarding a delay

claim, it must "demonstrate that the excusable event caused a delay to the overall completion of the contract, i.e., that the delay affected activities on the critical path because the contractor is entitled to only so much time extension as the excusable cause actually delayed completion of the contract." (internal quotations and citations omitted). *See also Southern Comfort Builders, Inc. v. United States*, 67 Fed. Cl. 124 (2005) (regarding delay claims, "[a] general statement that disruption or impact occurred, absent any showing through use of updated CPM schedules, logs or credible and specific date or testimony, will not suffice to meet that burden.") (citations omitted); *Rustler Constr., Inc. v. D.C.*, 211 A.3d 187, 192–93 (D.C. 2019) ("Damages for overall delay are recoverable only if the claimant proves not only that the delayed tasks were on the critical path, but also the extent to which those delays affected completion of the overall project. . . . Without defining the critical path, a contractor is barred from recovery for overall delay.")

The rationale for requiring delay analysis is perhaps best explained in federal government contracts case law.  In *Mega Constr. Co., Inc. v. United States*, 29 Fed. Cl. 396, 424 (1993) the Court of Federal Claims discussed the relevance of a CPM analysis to determine delay damages, noting that CPM analysis is "an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects." (citation omitted).  As the *Mega* court explained:

> The reason that the determination of the critical path is crucial to the calculation of delay damages is that only construction work on the critical path ha[s] an impact upon the time in which the project [i]s completed. If work on the critical path [i]s delayed, then the eventual completion date of the project i[s] delayed.... [The] critical path periods provide the court with the foundation necessary to reach delay damage conclusions.

*Mega Constr.*, 29 Fed. Cl. at 425 (quotations omitted).  The *Mega* Court concluded that the contractor's entitlement to delay damages requires evidence establishing the critical path and the occurrence of delays along that path – which SmithGroup has admittedly failed to do. *Id.*

Mr. Shockey's sworn testimony in support of SmithGroup's delay claim is insufficient to qualify as "analysis" of any kind, much less the type of detailed CPM analysis courts require to substantiate delay claims. Likewise, SmithGroup's delay expert Mr. Helmes admits that he performed *no analysis* of SmithGroup's claims, instead focusing only on Skanska's claims against SmithGroup.  In the absence of any detailed delay analysis, SmithGroup's purported proof of delay damages, i.e., Mr. Shockey's basic compilation of all labor costs incurred during a particular period of time, which SmithGroup is now bound by, is legally insufficient as a matter of law to meet the threshold to recover for a delay claim.

### B.      SmithGroup Cannot Prove its Delay Claim without an Expert.

SmithGroup's failure to perform a delay analysis in support of its Extended CA Services claim (lay or expert) is an independent ground for summary judgment; however, in the event that Mr. Shockey's (lay) compilation of labor costs is regarded as form of "delay analysis," Skanska is still entitled to summary judgment because SmithGroup is without a qualified delay expert.

SmithGroup did not disclose an expert witness to support its affirmative delay claim, instead disclosing Mr. Helmes only to review Skanska's delay claim against SmithGroup.  A party that is seeking to recover for a delay claim bears the burden of proving, to a "reasonable degree of certainty," the other party's liability, causation, and the amount of resulting damages. *See Hensel Phelps Constr. Co*., MSBCA 1080 &1167, 4 MSBCA ¶ 306 (1992); *see also Kirby v. Chrysler Corp*., 554 F. Supp. 743, 752 (D.Md. 1982) (the amount awarded will not be based on speculation or conjecture).  SmithGroup appears to believe it may rely on the testimony of a

single lay witness, Mr. Shockey, to testify as to the incurrence of labor costs during a particular period, without a more sophisticated analysis of the schedule impacts driving such costs. Proving delay damages not only requires expert CPM analysis to establish causation and fault for critical schedule impacts, but the presentation of resulting damages typically goes far beyond the simple compilation Mr. Shockey performed. Indeed, courts have repeatedly held lay testimony regarding delay damages unreliable and subjective. *See Appeals of States Roofing Corp.*, A.S.B.C.A. No. 54860, 55501, 55502, 55505, 10-1 B.C.A. (CCH) ¶ 34356, 2010 WL 292732 (Armed Serv. B.C.A. 2010) ("We similarly reject the MCCA analysis here, inasmuch as it was performed not by an expert, but by SRC's president, Mr. DeLauney, making it impossible for us to disregard the inherent subjectivity.").

Finally, while Maryland case law is limited, The Maryland Construction Law Deskbook advises construction attorneys that in most cases, *an expert is required to prove a delay claim*, stating, "[I]t *is usually necessary to use a qualified expert(s) to establish both the duration of the delay and the daily rate.*" Dachille, M., CONSTRUCTION LAW DAMAGES, Maryland Construction Law Deskbook (2d ed. (2017), Ch. 9, n. 99 (emphasis added). Here, the undisputed facts establish that SmithGroup's lone lay witness regarding its damages, Mr. Shockey, has performed none of the required analysis to establish entitlement. Even if Mr. Shockey's testimony qualifies as "analysis," it is insufficient to establish delay damages where SmithGroup has not disclosed or provided any expert opinion testimony regarding its delay claim.

## III.    CONCLUSION

For the foregoing reasons, Skanska respectfully requests that the Court grant partial summary judgment in its favor, holding that SmithGroup cannot, as a matter of law, recover from Skanska its claim for Extended CA Services in the amount of $405,913.20.

Dated: April 22, 2022

Respectfully submitted,

**VARELA, LEE, METZ & GUARINO, LLP**

_____
                   /s/

Thomas S. O'Leary (MD Bar No. 20442)
Brian R. Dugdale (admitted *pro hac vice*)
Paul A Varela (admitted *pro hac vice*)
Varela, Lee, Metz & Guarino, LLP
1600 Tysons Blvd, Suite 900
Tysons Corner, VA 22102
Tel: 703.454.0170
Fax: 703.454.0169
toleary@vlmglaw.com
bdugdale@vlmglaw.com
pvarela@vlmglaw.com

*Counsel for Defendant/Counterclaim Plaintiff*
*Skanska USA Building Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 22nd day of April 2022, a true copy of the foregoing was served via the CM/ECF system.

_____/s/_____
Thomas S. O'Leary (USDC MD Bar No. 20442)
Varela, Lee, Metz & Guarino, LLP
1600 Tysons Blvd., Suite 900
Tysons Corner, Virginia 22102
toleary@vlmglaw.com

*Counsel for Defendant/Counterclaim Plaintiff*
*Skanska USA Building Inc.*
