*UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF MARYLAND*
**(Greenbelt Division)**

---

SMITHGROUP, INC., )
f/k/a SmithGroup JJR, Inc. )
 )
     Plaintiff/Counterclaim Defendant )
 )
v. )     Civil Action No.: 88:20-cv-02499-LKG
 )
SKANSKA USA BUILDING, INC. )
 )
     Defendant/Counterclaim Plaintiff. )

---

**PLAINTIFF SMITHGROUP, INC.'S OPPOSITION TO DEFENDANT SKANSKA USA BUILDING INC.'S RULE 104 MOTION FOR EXCLUSION OF EXPERT TESTIMONY**

## <u>TABLE OF CONTENTS</u>

SUMMARY OF OPPOSITION ..................................................................................................1

CORRECTION OF SKANSKA'S FACTUAL ASSERTIONS....................................................3

APPLICABLE LAW ..................................................................................................................5

ARGUMENT ..............................................................................................................................8

I.      MR. KIRCHNER FORMED PROPER AND ADMISSIBLE OPINIONS ABOUT THE APPLICABLE STANDARD OF CARE...........................................................................8

II.     LACK OF "EXPERIENCE" TESTIFYING AS AN EXPERT WITNESS IS IRRELEVANT TO THE EXPERT'S QUALIFICATION UNDER RULE 702 ..............14

III.   THEORIES ABOUT WITNESS BIAS SHOULD BE RAISED ON CROSS-EXAMINATION AT TRIAL—NOT IN A RULE 104 MOTION ..................................15

CONCLUSION..........................................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Am. Strategic Ins. Corp. v. Scope Services, Inc.,* No. PX-15-2045, 2017 WL 4098722, at *2
(D. Md. Sept. 15, 2017)………………………………………………………………………………..5

*Cf., Kumho Tire Co., Ltd. v. Carmichael*, 562 U.S. 137, 152 (1999)…………………………1, 5

*Cf.*, *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)………………………1

*Dorman v. Annapolis OB-GYN Ass., P.A.*, 781 Fed. App'x 136, 144 (4th Cir. 2019)……… 7, 15

*Georgia-Pacific Corp. v. Ervin and Edwards Const. Co.*, 891 F.2d 286, 1989 WL 141652, *2
(4th Cir. 1989)…………………………………………..…………………………………7, 13, 15

*Gibbes, Inc. v. Law Engineering*, 960 F.2d 146, (4th Cir. 1992)……………………6, 7, 8, 9, 10

*Green v. Wing Enterprises, Inc.*, No. RDB-14-1913, 2015 WL 8315773, *7 (D. Md. Dec. 9,
2015)……………………………………………………………………………………………14, 15

*Hare v. Opryland Hospitality, LLC*, DKC-09-0599, 2010 WL 3719915, at *6 (D. Md. Sept. 17,
2010)…………………………………………………………………………………………..14

*Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)……………………………………………….6

*SEC v. Jacoby*, No. CCB-17-3230, 2022 WL 982529 (D. Md. Mar. 30, 2022) ………………..6

*Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 394 (D. Md. 2001)……………………..14

*Smith v. Am. Transitional Hosps., Inc.*, 330 F. Supp. 2d 1358 (S.D. Ga. 2004)………………...13

**<u>Other Authorities</u>**

Fed. R. Evid. 702……………………………………………………………………………….5

**TABLE OF EXHIBITS**

**Exhibit**                                                                                          **Pages**

A.      Kirchner CV………………………………………………………………………..……..1

B.      Christopher G. Kirchner, P.E. Testimony……………..……2, 3, 4, 8, 9, 10, 11, 12, 13, 15

C.      Contract…………………..…………………………………………………………2, 9, 13

D.      Mark A. Miller Testimony………………………………………………………….4

E.      Meera Wagman Testimony………………………………………………………...5

F.      DC Water LTR (Aug. 29, 2018)………………………………………………...12

Plaintiff SmithGroup, Inc. ("SmithGroup"), by counsel, responds as follows to oppose Defendant Skanska USA Building, Inc.'s ("Skanska") Motion for Exclusion of Expert Testimony (the "Motion to Exclude"):

## SUMMARY OF OPPOSITION

To defend against Skanska's claims of defects in SmithGroup's design services, SmithGroup timely disclosed the opinions of Christopher G. Kirchner, P.E.  Mr. Kirchner is licensed as a professional engineer in both the District of Columbia and Maryland, and his opinions are supported by thirty years of experience as a practicing mechanical engineer, including experience designing HVAC systems for significant buildings within the District of Columbia. Ex. A, Kirchner CV.  On that basis alone, Mr. Kirchner is already more qualified than Skanska's mechanical engineer expert, who has never designed a single HVAC system in the District of Columbia.  *See*, SmithGroup's Br. in Supp. Summ. J. 19-20 (ECF No. 36-1) (citing relevant portions of Mr. Dowdall's testimony).

Skanska's Motion to Exclude advances three spurious arguments to exclude Mr. Kirchner's testimony.  Two of those arguments may be rejected on their face.  First, Skanska is wrong to argue that lack of prior experience *as a testifying expert* supports disqualification under Rule 702 (or any other rule of evidence).  To the contrary, a plain reading of the rule confirms that an expert's qualifying "knowledge, skill, experience, training, or education" concerns expertise in the subject matter of the expert's opinions, not expertise in litigation support.  *Cf.*, *Kumho Tire Co., Ltd. v. Carmichael*, 562 U.S. 137, 152 (1999) ("The objective of [*Daubert's* gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony.").  Rule 702 does not demand expertise in the procedure of testifying at trial, and the rule certainly does not establish a closed society of professional litigation experts as Skanska infers.  *Cf.*, *Westberry v. Gislaved Gummi AB*, 178 F.3d

257, 261 (4th Cir. 1999) ("Rule 702 was intended to liberalize the introduction of relevant expert evidence.").

Second, theories about Mr. Kirchner's purported bias are a question of weight for the fact-finder, to be advanced at trial through Skanska's cross-examination of Mr. Kirchner. Skanska offers no authority whatsoever for the assertion that accusations of bias are a proper basis to exclude expert testimony. Skanska's accusations of bias are not serious anyway because Mr. Kirchner has professional connections on both sides of this dispute. Ex. B, Kirchner Dep. 225:10-226:13.

Finally, Skanska's argument that Mr. Kirchner failed to "appropriately analyze or provide opinions on the applicable Standard of Care and whether SmithGroup met the same" is founded entirely on Skanska's incomplete parsing of Mr. Kirchner's deposition testimony and is contrary to precedent from the Fourth Circuit Court of Appeals. The applicable standard of care is defined by the Parties' contract simply as: "... the care and skill ordinarily used by members of the profession practicing under similar conditions at the same time and locality of the Project." Ex. C, Contract, Exhibit PS-1, Amended § 3.1. Mr. Kirchner's testimony is replete with examples of his own experience, spanning several decades as a professional design engineer, to form his opinions about the adequacy of SmithGroup's professional services under the circumstances of this DC Water Project. Mr. Kirchner supported his opinions with, among other things, personal experience on similar design-assist projects, where an engineer is instructed by the design builder to consider a design-assist subcontractor's suggestions to meet the construction budget. *E.g.*, Ex. B, Kirchner Dep. 53:20-64:3.

In response to Skanska's repeated attempts to distort Mr. Kirchner's deposition testimony, Mr. Kirchner clarified that the reason he did not *initially* recall reviewing the Parties' contract was

because the document recites a common statement of the standard of care, which was the basis of his standard-of-care opinion anyway.  *Id.*, 72:3-75:18.  Mr. Kirchner's role in this litigation is simply to opine about his comparison of SmithGroup's professional services against those expected of similar professionals on similar projects.  Indeed, Mr. Kirchner appropriately and deliberately tailored his analysis to the project's "similar conditions" by carefully studying *Southland's* more unusual role as Skanska's mechanical design-assist subcontractor, confirming that Southland held parallel design responsibility for the project's HVAC system.  *Id.* 54:14-81:18.

Skanska's arguments to exclude Mr. Kirchner's testimony from trial are unfounded, and the Motion to Exclude should be denied.

### CORRECTION OF SKANSKA'S FACTUAL ASSERTIONS

Without belaboring every disputed proposition in the Motion to Exclude, several of Skanska's statements of "undisputed material facts" must be addressed to clarify the issues presented:[1]

The HVAC system was **not** designed "in its entirety" by SmithGroup, as Skanska stated in Paragraph 13 of its memorandum (ECF 38-1).[2]  Throughout the litigation, Skanska has attempted to oversimplify this question of design responsibility, now by ignoring testimony within the very same transcript pages that Skanska cited in its Motion to Exclude.  *See*, Posson Dep. 27-28 (explaining that Skanska's design-assist subcontractor, Southland, was "an integral part of the

---

[1]     SmithGroup denies many of the facts and contentions advanced by Skanska's Motion to Exclude, but a Rule 104 motion is not the procedure to resolve the Parties' competing interpretations of fact.  To the extent necessary, SmithGroup incorporates by reference the statement of undisputed material facts supporting its motion for summary judgment (ECF 36-1).

[2]     It is particularly ironic how Skanska advances this issue to support its Motion to Exclude, after Mr. Kirchner *unequivocally rejected* opposing counsel's leading question on this same point: "Q.  Ultimately, SmithGroup is responsible for the design though, correct?  A.  No, sir, not in this context."  Ex. B, Kirchner Dep. 56:6-56:12.

design team in helping make decisions, giving constructability reviews, ... and then helping refine the details to get GMP package put together and then GMP pricing put together ...").  Skanska's own fact witnesses testified that the decision to change the HVAC design from a quieter chilled-beam system to a lower-cost fan-coil system was a "design effort between Southland, SmithGroup, *and Skanska* to find a system that worked with the budget."  Ex. D, Miller Dep. 37:1-37:8 (emphasis added); *see also*, *id.* 35:11-36:6.  This more nuanced context is precisely what Mr. Kirchner considered when forming his standard of care opinions.  *See*, Ex. B, Kirchner Dep. 56:10-57:18.

The Owner did **<u>not</u>** "inform[] Skanska that the HVAC System contained design defects or deficiencies," as Skanska stated in Paragraph 15 of its memorandum.  The August 29, 2018 letter underlying Skanska's proposition was attached as Exhibit 1 to Skanska's Counterclaim.  In that letter, the Owner stated that it "believe[d] that there is *either* a systemic design/manufacturing problem with the HVAC system *or* that it is being overloaded, *possibly because of conditions caused by Skanska's continued inability to complete the building's exterior glazing on the first floor*." (emphasis added).  As shown, the Owner was speculating in 2018—during construction—about the cause of HVAC issues, acknowledging that Skanska's construction or manufacturing defects or inability to enclose the building could just as likely be the cause.  As demonstrated in SmithGroup's pending motion for summary judgment, the dispositive question presented by Skanska's claims is why should SmithGroup—as opposed to Skanska or Skanska's subcontractors and manufacturers—be held liable for budget overruns, delays, or other issues alleged by Skanska?  Mr. Kirchner offers opinions to explain how SmithGroup met the applicable standard of care for the mechanical design, whereas Skanska continues obfuscating the entire question.

Contrary to Paragraphs 29-30 of Skanska's memorandum, Skanska's expert, Meera

4

Wagman, repeatedly disclaimed forming any relevant standard of care opinions, and she further disclaimed forming opinions about the underlying cause of the delays she identified.  This issue was addressed in SmithGroup's memorandum in support of motion for summary judgment (ECF 36-1) at pages 33-37.  As to allegations of HVAC-related delay in particular, Ms. Wagman testified that it wasn't possible, at least for her, to allocate an exact number of days to specific issues, "as they all contributed to this year's long delay period."  Ex. E, Wagman Dep. 179:3-179:12.  Ms. Wagman was notably unable to allocate specific days of delay to efforts to address HVAC noise concerns in the face of other, concurrent HVAC issues, none of which neither she nor anyone else could opine were caused by SmithGroup.  *Id.*, 186:12-187:7.  There is no basis for Skanska to accuse Mr. Kirchner of ignoring opinions that Ms. Wagman herself *disclaimed* having even formed.  *Contra*, Skanska Mem. ¶ 33.

## APPLICABLE LAW

Rule 702 permits qualification of an expert witness "by knowledge, skill, expertise, training or education."  An expert so qualified may testify about his opinions at trial so long as:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "Courts have distilled Rule 702's requirements into two crucial inquiries: whether the proposed expert's testimony is relevant and reliable."  *Am. Strategic Ins. Corp. v. Scope Services, Inc.*, No. PX-15-2045, 2017 WL 4098722, at *2 (D. Md. Sept. 15, 2017) (citing *Kumho Tire*, 526 U.S. 137, 141 (1999)).

"When a party challenges an expert's qualifications, 'the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor

education on the issue for which the opinion is proffered.'" *Id.*, at *3*; *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993); *see also*, *Gibbes, Inc. v. Law Engineering*, 960 F.2d 146, (4th Cir. 1992) ("doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility" (citation omitted)); *SEC v. Jacoby*, No. CCB-17-3230, 2022 WL 982529, at *1 (D. Md. Mar. 30, 2022) ("the trial court's role as gatekeeper is not intended to serve as a 'replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule"). Specifically, "formal scientific or academic training and methodology is not a necessary predicate to testimony as an expert. Rather, experience alone, or in conjunction with 'other knowledge, skill, training or education,' can provide a sufficient foundation for expert testimony." *Id.*

The "fit between an expert's specialized knowledge and experience and the issues before the court need not be exact." *Id.* The value of standard of care opinions in particular is to help the factfinder "answer whether the defendant's actions fell below standards commonly held by those in the profession." *Id.*, at *7*.

The District of Maryland has distinguished "experiential" experts (whose opinions are based on years of professional experience) from scientific experts (whose opinions may be peer reviewed). *SEC*, 2022 WL 982529, at *3. Because the defendants in *SEC* failed to show that the challenged standard of care expert's opinions were unreliable, disagreement with the expert's conclusions and analysis was properly remedied through cross-examination—*not* by exclusion. *Id.*

There is zero authority for the absurd proposition advanced by Skanska that an expert can and should be excluded merely because he or she has not previously served as an expert in a litigation context before. The relevant inquiry is the expert's skills, knowledge and experience in

the relevant technical field, not his or her experience as an advocate in litigation.

As to professional engineer experts opining about the standard of care in malpractice lawsuits, the Fourth Circuit does *not* require expertise in legal terms of art. *Gibbes*, 960 F.2d, at 4. For that reason, opposing counsel cannot take advantage of an expert's confusion about legal terminology during a deposition to disqualify the expert. *Id.* For example, rather than confuse an engineer expert by demanding a definition of the term "standard of care," counsel should simply ask the witness engineering-focused questions, such as requesting a description of the "degree of care and skill as, under similar conditions and like surrounding circumstances, is ordinarily employed" by engineers performing similar services. *Id.* The Fourth Circuit appreciates that an adverse attorney's tactical deposition questioning and resulting witness confusion are not probative about whether the witness was capable of describing the applicable standard of care, had appropriate questions been asked during the deposition. *Id.*

Finally, Skanska failed to cite any authority supporting its proposition that accusations of bias against an expert witness are proper grounds for exclusion of the expert's testimony under Rule 104. To the contrary, the authorities cited by Skanska's own memorandum confirm that "[e]xploring bias is a proper topic for cross-examination...." *Dorman v. Annapolis OB-GYN Ass., P.A.*, 781 Fed. App'x 136, 144 (4th Cir. 2019); *see also*, *Georgia-Pacific Corp. v. Ervin and Edwards Const. Co.*, 891 F.2d 286, 1989 WL 141652, *2 (4th Cir. 1989) (denying plaintiff's motion to exclude mention of insurance during the testimony of plaintiff's damages expert, holding that employment of the expert by plaintiff's insurance carrier was relevant and admissible on the issue of bias).

<u>**ARGUMENT**</u>

I.  **MR. KIRCHNER FORMED PROPER AND ADMISSIBLE OPINIONS ABOUT THE APPLICABLE STANDARD OF CARE**

Skanska, like the appellee in *Gibbes,* tries to argue that Mr. Kirchner does not know the applicable standard of care and is not qualified to opine about the applicable standard of care.  *See*, Skanska Mem. 1, 9-10, 12-14.  Like the appellee in *Gibbes*, Skanska's argument relies entirely upon Skanska's efforts to confuse Mr. Kirchner during the deposition and to manipulate Mr. Kirchner's deposition testimony.

At the outset of his deposition, Mr. Kirchner explained that he was opining about the applicable standard of care, as Mr. Kirchner understood it as a professional.  Ex. B, Kirchner Dep. 49:8-49:14.  Though Mr. Kirchner did not initially recall reviewing the Parties' contract, once presented with the document's standard of care language he explained that the language "was very similar to other contracts that [he had] seen," and that he did recall seeing that section of the Parties' contract a long time ago.  *Id.*, 77:10-77:13.  From then on, Mr. Kirchner repeatedly clarified with increasing certainty that he had seen the contract language prior to forming his opinions about the applicable standard of care.  *Id.* 78:20-82:1.

Skanska tries to argue that Mr. Kirchner's study of this contract language was inadequate, and further to infer that Mr. Kirchner did not "understand or opine on the applicable Standard of Care *as defined by the Design Agreement*".  Skanska Mem. 12 (emphasis in original).  But Skanska's argument falls apart immediately when you read the contract's standard of care language, which mirrors exactly the common-law standard of care:

> Designer and its Consultants shall perform all Design Services in accordance with all Legal Requirements, satisfying the requirements called for in the Contract Documents including the Project Budget and Schedule and this Agreement, and notwithstanding anything to the contrary, further agrees to execute the Design Services *with the care and skill ordinarily used by members of the profession practicing under similar conditions at the same time and locality of the Project.*

Ex. C, Contract, Exhibit PS-1, Amended § 3.1 (emphasis added). By comparison, were the contract silent on the standard of care to be used, the common law supplies one: "In an action against a professional man for malpractice, the plaintiff bears the burden of overcoming the presumption that due skill and care were used." *Crockett v. Crothers*, 264 Md. 222, 224,-25, 285 A.2d 612, 614 (1972) (approving an instruction that the defendant, an engineer, is required "to exercise that degree of care that a careful and prudent engineer would exercise under similar circumstances."); *accord*, *Telak v. Maszczenkski*, 248 Md. 476, 482, 237 A.2d 434, 443 (1968).  *Cf.*, MPJI-Cv 27:2 (standard of car for doctors) and MPJI-Cv 27:7 (standard or care for lawyers).  There is simply no difference between what the contract required by its express terms and what the common law would have required impliedly in the absence of an express term.

Exactly like the appellee in *Gibbes*, Skanska improperly attempts to discredit Mr. Kirchner's foundation and expertise by arguing that Mr. Kirchner did not know or understand certain legal terminology.  *Gibbes*, at *4.  Contrary to Skanska's misdirection, Mr. Kirchner's opinion properly considered whether SmithGroup performed its services "with the care and skill ordinarily used by members of the profession practicing under similar conditions at the same time and locality of the Project."  Mr. Kirchner's opinions about that subject matter were properly founded on his review of design documentation from throughout this project, which he evaluated based on his decades of experience as a practicing mechanical engineer, licensed in the District of Columbia (among other jurisdictions), who has designed HVAC systems (including systems using DOAS),[3] and who has experience working with design-assist contractors.  *E.g.*, Ex. B, Kirchner Dep. 14:6-22:3, 33:7-35:13, 36:16-41:22, 57:2-57:13, 58:1-58:11, 62:1-64:3, 74:20-77:13, 108:14-

---

[3]     "DOAS is an acronym for Dedicated Outdoor Air System and was discussed in detail at page 17 of SmithGroup's opening brief in support of summary judgment.

112:22, 123:12-124:6, 167:14-171:1, 179:17-181:8, 205:5-206:4, 212:1-215:8, 221:7-226:16, 228:16-228:21, 231:14-232:9, 238:4-239:9, 241:17-243:14, 246:2-252:11, 268:9-268:17, 274:3-274:18, 285:7-290:9, 296:25-297:13, 301:10-301:16, 303:1-303:18.

Later in his deposition, Mr. Kirchner was asked the kind of clarifying questions suggested by the Fourth Circuit in *Gibbes*¸ rebutting Skanska's attempts to manipulate Mr. Kirchner's testimony:

> Q.      In your opinion, did SmithGroup execute the design services called for in its agreement with care and skill ordinarily used by members of the profession practicing under similar circumstances in the Washington, D.C. area?
> A.      Yes.
> Q.      And when you wrote your report, did you have that standard in mind?
> A.      Yes.

Ex. B, Kirchner Dep. 313:4-313:12.

Regardless of whether Mr. Kirchner read Section 3.1 of the Parties' contract—*as he repeatedly clarified that he did*—Mr. Kirchner's opinions about SmithGroup's services are properly founded upon his professional experience and study of relevant information.

For example, Skanska attempts to criticize Mr. Kirchner for considering the role of Skanska's subcontractor, Southland, when evaluating SmithGroup's compliance with the applicable standard of care.  Skanska Mem., at 14.  But Mr. Kirchner explained why understanding Southland's role as a design-assist subcontractor was essential to understanding the standard of care owed by SmithGroup:

> The group, the team is responsible for the design.  This was a collaborative arrangement.  There was a design assist agreement, so in my understanding of this and in my experience, this was a collaborative effort.  They were all responsible for the design.
> ...
> I've worked on many design assist projects, and the definition can vary, but based on the design assist contract that I reviewed on this one, Southland, at least the subcontractor was being held to the same standard of care as any other professional design, and normally in a—in that design assist role, they take a much

10

greater piece, the subcontractor takes a much greater part of assisting that design, and that's the purpose of having the design assist contractor there, is to help develop the design, to keep the design within the budget that was set for it.

Ex. B, Kirchner Dep. 56:14-57:13.

Based on that context, Mr. Kirchner explained how SmithGroup had limited practical ability to overrule Skanska and Southland's proposals to bring the HVAC design within Skanska's construction budget, thereby undermining a central theme of Skanska's claims:

> To a certain degree, yes [SmithGroup can overrule Southland], depending on what the issue is, but usually only in the issue—usually in my experience on—being on both sides, it usually has to be a health and safety or code issue if money is involved.  If costs are trying to be controlled and the design/builder in this instance is the one that is looking for ways to try to cut costs, usually that is something that ends up becoming incorporated into the design, unless it is something that would be against health and safety or against code or go against the owner's wishes.

*Id.* 58:1-58:11; *contra*, *e.g.*, Skanska Opp'n to Summ. J., at 3 ("If SmithGroup disagreed, SmithGroup could have informed Skanska that it would not accept Southland's suggestions.").

As Mr. Kirchner explained, SmithGroup was *not* at liberty to reject Southland's HVAC design proposal to use less expensive (but louder) equipment, as Skanska contends, because SmithGroup had a competing contractual obligation to try to accommodate Skanska's budget in the design, and noisy equipment doesn't present any health or safety concern.  Ex. B, Kirchner Dep. 168:9-172:7.  Mr. Kirchner further explained why it was appropriate, and more efficient, for SmithGroup to wait until the mechanical design was set before considering which acoustical treatments to add in the process of finalizing the construction documents.  Ex. B, Kirchner Dep. 115:4-117:21.

As to the DOAS system, Mr. Kirchner explained how a mechanical engineer provides design intent, and then the manufacturer or the builder's controls contractor is responsible for configuring the equipment to operate as intended by the engineer.  Ex. B, Kirchner Dep. 227:7-

11

232:9.  Mr. Kirchner has personal experience with software updates causing control problems, and also with DOAS systems not working as intended because the building was not properly sealed. *Id.*, 227:7-228:21.  These are examples of alternate causes for the alleged HVAC issues on this project, which are completely unrelated to SmithGroup's design, and therefore prevent Skanska from proving liability against SmithGroup.  *See*, *e.g.*, Ex. F, DC Water LTR (Aug. 29, 2018) (suggesting that HVAC problems might be caused by "Skanska's continued inability to complete the building's exterior glazing on the first floor"); SmithGroup Mem. in Supp. Summ. J., at 17-18 (addressing the bald assumption of Skanska's engineer expert, Mr. Dowdall, that the DOAS system "may" not be capable of operating at target conditions).

Similarly, Mr. Kirchner opined that even though the applicable building code technically required condensate piping, "it is well known in that area that that requirement was not necessarily for these type of systems, and so the code was actually changed in 2015 to allow that to occur, and there's been millions of square feet buil[t] in Washington, D.C. of these types of systems without condensate drains."  Ex. B, Kirchner Dep. 205:5-205:11.  These are proper opinions about the applicable standard of care for HVAC design in the District of Columbia, based on Mr. Kirchner's own experience designing HVAC systems, including for buildings in the District of Columbia. *Id.*, 221:17-223:22; *contra*, Skanska Mem. 13-14.

As shown, Mr. Kirchner's standard of care opinions properly rebut Mr. Dowdall's opinions criticizing SmithGroup's mechanical design for noise, lack of condensate drains, and DOAS issues.[4]  This testimony, demonstrating how Mr. Kirchner properly tailored his standard of care opinions to the circumstances and location of the DC Water project, is completely distinguishable

---

[4]      Mr. Kirchner's opinions go into even greater detail about these topics.  Yet the testimony discussed above is sufficient to demonstrate the lack of merit in Skanska's attacks against Mr. Kirchner and the basis of his opinions.

from the cases cited by Skanska to support exclusion of expert testimony from trial.  For example, Mr. Kirchner **never** testified that he did not know the applicable standard of care, as in the Georgia case Skanska cited, *Smith v. Am. Transitional Hosps., Inc.*, 330 F. Supp. 2d 1358 (S.D. Ga. 2004). Indeed, the expert nurse in *Smith* was disqualified based on her opinion that the applicable standard of care is defined by a facility's policies and procedures, rather than by the "reasonable degree of care and skill ordinarily exercised by members of the nursing profession *generally under conditions and similar and surrounding circumstances*."  *Id.*, 330 F. Supp. 2d, 1361 (emphasis in original).  Under the *Smith* analysis, it is Skanska—not Mr. Kirchner—who improperly advances a unique, project-specific standard of care based on a parsed interpretation of contract language.

This case also does not involve a "national" standard of care, as discussed in the cases cited on pages 12-13 of Skanska's memorandum.  Consistent with Mr. Kirchner's stated opinions, the applicable standard of care looks to "the care and skill ordinarily used by members of the profession practicing under similar conditions at the same time and locality of the Project."  Ex. C, Contract § 3.1.  As shown, Mr. Kirchner properly tailored his opinions to similar conditions (including the design-assist context) and also the time and locality (concerning contemporary interpretations of code requirements for condensate piping in the District of Columbia) of the Project.  *E.g.*, Ex. B, Kirchner Dep. 54:11-58:11; 204:12-206:14.[5]

Mr. Kirchner's opinions about SmithGroup's compliance with the applicable standard of care are proper and admissible.   Skanska's Motion to Exclude should be denied.

---

[5]      Note the sharp contrast between Mr. Kirchner's properly tailored opinions, versus the *ipse dixit* of Skanska's expert, who has *never* designed a building in D.C., and who contends that code officials who disagree with his opinions must have made "mistakes."  SmithGroup Mem. in Supp. Summ. J., at 19-20.

## II.    LACK OF "EXPERIENCE" TESTIFYING AS AN EXPERT WITNESS IS IRRELEVANT TO AN EXPERT'S QUALIFICATION UNDER RULE 702

Little needs to be said in response to Skanska's argument that Mr. Kirchner lacks experience "as an expert witness" because Skanska failed to offer any authority to support this challenge.  Skanska Mem., at 14-15.  The first case cited by Skanska, *Green v. Wing Enterprises, Inc.*, No. RDB-14-1913, 2015 WL 8315773, *7 (D. Md. Dec. 9, 2015), concerns a court's general gatekeeper role, but *without* suggesting that lack of prior experience as an "expert witness" is a relevant consideration.  The other two cases cited by Skanska on this issue appear to have been cited in error, as they discuss questions of bias argued in a completely different section of Skanska's brief.

What authority can be found suggests that the District of Maryland is instead concerned with preventing prior experience as an expert witness from supplanting proper, Rule 702 qualification in the subject matter of the expert's testimony.  "In all cases ... the district court must ensure that it is dealing with an expert, *not just a hired gun*."  *Hare v. Opryland Hospitality, LLC*, DKC-09-0599, 2010 WL 3719915, at *6 (D. Md. Sept. 17, 2010); *see also*, *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 394 (D. Md. 2001) ("In my judgment, Dr. Shelley offers his opinions concerning the Murray snow thrower at issue in this case as a classic 'hired gun,' with no particular expertise concerning snow throwers.").  If anything, a practicing engineer with over thirty years of experience with the exact system and project delivery method at issue who happens to be serving his first engagement as a testifying expert should be considered *more reliable* than a witness who leveraged professional credentials to build a career out of testifying in court.

Mr. Kirchner's decades of experience as a practicing mechanical engineer, specifically including experience designing DOAS-based HVAC systems in the District of Columbia with a design-assist project delivery method, is proper qualification to support his opinions under Rule

702.  Indeed, his lack of experience as a courtroom advocate only enhances his credibility. Skanska's Motion to Exclude should be denied.

## III.   THEORIES ABOUT WITNESS BIAS SHOULD BE RAISED DURING CROSS-EXAMINATION AT TRIAL—NOT IN A RULE 104 MOTION

Unlike Skanska's "experience" argument (which lacked supporting authority), the cases cited in Skanska's brief actually *contradict* Skanska's proposition of excluding expert testimony based on accusations of bias.  *See*, *Green v. Wing Enterprises, Inc.*, No. RDB-14-1913, 2015 WL 8315773, *7 (D. Md. Dec. 9, 2015) ("It is the jury ... on whom the duty falls to weight the sufficiency and credibility of each party's evidence."); *Dorman v. Annapolis OB-GYN Assocs., P.A.*, 781 F. App'x 136 (4th Cir. 2019) ("[e]xploring bias is a proper topic for cross-examination.") (citation omitted); *Georgia-Pac. Corp. v. Ervin & Edwards Const. Co.*, 15 891 F.2d 286 (4th Cir. 1989) (expert who was employee of and claims adjuster for plaintiff's insurance carrier was permitted to testify, but "[h]is employment was relevant and admissible on the issue of bias.").  As shown by the authorities cited in Skanska's own brief, theories about bias are a subject for cross-examination—not a basis for preemptive exclusion of Mr. Kirchner's opinions from trial.

To be sure, Skanska is overplaying its accusations of bias, further demonstrating why the alleged bias is no grounds for exclusion.  Skanska's entire argument is based on Mr. Kirchner's experience working at SmithGroup from 1997-2004.  Ex. B, Kirchner Dep. 22:20-26:4.  Mr. Kirchner does not have a personal relationship with any of SmithGroup's fact witnesses in this litigation.  *Id.*  The closest relationship he had with any of SmithGroup's witnesses was a professional relationship with an engineer named Don Posson, based on a project in D.C. that they worked on together for six months prior to 2004, while Mr. Posson was working in the D.C. office and Mr. Kirchner was working in the Detroit office.  *Id.*  Mere employment at SmithGroup twenty years ago is no basis to assume that Mr. Kirchner's opinions and testimony are unreliable.

It is not surprising that as a result of a decades-long career, Mr. Kirchner has previously encountered witnesses and entities involved in this litigation.  In addition to SmithGroup, Mr. Kirchner has also worked with people associated with Skanska's design-assist subcontractor, Southland, supporting prior knowledge of some of Southland's other projects.  *Id.*, 223:22-226:16. Mr. Kirchner therefore has prior experience working with people associated with both sides of this litigation.

The remedy for Skanska's accusations of bias is simply for Skanska to question Mr. Kirchner during cross-examination at trial.  The Motion to Exclude should be denied.

<u>**CONCLUSION**</u>

As shown, Skanska failed to raise any proper challenge to Mr. Kirchner's opinions or qualifications to offer those opinions at trial.  For these reasons, Skanska's Motion to Exclude should be denied, and the Court should grant any further relief to SmithGroup that it deems appropriate.


Dated: May 27, 2022                                        Respectfully submitted,


                                                            */s/*      Leslie Paul Machado

                                                            Leslie Paul Machado (Bar No. 14952)
                                                            Alison C. Duffy (Md. Bar No. 21002)
                                                            O'HAGAN MEYER, PLLC
                                                            2560 Huntington Avenue, Suite 204
                                                            Alexandria, Virginia 22303
                                                            (703) 775-8607 (phone)
                                                            (804) 403-7110 (facsimile)
                                                            lmachado@ohaganmeyer.com
                                                            aduffy@ohaganmeyer.com

                                                            Stephan F. Andrews (admitted *pro hac vice*)
                                                            James W. Walker (admitted *pro hac vice*)
                                                            O'HAGAN MEYER, PLLC

411 East Franklin Street, 5th Floor
Richmond, Virginia 23219
(804) 403-7100 (phone)
(804) 403-7110 (facsimile)
sandrews@ohaganmeyer.com
jwalker@ohaganmeyer.com
*Counsel for SmithGroup, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of May, 2022, I served the foregoing via ECF/Pacer and via electronic mail to counsel for Skanska USA Building, Inc.


<u>/s/</u>      Leslie Paul Machado

18