# *UNITED STATES DISTRICT COURT*
# *FOR THE DISTRICT OF MARYLAND*
## (Greenbelt Division)

|  |  |  |
|---|---|---|
| SMITHGROUP, INC., | ) | |
| f/k/a SmithGroup JJR, Inc. | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant | ) | |
| | ) | |
| v. | ) | Civil Action No.: 8:20-cv-02499-LKG |
| | ) | |
| SKANSKA USA BUILDING, INC. | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## PLAINTIFF SMITHGROUP, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO SKANSKA'S CROSS-MOTION

## <u>TABLE OF CONTENTS</u>

Page

SUMMARY OF REPLY ............................................................................................1

STANDARD OF REVIEW ......................................................................................4

REPLY TO SKANSKA'S RESPONSIVE STATEMENT OF FACTS.........................7

ARGUMENT ........................................................................................................18

I.      CLARIFICATION OF THE APPLICABLE STANDARD OF CARE ...........................18

II.     SKANSKA LACKS EXPERT OPINION TESTIMONY NECESSARY TO PROVE ITS
        CLAIMS AGAINST SMITHGROUP ...............................................................21

        A.      Ms. Wagman's Opinions Are Irrelevant to Proving Causation or a Breach of the
                Applicable Standard of Care by SmithGroup. ........................................22

        B.      Mr. Gaines Has No Opinion Whatsoever About SmithGroup's Services. ............26

        C.      Mr. Dowdall Lacks Necessary Qualification and Foundation to Support his
                Purported "Opinions."...........................................................27

                i.      Mr. Dowdall Is Not Qualified to Opine About Contemporaneous
                        Interpretations of the International Mechanical Code by Design
                        Professionals Practicing in the District of Columbia. ...............................27

                ii.     Mr. Dowdall's Analysis of the DOAS System and Design Is Incomplete,
                        by his Own Admission....................................................29

                iii.    Mr. Dowdall's Contentions About HVAC Design Requirements
                        Contradict the "Conditions" of the Project. ..................................30

        D.      Skanska Lacks Essential Expert Opinion Testimony to Prove Any of Its
                Counterclaims at Trial. ....................................................34

III.    SKANSKA FAILED TO PROFFER ANY EVIDENCE TO SUPPORT ITS CLAIM
        FOR "INDEMNITY"..................................................................37

IV.     SKANSKA FAILED TO SUBSTANTIATE ANY DISPUTE OF MATERIAL FACT
        CONCERNING ITS BREACH OF CONTRACTUAL NOTICE OBLIGATIONS.........38

OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT .....................40

I.      RESPONSE TO SKANSKA'S STATEMENT OF FACTS ..............................40

II.     SMITHGROUP NEVER ALLEGED A "DELAY" CLAIM ............................42

III.    THE DISTRICT OF MARYLAND HAS PREVIOUSLY HELD UNDER SIMILAR
        CIRCUMSTANCES THAT LACK OF CPM EXPERT TESTIMONY IS NO REASON
        TO GRANT SUMMARY JUDGMENT ................................................44

CONCLUSION....................................................................................45

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker DC, LLC v. Baggette Construction, Inc.*, 378 F. Supp. 3d 399, 411 (D. Md. 2019)..3, 4, 43, 44, 45

*Cf., Elat v. Ngoubene,* 993 F. Supp. 2d 497, 527 (D. Md. 2014)...................................................31,

*Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 574 (D. Md. 2001)…………..……...…..4, 5, 12

*Giddings v. Bristol-Meyers Squibb Co.*, 192 F. Supp. 2d 421, 423 (D. Md. 2002)........................6

*Hare v. Opryland Hospitality, LLC*, DKC-09-0599, 2010 WL 3719915, at *6 (D. Md. Sept. 17, 2010) ................................................................................................................................................28

*Harris v. Reston Hosp. Center, LLC*, 523 Fed. App'x 938, 946 (4th Cir. 2013)......................7, 40

*Hooten-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001) ........................................................7

*Kirby v. Chrysler Corp.,* 554 F. Supp. 743 (D. Md. 1982).............................................................44

*Shreve v. Sears, Roebuck & Co.,* 166 F. Supp. 2d 378, 394 (D. Md. 2001).................................29

*Washington Metro. Area Transp. Author. v. Potomac Investment Prop., Inc.,* 476 F.3d 231, 234 (4th Cir. 2007).....................................................................................................................1, 4, 21

**Other Authorities**

Fed. R. Civ. P. 56...................................................................................................................1, 37

Fed. R. Evid. 702.  ....................................................................................................................28

Brunner & O'Connor on Construction Law § 15:121 (2021). .................................................. 43

## TABLE OF EXHIBITS

**Exhibit**                                                                 **Pages**

VV.    Mark A. Miller Testimony…………………………………………………..2, 9, 10, 11, 33

WW.   Meera Wagman Testimony…………………………………………..8, 18, 23, 25, 39

XX.    D. Michael Dowdall Testimony………………………………...…………..16, 29, 32

YY.    Kevin Ricart Testimony……………………………….……………….…..……16, 28

ZZ.    Thomas A. Gaines Testimony……………………………………………………….27

AAA.   Christopher G. Kirchner Testimony………………………………………….....…28

BBB.   Secretariat Report……………………………………………………….……35, 36

CCC.   Anne Marie Tombros Testimony……………………………..…………………….36

DDD.   Brian Leier Testimony…………………………………………………………….....40

Plaintiff SmithGroup, Inc. ("SmithGroup"), by counsel and pursuant to Federal Rule of Civil Procedure 56, states as follows in reply to support its Motion for Summary Judgment against Defendant Skanska USA Building, Inc. ("Skanska"), and in opposition to Skanska's cross-motion:

## SUMMARY OF REPLY

In response to SmithGroup's Motion for Summary Judgment, Skanska failed to offer any consistent or sufficient argument about why its counterclaims should proceed to trial.  Nor has Skanska identified evidence to support a genuine dispute of material fact.  Instead, Skanska advances a series of distractions, which lay bare Skanska's confusion about its own burden of proof not only in this litigation, but also to overcome a motion for summary judgment.

Skanska accuses SmithGroup of omitting certain contract language from its analysis but offers no explanation for how the complete text of Section 3.1 requires a different interpretation of the applicable standard of care or otherwise avoids the requirement for expert testimony to prove a breach.  Skanska Opp'n, at 11.  Skanska instead concludes that interpretation of the contract is "a disputed fact in and of itself," wrongly assuming that contract interpretation is a question of fact rather than of law.  *Compare id.*, at 12 *with Washington Metro. Area Transp. Author. v. Potomac Investment Prop., Inc.*, 476 F.3d 231, 234 (4th Cir. 2007) ("Under Maryland law, the interpretation of a contract ... is a question of law.").

Skanska then spends much of its brief attempting to describe a different interpretation of its experts' deposition testimony, while continuing to advance expert "opinions" that were disclaimed by the experts themselves and can be found only (if at all) in inadmissible reports. SmithGroup will address all of this again, below.

Skanska alternatively argues (without any supporting authority) that expert standard of care testimony is *not* actually required to prove certain of Skanska's "breach of contract" claims—

completely ignoring that each and every count of Skanska's Counterclaim alleges SmithGroup's negligent "acts, errors, or omissions." *Compare id.*, at 19 *with* Counterclaim ¶¶ 20(e), 24(c), 28(c), and 32.  This argument is truly a head-scratcher because Skanska conceded in a simultaneous parallel filing that *all* of the services SmithGroup provided to Skanska were governed by the exact same standard of care.  *See*, Skanska's Br. in Supp. Rule 104 Mot. at 4, ¶ 10 (ECF 38-1) ("The Standard of Care applies to SmithGroup's entire scope of design obligations under the Design Agreement including the HVAC system design; *there are no components of SmithGroup's contractual scope that are excluded from the Standard of Care as defined in the Design Agreement*." (emphasis added)).  Because SmithGroup's *entire* performance under the contract was always governed by the applicable standard of care, Skanska cannot prove any of its breach of contract theories without appropriate and admissible, relevant expert opinion testimony.

In another attempt to save its claims, Skanska paradoxically argues that this Court should overlook Skanska's own, prior contractual breaches.  *Id.*, at 25.  Skanska's new "course of conduct" argument is striking in how boldly it contradicts the strict-liability view of contract interpretation that Skanska advances to blame SmithGroup for the consequences of design decisions *that Skanska undeniably approved*, if not outright encouraged.  *See*, *e.g.,* Ex. VV, Miller Dep. 37:1-37:8 (explaining how the decision to change from the HVAC design from a quieter chilled-beam system to a lower cost fan-coil system was a "design effort between Southland, SmithGroup, *and Skanska* to find a system that worked with the budget." (emphasis added)).

Skanska's brief is further buttressed by various disparagements against SmithGroup, which need not be addressed except to recognize them as unnecessary *ad hominem* attacks and other logical fallacies.  Skanska accuses SmithGroup of ignorance in Footnote 9.  Skanska attacks SmithGroup's credibility in Footnote 6, based entirely on SmithGroup's observations that the

person Skanska proffers as "one of the foremost experts in the HVAC design industry" has never designed an HVAC system in D.C., failed to fully develop opinions about what he opines "may" have happened, accuses code officials of "mak[ing] mistakes" where they develop national standards that differ from his personal preferences, etc. *See* SmithGroup Mem. 17-31.  On page 24, Skanska even goes so far as to accuse counsel of failing to "effectively question [Skanska's experts] to elicit testimony that would enable SmithGroup to defend against Skanska's counterclaims ..."  This last point is remarkable because much of SmithGroup's motion for summary judgment was founded upon *deposition testimony* through which Skanska's own experts repeatedly disclaimed forming opinions that Skanska continues advocating in its opposition brief.

Skanska's cross-motion for summary judgment fairs no better.  The entire cross-motion is premised upon a fiction that "[i]t is undisputed that SmithGroup's claim for Extended CA Services is a delay claim ..." Skanska Opp'n, at 32.  Relying on that faulty assumption, Skanska argues that SmithGroup's burden of proof for a purported "delay" claim requires expert critical path method ("CPM") analysis at trial, which SmithGroup never disclosed.  SmithGroup did not disclose any CPM opinions because SmithGroup has not asserted any construction "delay" claim at all, and no such evidence is necessary or relevant to support a simple *fee* claim for additional professional services rendered at Skanska's request.

Even if SmithGroup's fee claim could somehow be camouflaged as a construction "delay" claim (which it is not), the District of Maryland recently rejected a general contractor's similar argument that subcontractor delay claims require CPM analysis to survive summary judgment. *Baker DC, LLC v. Baggette Construction, Inc.*, 378 F. Supp. 3d 399 (D. Md. 2019).  In reaching that conclusion, the District of Maryland rejected the general contractor's reliance on the very same case cited on pages 33-34 of Skanska's brief.  *Id.*, at 412.  Specifically, the Court

3

distinguished subcontractor delay claims because the general contractor (such as Skanska) holds responsibility for overseeing the entire project.  Skanska's cross-motion dodges *Baggette* entirely by representing that "binding case law is limited," and encouraging the Court to look instead to analysis from federal courts in Virginia and the District of Columbia.

## **STANDARD OF REVIEW**

In its opening brief, SmithGroup set forth the applicable standard of review for summary judgment under Rule 56.  *See*, SmithGroup Br. 2.  Skanska incorporated SmithGroup's presentation of that standard by reference.

It must be emphasized, however, what it means in law and practice that supposed disputes of fact must be "genuine."  SmithGroup supported every fact brought forward as a material fact for summary judgment purposes with support from deposition testimony and documents exchanged in discovery.  Skanska contends that many of these facts are "disputed." A fact is *"genuinely"* placed in dispute only if the opponent of a motion for summary judgment brings forward contrary evidence in one of several specific forms:  deposition testimony, affidavits, documents, stipulations and the proponent's admissions in discovery.  Just as important, the evidence relied on to place a fact in dispute for summary judgment purposes must be admissible. "If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, 'there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case *necessarily renders all other facts immaterial*.'"  *Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 574 (D. Md. 2001) (emphasis added).

It is axiomatic that a party opposing a motion for summary judgment on the basis of a contention that a material fact is disputed "'may not rest upon the mere allegations or denials of

[his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Gravina v. Azar*, No. 8:19-cv-2993-PX, 2021 WL 948822, at *6 (D. Md. Mar. 12, 2021) (quoting *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

The District of Maryland emphasized that "*the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.*" *Dowty Comm., Inc. v. Novatel Computer Sys. Corp.*, 817 F. Supp. 581, 594 (D. Md. 1992) (emphasis in original). Recognizing the summary judgment procedure "as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action,'" the Court noted:

> the inherent difficulty in demonstrating an absence of evidence, and is confident that the most efficient and least expensive method of litigating summary judgment motions predicated on an absence of evidence *is to have the nonmoving party that shoulders the ultimate burden of persuasion at trial identify to the Court and to its adversary those portions of the record that support its claims.*

*Dowty*, at 595; *see also*, *Turner v. Human Genome Science, Inc.*, 292 F. Supp. 2d 738, 743 (D. Md. 2003) ("on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence"). It is *not* sufficient for the nonmoving party to respond to such a motion for summary judgment by advancing "conclusory assertions about the available evidence." *Id.* The nonmoving party "cannot create a genuine dispute of material fact 'through mere speculation or the building of one inference upon another.'" *Doe*, 544 F. Supp. 3d, at 573. If the nonmoving party fails to meet its burden to present such evidence, the nonmoving party may not take a second bite at the apple by later asking the Court to consider evidence that the nonmoving party failed to timely identify. *Id.* All of this analysis is entirely consistent with the plain text of Rule 56(e), allowing the Court to consider facts undisputed if the opposing party does not properly support its

challenge to the facts by citing *admissible* evidence required by Rule 56(c) (including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, etc.).

Skanska fails to appreciate this standard of review.  For example, Skanska repeatedly argues that because SmithGroup did not separately address the shortcomings of Skanska's expert "opinions" in a redundant Rule 104 motion, SmithGroup is somehow barred from raising those flaws to support summary judgment.  Skanska Opp'n, at 11 n.4, 23-24.  "Nevertheless, *like other evidence*, where a party offers irrelevant or unreliable expert testimony to satisfy an element of the offense, *the trial Court may exclude the expert testimony from its summary judgment consideration*."  *Giddings v. Bristol-Meyers Squibb Co.*, 192 F. Supp. 2d 421, 423 (D. Md. 2002) (emphasis added).  Skanska's experts need not be formally excluded for SmithGroup to prevail on summary judgment.  Instead, SmithGroup met its burden by "showing" the Court that Skanska lacks the expert opinions necessary to prove Skanska's counterclaims.

Skanska similarly cannot defeat summary judgment by quoting statements from its own experts' Rule 26(a)(2) reports, which are inadmissible hearsay, and which SmithGroup has shown often contradict the experts' sworn deposition testimony.  *Solis v. Prince George's Cnty*, 153 F. Supp. 2d 793, 799 (D. Md. 2001) ("unsworn expert reports, which may have been prepared in compliance with Rule 26(a)(2), will not be considered by the Court for purposes of summary judgment.");  *see also*, *In re Eternity Shipping, Ltd.*, 444 F. Supp. 2d 347, 363 (D. Md. 2006) (recognizing that unsworn expert reports were inadmissible hearsay, and ignoring them on summary judgment);  *Turner*, 292 F. Supp. 2d at 743 ("unsworn statements or expert reports do not qualify as affidavits and are not proper for consideration by the court when ruling on a motion

for summary judgment"); *but see*, Skanska Br. at 12, 14, 17, 18, 20-24 (repeatedly citing its experts' reports to oppose summary judgment).

Disputes about questions of law, such as contract interpretation, do not preclude summary judgment.  *Compare*, Skanska Br., at 12 (arguing that disagreement about contract interpretation is "a disputed material fact") *with Washington Metro. Area Transp. Author. v. Potomac Investment Prop., Inc.*, 476 F.3d 231, 234 (4th Cir. 2007) ("Under Maryland law, the interpretation of a contract ... is a question of law."); *Hooten-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001) (affirming summary judgment based on question of law for court, which was not a question of fact for the jury).  In this case, the contract is undisputed and unambiguous, requiring only enforcement, not interpretation.

Finally, Skanska cannot avoid summary judgment by advancing entirely new, unpled legal theories, such as a "course of conduct," for the first time in response to SmithGroup's motion for summary judgment.  *Compare*, Skanska Opp'n, at 25 *with Harris v. Reston Hosp. Center, LLC*, 523 Fed. App'x 938, 946 (4th Cir. 2013) (affirming summary judgment where district court refused to consider opposing party's new legal theory, which was introduced for the first time to oppose summary judgment).

### REPLY TO SKANSKA'S RESPONSIVE STATEMENT OF FACTS

Most of Skanska's responses to SmithGroup's statement of facts are improper, promoting either: (1) legal conclusions; (2) interjection of superfluous contentions in response to undisputed facts; or (3) improper contentions that a fact is disputed without the required citation to contrary evidence in the record.  SmithGroup requests the Court to disregard pursuant to Rule 56(e) all of Skanska's contentions, to the extent the contentions are anything other than a citation to the record demonstrating a genuine dispute of fact, as required by Rule 56.  In reply to Skanska's specific

responses, SmithGroup states as follows:

1-4.    Undisputed.

5.      Not genuinely disputed.  The parties' contract speaks for itself, SmithGroup accurately quoted relevant language, and Skanska fails to identify how any other language found in the contract is "material" to require a different interpretation of the standard of care, much less to dispute SmithGroup's statement.  Further, Skanska does not contend the contract is ambiguous, so there can be no "dispute of material fact" when applying the contract's terms to this dispute.

6-23.   Undisputed.

24.     The fact is conceded to be undisputed, yet Skanska responds further by continuing to argue its own legal conclusions.  Whether or not SmithGroup "at all times retained overall design responsibility under the Design Agreement" in the face of Southland's undisputed, parallel design-assist role is simply an example of many elements of Skanska's claims requiring admissible expert testimony, which Skanska lacks and therefore cannot prove at trial.

25-26. Undisputed.  Note how Skanska does not dispute that Southland assigned its own professional engineer "to provide assistance with the engineering design."

27.     Not genuinely disputed.  Skanska has grossly misrepresented the deposition testimony of Ms. Wagman and Mr. Gaines throughout its briefing.  *See*, *infra*, 22-27, 34-37.  Ms. Wagman disclaimed forming opinions about the applicable standard of care, much less that SmithGroup caused any delay, and she lacks qualification to opine whether SmithGroup's professional services met the applicable standard of care.  *E.g.*, Ex. WW, Wagman Dep. 11:9-11:17; 166:4-167:3.

28-32. Undisputed.  Note how it is undisputed that SMW's initial acoustical study was completed *before* the HVAC system was designed.

33.     Not genuinely disputed.  Skanska does not dispute Fact 32, concerning SmithGroup's

8

proposed $22,000 budget in March 2015 for Phase 2 acoustic/vibration design services. Skanska does not dispute Fact 41, stating that in July 2016, Skanska approved a *change order* that Skanska requested *exclude* acoustic/vibration design services from Phase 2. Fact 33 simply addresses SmithGroup's interim correspondence, in December 2015, referencing SmithGroup's understanding of the acoustic consultant's anticipated role for Phase 2. In SmithGroup's cited Exhibit U, Skanska acknowledged receipt of the correspondence. Skanska does not cite any evidence to indicate that Skanska disagreed with SmithGroup's repeated references to its understanding that Phase 2 would include acoustic design services, until they were eventually excluded at Skanska's request by the July 2016 change order.

34-35. Undisputed. Note how it is undisputed that in January 2016, SmithGroup was recommending acoustic design services be included in Phase 2, which is *before* Southland proposed the cheaper, noisier fan-coil HVAC design. *See also*, Fact 36.

36. Not genuinely disputed. Skanska cites no evidence to contradict SmithGroup's properly supported statement that Southland proposed the new, cheaper approach to HVAC design, much less the date that occurred. *See*, Ex. VV, Miller Dep. 37:4-37:8 (confirming that decision to change from a chilled-beam system to a less expensive fan-coil system was a collaborative effort "between Southland, SmithGroup, and Skanska to find a system that worked with the budget."). Skanska responds instead by advocating its own legal conclusions that Southland "was not responsible" for HVAC design, that SmithGroup was solely responsible for deciding what to include in the HVAC design, and that SmithGroup should have unilaterally rejected the fan-coil design recommended by Skanska's HVAC design-assist subcontractor. Nothing in Skanska's response identifies any genuine dispute of fact requiring a trial. Further, Skanska's superfluous legal conclusions are contradicted by the testimony of Skanska's own fact witness, who confirmed during his deposition

that SmithGroup's initial HVAC design (which Skanska now contends SmithGroup should have pursued unilaterally) did not meet Skanska's budget.   Ex. VV, Miller Dep. 35:5-35:7 ("SmithGroup wanted to have chilled beams *but they were not in the budget* and that was not the final design." (emphasis added)), 39:16-40:11.   Further, Skanska has argued throughout this litigation that SmithGroup had a contractual duty *not* to design beyond Skanska's construction budget.   Skanska's superfluous contention that SmithGroup should have unilaterally rejected Southland's suggestion of a less-expensive fan-coil HVAC system is not serious.[1]

37.     Not genuinely disputed.  Mr. Miller's testimony was quoted extensively in the body of SmithGroup's opening brief, and cited again in support of Fact 37, and that testimony speaks for itself.  SmithGroup's Fact 37 does not argue the parties' relative "contractual responsibility" for HVAC design—it instead states that SmithGroup, Skanska, and Southland did, *in fact*, jointly share "responsibility for selecting an HVAC system that could work with the Project's budget." Skanska's repetitive legal conclusions are argumentative, without disputing that fact.

38-39. Undisputed.  Note how it is undisputed that SmithGroup informed both Southland and Skanska *in 2016* that it had concerns about the noise of Southland's proposed equipment.

40.     Skanska concedes that SmithGroup's Fact 40 is undisputed, so it is improper for Skanska to gratuitously advocate its interpretation of surrounding events in response to that undisputed fact, without even supporting the new contentions.  For example, Skanska conceded Fact 31, stating that the Phase 1 acoustic study was performed in 2015, before the HVAC system *had even been designed*, which contradicts Skanska's inference here that SmithGroup withheld information from the acoustic consultant.  Skanska's argument about negotiating Phase 2 services only infers that acoustic analysis was deliberately excluded by Skanska from SmithGroup's Phase 2 services,

---

[1]     Of course, missing from all of this is that nothing prevented Skanska from accepting the original design and finding the savings elsewhere to bring the overall project within budget.

consistent with undisputed Fact 41, which supports SmithGroup's defense of the claims asserted. A dispute about "whether SmithGroup should have, could have, and was responsible" for acoustic design issues is a *legal* question, which Skanska lacks proper evidence to prove, as opposed to a genuine dispute of material fact.  All of Skanska's superfluous contentions should be ignored.

41.     Undisputed.  It is, therefore, undisputed that Skanska excluded acoustical/vibration design services *after* SmithGroup had already raised HVAC noise concerns to Skanska.  *See* Fact 38.

42.     Not genuinely disputed.  Skanska does not dispute the authenticity of the document, or that the document on its face allocates $15,000 for further acoustical design services.  Instead, Skanska argues a collateral issue, that Skanska's pay application *deliberately* misrepresented its work to obtain payment from DCW on tasks that were not actually performed, such as the acoustic design. Skanska then tries to support its contention by citing inadmissible hearsay testimony of Mr. Miller, conceding that he had no conversation with DCW getting its approval to invoice unperformed "AV" (referencing acoustic/vibration) services to pay for different work.  Ex. VV, Miller Dep. 137:21-141:18.  Even if the new contention could be proven, it supports SmithGroup's defense.

43.     Skanska agrees the fact is *undisputed*, so there is no reason for Skanska to argue its views of the case yet again.  Skanska also violates Rule 56 by describing its superfluous new contentions to be "undisputed" without citing proper evidentiary support.  As shown above, Skanska cannot genuinely argue that SmithGroup—alone—"selected the HVAC equipment."   Skanska cannot avoid summary judgment by describing facts as "disputed" or "undisputed" depending on which classification for each fact supports an argument.  *Compare*, Skanska Resp. to Fact 36 (*disputing* improperly SmithGroup's proffered fact that Southland proposed the cheaper fan-coil HVAC design) *with* Skanska Resp. to Fact 43 (now arguing it is "undisputed that SmithGroup selected the HVAC equipment").  Skanska's superfluous contentions should all be ignored.

44.     Not genuinely disputed.  SmithGroup did not quote Mr. Leier as using the words "too late," and SmithGroup accurately paraphrased the Mr. Leier's correspondence, which included the statement: "now is not the time to discover this."  The cited exhibit speaks for itself, and Skanska's interpretation of the chain of correspondence does not create any genuine dispute of fact.

45.     Not genuinely disputed.  The document speaks for itself, and the cited passages of Mr. Miller's deposition do not support Skanska's interpretation.  Skanska did not dispute facts where both SmithGroup and Skanska previously conveyed that acoustical review would be included in Phase 2, contrary to Skanska's present "dispute" about Fact 45.  See, Facts 32, 34, 40.  Even if Skanska is correct that it "specifically excluded the Phase 2 acoustical review from SmithGroup's scope and fees for Phase 2," Mr. Dowdall cannot support his opinion, discussed below, that SmithGroup held an absolute duty "as the Designer," to perform acoustic analysis that *Skanska did not want to pay for*.  *See*, Skanska Opp'n, at 13.

46.     Not genuinely disputed.  Mr. Leier's deposition testimony speaks for itself, supporting SmithGroup's Fact 46, which does not *quote* Mr. Leier's testimony as misrepresented by Skanska's response.  SmithGroup's paraphrasing of Mr. Leier's testimony is entirely consistent with the transcript.  A purported dispute about this fact is not material anyway, where Skanska lacks expert testimony to support allegations about a breach of the applicable standard of care.  "If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, 'there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case *necessarily renders all other facts immaterial*.'"  *Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 574 (D. Md. 2001) (emphasis added).

47.     Undisputed.

48.    Skanska concedes the stated fact is undisputed, yet Skanska again takes the liberty of arguing unrelated contentions, which cannot be interjected to fabricate a "material" dispute of fact. See, for example, SmithGroup's reply for Fact 46, above, and also Fact 31, where it is confirmed to be *undisputed* that the Phase 1 acoustic analysis was performed *before* the HVAC system was even designed.  And because there is no dispute that acoustic design was removed from Phase 2, at Skanska's request, there is no foundation for Skanska's inference that SmithGroup should have been specifying quieter equipment that Skanska could not afford, or else specifying sound-mitigation details that Skanska did not want to pay for.  *See*, Fact 41; Contract, Amended § 3.5 (ECF 1-1, page 43 of 46) (confirming that post-GMP authorization of SmithGroup's services applied to both *scope* and fee—not only an adjustment of SmithGroup's fee).  Skanska lacks appropriate expert opinions to prove what it believes SmithGroup "could have and should have" done under the applicable standard of care.  Skanska's superfluous contentions should be ignored.

49.    Not genuinely disputed.  As shown in reply to Fact 42, Skanska relies on inadmissible hearsay testimony to substantiate its purported dispute, and the new contention supports SmithGroup's defense.

50.    Not genuinely disputed.  SmithGroup dedicated eleven pages of its opening brief to this issue, which it incorporates here by reference in response to Skanska's further parsing of Mr. Shockey's statement that "some review of mech systems noise would be advisable for due diligence."  *See*, SmithGroup Br. in Supp., at 21-31.

51-52.  Undisputed.

53-56.  Not genuinely disputed.  Skanska contends that four separate facts are genuinely disputed, simply by cross referencing its prior, insufficient responses.  SmithGroup has shown already that Skanska supports its challenge to these facts by citing inadmissible hearsay testimony.  *See*, Fact

42. Regardless of any purported side agreement between Skanska and DCW to allow inaccurate pay applications, the documents addressed by Facts 54-56 speak for themselves as to the nature and value of services represented by Skanska to have been performed.  It is irrelevant whether Skanska *intentionally misrepresented* its descriptions of work in those pay applications.

57.     Undisputed.

58.     Not genuinely disputed.  SmithGroup cited relevant contract language and deposition testimony about SmithGroup's contract requirement to confer with Skanska before re-engaging the acoustic consultant.  Skanska is coy when it argues that SmithGroup did not technically "notify Skanska" of the engagement, thereby precluding Skanska's ability to object. There is no serious contention that SmithGroup was contractually required to actually hire a consultant for services Skanska removed from Phase 2, so that Skanska could then formally "object" to paying the consultant's fees.  *See*, Fact 41 (undisputed); Contract, Amended § 3.5 (ECF 1-1, page 43 of 46) (confirming that post-GMP authorization of SmithGroup's services applied to both *scope* and fee).

59-60.  As before, Skanska concedes that SmithGroup's stated facts are *undisputed*, yet Skanska improperly cross-references its prior cross references, all of which are supported by nothing more than inadmissible hearsay testimony. *See* Facts 42, 53-56.  Skanska's improper and unsupported supplemental contentions should be ignored.

61-62.  Undisputed.  The facts are relevant to show more billing irregularities by Skanska on this project, some of which resulted in more disputes with DCW.

63.     Undisputed.

64.     Not genuinely disputed.  There is no basis for Skanska to argue that SmithGroup was obligated to provided acoustical analysis *for free* after Skanska requested SmithGroup to remove acoustic analysis from Phase 2 altogether.  *See*, Fact 41 (undisputed); Contract, Amended § 3.5

(ECF 1-1, page 43 of 46) (confirming that post-GMP authorization of SmithGroup's services applied to both *scope* and fee—not only an adjustment of SmithGroup's fee). SmithGroup has previously addressed Skanska's recurring *unsupported* contentions that SmithGroup was solely responsible for HVAC design, including design decisions proposed by Skanska's design-assist subcontractor to accommodate Skanska's construction budget. *E.g.*, Fact 36.

65.     Yet again, Skanska concedes the fact is undisputed, then advocates new contentions and legal conclusions, which should be ignored. Skanska's elaborations also contradict Amended Section 3.5 of the Parties' contract, which only required the design to be 80% complete at the end of Phase 1. (ECF 1-1, page 43 of 46). Skanska then requested SmithGroup to remove acoustic design from Phase 2 altogether. (Fact 41, undisputed) SmithGroup's Fact 65 (undisputed) states an uncontroversial proposition that it would have been more economical for Skanska to simply authorize the acoustic analysis SmithGroup repeatedly recommended for Phase 2. Instead, Skanska elected to ignore the noise concern and to apply funds *budgeted for acoustic analysis* to other, unrelated work (*e.g.*, Fact 42, 54-56). When the installed HVAC system is too loud, Skanska tries to blame the issue on SmithGroup's design services. This is not a dispute requiring a trial.

66.     Not genuinely disputed. Skanska's response to this fact is entirely conclusory, arguing for example that SmithGroup "refused to reimburse Skanska for the costs of mitigation measures *for which SmithGroup was at fault*." This is all legal argument, based on the same contentions that SmithGroup's motion for summary judgment demonstrated Skanska lacks evidence to prove at trial. Skanska's string of citations does not support a genuine dispute of Fact 66, and Skanska even concedes that SmithGroup did provide *some* assistance, as stated.

67-72. Undisputed, including the fact that *Skanska* agreed condensate drains were not required.

73.     The fact asserted was not disputed, but Skanska again interjects its own, improper legal

conclusions, including that it is "undisputed that SmithGroup was incorrect, as the drains were required by code, and that the lack of drains contributed to the problems after construction." Four pages of SmithGroup's brief explained why Skanska cannot prove that the applicable standard of care required specification of condensate drains, or that lack of condensate drains caused anything. *See*, SmithGroup Br. in Supp., at 18-21. More analysis on that issue can be found in the body of SmithGroup's reply brief, below.

74.     The undisputed fact is simple: "Skanska never installed condensate drains." Skanska cannot help itself, again cross-referencing superfluous and immaterial new contentions.

75.     Again, the fact is undisputed, but Skanska tries to argue its case in response. It is undisputed that DCW, the building owner, never asked Skanska to install condensate drains. Skanska's contentions about other "HVAC System problems" are irrelevant to the fact asserted, and they are the very kinds of contentions that Skanska lacks expert testimony to support, as addressed throughout SmithGroup's briefing. The exhibits proffered by Skanska concern HVAC noise issues—not condensate drains or any "related" issues about humidity or condensation.

76.     Skanska does not dispute this fact or cite any evidence to support its gratuitous contention that a variance was legally required. To the contrary, Skanska's own expert, Mr. Dowdall, testified that he had "no reason to doubt" the Southland engineer's experience in D.C. that "he's never had to get a variance." Ex. XX, Dowdall Dep. 158:19-159:5.

77.     Skanska does not dispute the fact, but again tries to argue its case in response. In further reply to Skanska's improper commentary, one of SmithGroup's engineers who worked on this project testified that the revised 2015 update to the IMC was already available during design of this project, "so I believe that my interpretation of the 2012 code was validated based on what was updated in the 2015 ..." Ex. YY, Ricart Dep. 184:12-185:5.

16

78-80.  Undisputed.

81.     Fact 81 is not disputed, specifically including the fact that "Dowdall recommended tests to evaluate the equipment's capacity, *but those tests have not yet been performed*."  Skanska's superfluous contention that some *other*, unspecified tests were performed in response to the *Owner's* HVAC concerns is a transparent attempt to confuse the Court about the lack of foundation for Mr. Dowdall's "opinions."

82-83.  Undisputed.

84.     The fact asserted is undisputed, yet Skanska proffers new contentions about Ms. Tombros' responsibilities, only to contradict those same contentions in response to Fact 85, below.  As shown by Skanska's response to Fact 85, it is undisputed that Ms. Tombros *did* consider whether delays, including certain foundation issues, were caused by DCW.  Her lack of opinions that *SmithGroup* caused any delay only confirms Skanska's lack of evidence against SmithGroup.

85.     The fact asserted is undisputed, and Skanska's improper additional commentary contradicts Skanska's response to Fact 84 that it is "undisputed that it was not Ms. Tombros' responsibility to determine the cause of an impact."  The cited pages of Ms. Tombros' deposition transcript do not support the contention that she only attributed delays "when instructed to do so."

86-87.  Undisputed, and it is improper for Skanska to cross-reference superfluous contentions. Note also how undisputed Facts 86-87 contradict Skanska's commentary in response to Fact 84.

88-89.  Undisputed.  Because Skanska does not dispute its contractual duties, Skanska must be expected to respond substantively to arguments that Skanska breached those same duties.

90.     Not genuinely disputed.  Having argued that SmithGroup caused more than *three (3) years of delay*, Skanska musters only two (2) examples of contractually required written notice of delay. *See*, Skanska Opp'n, at 1.  One those two documents is a letter sent in 2018, after relevant work

17

had already been constructed, so it is not timely notice of anything.  The other document is an e-mail from 2017 requesting structural information, but Ms. Wagman agrees SmithGroup provided the requested structural detail in only "[f]ive days or less."  *See*, Wagman Dep. 170:8-170:14.  At best, Skanska's evidence confirms that SmithGroup promptly mitigated delay in the *only* instance where it received the written notice required by contract.  Skanska's new legal theory about a "course of conduct" is not supported by anything cited by Skanska.

91.    Undisputed.  Note how it is undisputed that Skanska's curtain wall subcontractor had design-assist responsibility, further emphasizing why expert testimony is necessary to prove Skanska's contentions that *SmithGroup* held any responsibility for curtainwall structural details.

92.    The fact is undisputed in its entirety, and the "five days or less" quote is taken directly from the deposition of Skanska's own expert.  Skanska's gratuitous elaboration strategically omits testimony where Ms. Wagman confirms she did not speak with anyone at ICON to understand why it took them 37 days to install the steel.  Ex. WW, Wagman Dep. 176:11-176:15.

93.    Undisputed.  This emphasizes Skanska's lack of evidence, supporting summary judgment.

94.    Undisputed, and there is no admissible evidence that SmithGroup delayed the curtainwall.

95.    Not genuinely disputed.  Skanska lacks any structural engineer or other expert witness to support contentions about SmithGroup's responsibility for engineering curtainwall design details.

## ARGUMENT

## I.    CLARIFICATION OF THE APPLICABLE STANDARD OF CARE

Skanska pedantically cites the amended Section 3.1 found in Exhibit PS-1 to the Parties' contract to complain that SmithGroup omitted language from its analysis of the standard of care. Skanska Opp'n, at 11-12.  In addition to similarly omitting parts of the complete text from its own brief, Skanska substantively failed to demonstrate any fault in SmithGroup's analysis of the applicable standard of care.

The final, amended definition of the contractual "Standard of Care," with original formatting, provides as follows:

> Designer and its Consultants shall perform all Design Services in accordance with all Legal Requirements, satisfying the requirements called for in the Contract Documents including the Project Budget and Schedule and this Agreement, and **notwithstanding anything to the contrary**, further agrees to execute the Design Services with the care and skill ordinarily used by members of the profession practicing under similar conditions at the same time and locality of the Project. ~~Notwithstanding the foregoing, if the Contract Documents contain performance standards for aspects of the Designer's Services, the Designer agrees that it will perform all applicable Services as to achieve such standards.~~

Compl., Ex. A (ECF 1-1, Page 43 of 46) (emphasis in original).

Notable in this amended language is the addition of text stating "notwithstanding anything to the contrary" immediately before reference to the typical, common law standard of care. Section 3.1 was therefore amended to emphasize how "notwithstanding anything to the contrary," SmithGroup was obligated to execute the entirety of its services "with the care and skill ordinarily used by members of the profession practicing under similar conditions at the same time and locality of the Project." That is exactly what SmithGroup has been arguing all along.

This amended Section 3.1 also identifies language that was struck, which Skanska omitted from its own analysis. That final sentence would have held open the possibility of requiring SmithGroup to meet a *higher* standard of care, yet it was clearly deleted by the Parties in the Exhibit PS-1 amendment.

Similar language limiting SmithGroup's standard of care is found again in amended Section 2.2.3:

> Designer agrees to the extent applicable to the execution of its obligations hereunder to be bound to Design/Builder in the same manner as Design/Builder is bound to Owner, ... **to the extent that the terms and conditions of the Design/Build Agreement do not exceed the Standard of Care**.

Exhibit PS-1 to the Contract (ECF 1-1, page 43 of 46) (emphasis added).

All of this context is further confused by Skanska's opposition brief, which altered the amended Section 3.1 to emphasize only the language Skanska advocates about "satisfying the requirements ... including the Project Budget and Schedule ..."  Skanska Opp'n, at 11.  Nothing in the amended Section 3.1—*much less any other section of the contract*—provides a guarantee or warranty by SmithGroup that its design for the Project could be built within a specific timeframe or budget.  SmithGroup was instead required to use ordinary professional skill and care to accommodate *all* project requirements, including its efforts to accommodate Skanska's construction schedule and budget, as emphasized by the edits found in Exhibit PS-1's final statement of the standard of care.  *See also*, Skanska's Br. in Supp. Rule 104 Mot. at 4, ¶ 10 (ECF 38-1) ("The Standard of Care applies to SmithGroup's entire scope of design obligations under the Design Agreement including the HVAC system design; *there are no components of SmithGroup's contractual scope that are excluded from the Standard of Care as defined in the Design Agreement*." (emphasis added)).

Section 4.2 of the contract confirms that Skanska, as design builder, was responsible for preparing the budget and schedule.  Section 4.2 then acknowledges that Skanska might be required to assist SmithGroup in meeting contractual obligations pertaining to the schedule and budget prepared by Skanska.[2]  If Skanska believed SmithGroup was causing delay on the project, then Skanska was contractually obligated to provide SmithGroup with prompt written  notice and an opportunity to mitigate that delay under Section 5.2.  Nothing in this contract language suggests that SmithGroup warranted or guaranteed that its design would meet the construction schedule or

---

[2]     Recall that Skanska's design-assist subcontractor, Southland, encouraged SmithGroup (with Skanska's support) to change the mechanical design from a quieter chilled-beam system to a less-expensive fan-coil system as Skanska was preparing its GMP budget.  SmithGroup Br. in Supp., at 22-27.  The drawings SmithGroup submitted for GMP pricing were only required to be *80% complete*, according to the contract.  *See*, Amended Section 3.5 (ECF 1-1, page 43 of 46).

budget created by Skanska.  To the contrary, all of SmithGroup's services are measured under Section 3.1 against "the care and skill ordinarily used by members of the profession practicing under similar conditions at the same time and locality of the Project."

Skanska does not argue that the contract is ambiguous, so the Court must enforce contract as written as a matter of law because no interpretive facts are genuine at issue.  *See*, *Sheridan v. Nationwide Retirement Sol., Inc.*, 313 Fed. App'x 615, 617 (4th Cir. 2009); *Washington Metro. Area Transp. Author. v. Potomac Investment Prop., Inc.*, 476 F.3d 231, 234 (4th Cir. 2007) ("Under Maryland law, the interpretation of a contract ... is a question of law.").  The contract language specifying the applicable standard of care is *not* "a disputed material fact in and of itself" as Skanska argues on page 12 of its brief to avoid summary judgment.

To prove its case at trial, Skanska must introduce appropriate evidence supporting its contentions that SmithGroup failed to perform its services "with the care and skill ordinarily used by members of the profession practicing under similar conditions at the same time and locality of the Project."  As already shown by SmithGroup's opening brief, Skanska's allegations that SmithGroup *breached* the standard of care can only be established with appropriate and admissible expert opinion testimony.  *See*, SmithGroup Br. in Supp., at 15-17.  Without such evidence, Skanska's claims will never rise from mere conjecture to become a "genuine" dispute necessitating a trial, which is one reason why summary judgment should be granted in SmithGroup's favor.

## II.   SKANSKA LACKS EXPERT OPINION TESTIMONY NECESSARY TO PROVE ITS CLAIMS AGAINST SMITHGROUP

Skanska confuses SmithGroup's analysis and argument about Skanska's experts, suggesting that: "SmithGroup appears to be arguing that multiple expert reports and/or interrelated expert testimony cannot be considered in conjunction with one another to establish 'causal linkage' between impacts and damages."  Skanska Opp'n, at 23.  Based on that faulty premise, Skanska

devotes much of its brief to extolling the qualifications of its three expert witnesses, and then attributing broad opinions to those experts that Skanska hopes will avoid summary judgment.

SmithGroup's argument is much more nuanced.  SmithGroup takes no issue whatsoever with the general concept of stacking expert opinions to allow their cumulative expertise to collectively prove different elements of the claim, i.e., duty, breach, causation, and damages. SmithGroup's argument is that Skanska—*cumulatively*—lacks sufficient expert opinion testimony to create a *genuine* dispute of fact about any breach of the applicable standard of care, much less to prove that SmithGroup caused any damages to Skanska.

As one example, without expert opinion testimony from a structural engineer, Skanska cannot prove that there were deficiencies in the structural design, let alone that an unproven defect caused delay.  *Contra*, Skanska Opp'n, at 21-22 (attributing structural engineering opinions concerning steel connection details to Ms. Wagman, who specifically disclaimed having any such opinion about structural engineering).  And where Skanska's experts affirmatively disclaimed forming opinions about certain subject matter, Skanska cannot avoid summary judgment by quoting purported "opinions" that can be found only in a joint written report, which proffers the opinions of the experts' employer, "Secretariat."  *Id.* (quoting from the Secretariat report to argue Ms. Wagman holds structural opinions that she disclaimed during her deposition); *see also*, *Solis v. Prince George's Cnty*, 153 F. Supp. 2d 793, 799 (D. Md. 2001) ("unsworn expert reports, which may have been prepared in compliance with Rule 26(a)(2), will not be considered by the Court for purposes of summary judgment.")

## A.     Ms. Wagman's Opinions Are Irrelevant to Proving Causation or a Breach of the Applicable Standard of Care by SmithGroup.

Skanska portrays Ms. Wagman as someone who will opine "that Design Services, provided by SmithGroup, caused delays to the Project Schedule, in turn breaching the applicable Standard

22

of Care set forth in the Design Agreement."  Skanska Opp'n, at 20.  Regardless of what might or might not be written in the consolidated "Secretariat Report" produced by Skanska pursuant to Rule 26(a)(2), Ms. Wagman unequivocally disclaimed forming any opinion that SmithGroup "caused delays" or otherwise breached the applicable standard of care.  For example:

> Q.      And you are expressing no opinion regarding whether the design team executed the design services with the care and skill ordinarily used by members of the profession practicing under similar conditions at the time on locality of the project; do I have that right?
> A.      Correct.

Ex. WW, Wagman Dep. 166:18-167:3; *see also*, *id.* 178:2-178:13 (explaining that Ms. Wagman considered delay as a discrete issue, assuming other experts would opine about causation).

Skanska argues that its evidence at trial will involve stacking expert opinions, to allow one expert to establish certain elements of the claim, and then have another expert build on that first expert's foundational opinions to create a "causal linkage."  Skanska Opp'n, at 23.  The problem for Skanska is that Ms. Wagman herself—not SmithGroup—clarified she did not rely on any other expert's analysis to support her own opinions:

> Q.      ... All right.  You are also not a mechanical engineer, I'm assuming?
> A.      I am not.
> Q.      **And you intend to express no opinions of your own regarding the quality of the mechanical design for the project?**
> A.      **I do not.**
> Q.      Okay.  I assume you are also familiar with the report of Mr. Galdahl (phonetic), [Dowdall], I'm not sure how to pronounce his last name, but the mechanical engineer engaged by Skanska to provide opinions on mechanical issues on the project?
> A.      I know that Mr. [Dowdall] provided an expert report on the HVAC, yes.
> Q.      Did you review it?
> A.      I did, but not in depth or detailed.  I reviewed it as part of my study, **but the—my analysis focuses on analyzing the schedule impact, not the technical details or information regarding the design that he refers to.**
> Q.      That's what I'm asking, is: Did you base any portion of your opinions on his opinion regarding the quality of the mechanical design?
> A.      So not the scheduled component is what it is, there's a scheduled piece of the analysis which identifies and quantifies delay to the critical path, and then

within that the next step then is causes of the delay. **So that's where Mr. [Dowdall] would come into play to say that the HVAC and the noise and all of those issues were due to, in his opinion, the design issues. And that's how the connection is made, because I, myself, as you said, am not a mechanical engineer.**

Q.     All right. For example, one of the issues that Mr. [Dowdall] flagged was, in his opinion, a failure to include condensate drains at the interior fan coil unit assemblies, did you take that opinion of his and try to determine if that had some schedule impacts, the failure to include fan coil intake condensate drains?

A.     Discreetly the one –

Q.     Yes, ma'am?

A.     In my opinion the period of the years the time that it took to resolve all of the HVAC issues, there were multiple issues ongoing which were intertwined and overlapping.

And so it is—**you can't discretely carve out an exact number of days to specific issues, as they all contributed to this year's long delay period.**

*Id.*, 176:17-179:12 (emphasis added); *see also*, *id.*, at 17:22-19:18 (again confirming that Ms. Wagman did not rely on the opinions of any engineers in forming her own opinions). There is no basis for Skanska to continue attributing opinions to Ms. Wagman that "SmithGroup did not provide an HVAC design which allowed for timely and prudent completion of the Project." Skanska Opp'n, at 22. Nor is there any basis for Skanska to continue representing to this Court that Ms. Wagman will connect specific periods of delay to Mr. Dowdall's opinions, which were themselves limited to: (1) HVAC noise; (2) condensate drains; and (3) DOAS. *Contra*, *id.*, at 22-23. Skanska has no expert available to connect the three purported standard of care opinions described by Mr. Dowdall to the delay identified by Ms. Wagman, who concedes there were numerous "intertwined and overlapping" HVAC issues that caused years of delay on this project.

It gets worse. Skanska quotes the Secretariat Report to suggest Ms. Wagman will testify at trial with opinions concerning a structural connection detail related to the curtainwall. Skanska Opp'n, at 21. Skanska represents that Ms. Wagman will testify at trial that the steel detailing issue, "[i]n Secretariat's view, is a lack of coordination in the design and submittal review process which resulted in critical path delay and impact which SmithGroup could have avoided." *Id.*, at 22.

Whoever at "Secretariat" has this "view", it certainly does not match Ms. Wagman's deposition testimony.  Ms. Wagman repeatedly confirmed under oath that she had no opinions whatsoever about the standard of care applicable to engineering, as previously discussed in SmithGroup's opening brief.  *See*, SmithGroup Br. in Supp., at 34-35; *see also*, *id.*, Ex. WW, Wagman Dep. 17:22-18:4.  When questioned specifically about this curtainwall detailing issue, Ms. Wagman: (1) did not know how many locations in the building required the supplemental steel detail; (2) confirmed that SmithGroup generated the requested details within only five days or less; and (3) was unable to conclude whether this structural detailing issue impacted the sequence of installation of the curtainwall.  Ex. WW, Wagman Dep. 167:5-176:15.  Skanska has *no expert opinion* to prove that SmithGroup (as opposed to the curtain wall manufacturer or subcontractor) held any contractual responsibility for this structural detail.  Ms. Wagman's observation that SmithGroup generated the requested detail in "five days or less" during construction is no conclusion that SmithGroup was contractually responsible for the detail, much less that SmithGroup caused critical path delay.  The Secretariat report is not evidence, and Skanska has *no evidence* to support a "genuine" dispute of material fact on this issue.

The opinions attributed to "Secretariat" in the joint expert report produced by Skanska are not evidence, they are inadmissible, and Skanska cannot force those "Secretariat" opinions on Ms. Wagman after she disclaimed them during her deposition.  A trial is not necessary to hear Ms. Wagman's conclusion that the project ran 1,148 days late due to a confluence of issues that she is either unable or unwilling to untangle, much less attribute to SmithGroup.  Whether or not construction of the project ran late is not a material dispute in this litigation.  Instead, the fundamental question on summary judgment is what admissible evidence can Skanska possibly introduce at trial to prove that SmithGroup's design services caused years of construction delay?

Ms. Wagman's opinions are irrelevant to the entire issue.

### B. Mr. Gaines Has No Opinion Whatsoever About SmithGroup's Services.

It is telling how little Skanska says in response to SmithGroup's analysis of Mr. Gaines, showing that his role at trial will be that of a calculator.  *See*, Skanska Br. in Supp., at 37.  Skanska appears to agree that Mr. Gaines' opinions are conclusory: "Mr. Gaines ... opines that expenditures Skanska incurred on HVAC-related remediation resulted in a specific Skanska damages."  Skanska Opp'n, at 23.

As already argued in SmithGroup's opening brief, such conclusory opinion testimony is not helpful to the finder of fact.  The opinions proffered by Mr. Gaines cannot avoid summary judgment because he failed to opine *whether* or *why* Skanska's alleged expenses should be attributed to SmithGroup's services, and there is no other expert testimony available to make that connection for him.  To the contrary, his colleague, Ms. Wagman, opines that there were many concurrent HVAC issues on this project, which cannot be untangled to distinguish Skanska's allegations against SmithGroup from other, unrelated issues.

Mr. Gaines was also even more strident than Ms. Wagman in denying reliance on opinions of other experts:

> Q.      In preparing your May 25 report, did you have information in any form from—I forget the fellow's first name, but Dowdell, the mechanical expert that Skanska has engaged in this matter?
> A.      I did not, no.
> Q.      Did you have any understanding as when you were completing your assignment, as to what his opinions were about the mechanical system?
> A.      Not specifically, no.
> Q.      Did it matter to you what Mr. Dowdell opinions were on the design of the mechanical system as far as how you would approach—
> A.      No.
> Q.      --either delay or the—
> A.      **A value's a value.  If—if there's some reason to—to omit a value, that's for another reason, such as one of his opinions, then it doesn't change the value itself.**

Ex. ZZ, Gaines Dep. 46:8-47:3 (emphasis added).  Mr. Gaines admittedly has no opinion about

what *caused* Skanska to incur any expenses, which he concedes would be the scope of a different

expert's opinion.  From his perspective, "[a] value's a value," and Mr. Gaines never connected

opinions offered by Mr. Dowdall or Ms. Wagman to any measure of damages alleged by Skanska.

His role in this litigation is therefore that of a calculator, not an expert witness.

      **C.**    **Mr. Dowdall Lacks Necessary Qualification and Foundation to Support his Purported "Opinions."**

      SmithGroup thoroughly addressed Mr. Dowdall's opinions and testimony in its opening

brief, and all of that analysis is reiterated here by reference.  *See*, SmithGroup Br. in Supp. 17-31.

Skanska responds to SmithGroup's analysis by arguing a different interpretation not only of Mr.

Dowdall's deposition testimony, but also of his report.  There remain several fundamental defects

with Mr. Dowdall's opinions and Skanska's argument, which can be summarized as follows:

      **i.**    **Mr. Dowdall Is Not Qualified to Opine About Contemporaneous Interpretations of the International Mechanical Code by Design Professionals Practicing in the District of Columbia.**

      As to Skanska's condensate line theory, the question presented is not whether the four

corners of the contemporaneous International Mechanical Code ("IMC") technically required

condensate drains.  Skanska does not require expert witness testimony to recite selected portions

of the IMC at trial.  The question for Skanska to prove at trial is instead whether "the care and skill

ordinarily used by members of the profession practicing *under similar conditions at the same time

and locality of the Project*" required SmithGroup to specify the condensate drains.

      SmithGroup answered this question by showing how a DC licensed engineer employed by

Skanska's own HVAC design-assist subcontractor recommended *against* SmithGroup specifying

the condensate drains, based on local practice.  *See*, SmithGroup, Br. in Supp. 19.  SmithGroup

has shown further that the IMC was revised to eliminate the condensate drain requirement

altogether, further evidencing that the earlier code's requirement was not necessary. *Id.*, at 20. If Skanska's counterclaim went to trial, SmithGroup would introduce testimony of one of its engineers who worked on this project, explaining that the revised 2015 update to the IMC was already available during design of this project, "so I believe that my interpretation of the 2012 code was validated based on what was updated in the 2015 ..." Ex. YY, Ricart Dep. 184:12-185:5. SmithGroup's expert will consistently opine, based on his extensive experience practicing in the District, that even though the applicable building code technically required condensate drains at the time, "it is well known in that area that that requirement was not necessarily for these type of systems, and so the code was actually changed in 2015 to allow that to occur, and there's been millions of square feet build in Washington, D.C. of these types of systems without condensate drains." Ex. AAA, Kirchner Dep. 205:5-205:11. To this date, *nobody* has demanded that condensate drains be installed, which Skanska does not dispute.

Skanska responds to these points instead by reciting its expert's rote conclusion that the IMC *technically* required condensate drains at the time, arguing that subsequent revisions to the IMC are "irrelevant." Skanska Opp'n, at 15-16. Skanska argues that having determined the IMC *technically* required condensate drains, Mr. Dowdall will opine at trial that the lack of condensate drains "contributed" to vague problems on the project, but deposition pages cited by Skanska do not describe any such opinions. *Id*. This is not a legitimate standard of care opinion.

Before testifying at trial, an expert witness must be shown to be qualified "by knowledge, skill, experience, training, or education. ..." Fed. R. Evid. 702. The District of Maryland is concerned with avoiding "hired gun" expertise, and preventing professional credentials from supplanting proper, Rule 702 qualification in the subject matter of the expert's testimony. "In all cases ... the district court must ensure that it is dealing with an expert, *not just a hired gun*." *Hare*

*v. Opryland Hospitality, LLC*, DKC-09-0599, 2010 WL 3719915, at *6 (D. Md. Sept. 17, 2010); *see also*, *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 394 (D. Md. 2001) ("In my judgment, Dr. Shelley offers his opinions concerning the Murray snow thrower at issue in this case as a classic 'hired gun,' with no particular expertise concerning snow throwers.").

Mr. Dowdall *has never designed a building in the District of Columbia*.  Ex. XX, Dowdall Dep. 9:22-10:3.  Although Mr. Dowdall may technically be licensed as an engineer in the District of Columbia, his practice currently focuses on "forensics and *litigation support*," rather than actual engineering design.  *Id*. 9:13-9:17 (emphasis added).  SmithGroup's opening brief explained how Mr. Dowdall lacks any qualification to opine about contemporaneously interpretation of the IMC *by design professionals practicing in the District*, much less by relevant government authorities, when this project was being built.  Nothing prevented Dowdall from familiarizing himself with local practice.  He simply elected not to do so.

Mr. Dowdall's opinion that the IMC technically required condensate drains is not relevant to the material issue of whether SmithGroup's design services met the applicable standard of care. This condensate drain issue should not proceed to trial because Mr. Dowdall is not qualified to provide the opinions necessary to prove Skanska's contention and because Skanska has provided no evidence that *it* has been damaged by the absence of condensate drains.

### ii.    Mr. Dowdall's Analysis of the DOAS System and Design Is Speculative, by his Own Admission.

During the deposition of Mr. Dowdall, SmithGroup's counsel explored the basis and substance of his opinions pertaining to the DOAS system.  Mr. Dowdall shut down that exploration by responding that "the key part here is I say 'may,'" distinguishing the statements in his report as speculation  Ex. XX, Dowdall Dep. 41:19-45:5.  Then, without allowing time for a follow-up question, Mr. Dowdall expounded that: "I say we need to have the manufacturer rerun the unit in

order to make sure that the capacity of the heat wheel is sufficient should we need to add more differential to the outside air versus exhaust airflows," which he confirmed was never done.  *Id.*  Mr. Dowdall then looked back through his report, and confirmed that SmithGroup's design intent was good, "the way it's supposed to be."  *Id.*  Neither Mr. Dowdall nor anyone acting under his direction confirmed that the DOAS *actually* lacked capacity to meet the pressurization requirement intended by SmithGroup's design.  *Id.*

This testimony is sufficient to confirm that Mr. Dowdall's opinions about the DOAS design are entirely speculative.  The mere fact that SmithGroup later—helpfully—worked with Skanska after construction to find a solution for problems found in the *as-installed* system does not suggest that there was anything wrong with SmithGroup's original design.  *Contra*, Skanska Opp'n 17.

Skanska misrepresents that very same testimony, found on pages 41-45 of Mr. Dowdall's deposition, as describing some opinion "that the DOAS system *was not* at the time of his opinions operating to target conditions because of SmithGroup design deficiencies."  Skanska Opp'n, at 18 (emphasis in original).  No such opinion can be found in those pages. In any event, the parties' competing interpretations about what Mr. Dowdall speculates "may" be a concern with the DOAS system is no genuine dispute requiring a trial.

### iii. Mr. Dowdall's Contentions About HVAC Design Requirements Contradict the "Conditions" of the Project.

Similar to Mr. Dowdall's condensate line opinion discussed above, Skanska cannot prove its claims by hiring an "expert" to read chapters of the ASHRAE handbook.  Instead, expert opinion testimony is required to show what other "members of the profession practicing under similar conditions" would have done.  *See*, Contract § 3.1 (ECF 1-1 page 43 of 46).  Mr. Dowdall's litigation-focused conclusions are inadequate because they disregard the conditions of this project.

Skanska first builds a paradox out of this HVAC noise issue by arguing that if SmithGroup

disagreed with Southland's cost-saving recommendation to design using mostly fan coil units, then "SmithGroup could have informed Skanska that it would not accept Southland's suggestions." Skanska Opp'n, at 3, implying that Skanska would have no choice but to do as SmithGroup demanded. Skanska argues further that it "did not prevent SmithGroup from doing anything, and that SmithGroup could have and should [have] incorporated appropriate sound attenuation into its HVAC design." *Id.*, at 14. A trial is not necessary to resolve Skanska's coy inconsistency, broadly faulting SmithGroup for not designing to Skanska's budget, while simultaneously arguing that SmithGroup should have unilaterally designed an HVAC system *that SmithGroup knew would not meet Skanska's budget*. *Cf.*, *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 527 (D. Md. 2014) ("a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement").

Skanska responds to the substance of SmithGroup's HVAC design analysis by arguing that Mr. Dowdall believes the reasons why SmithGroup did not include sound attenuation are "irrelevant" to the standard of care. Skanska Opp'n 12-15. According to Skanska and Mr. Dowdall, "it was SmithGroup's responsibility, as the Designer, to take the actions necessary to ensure its design would include the necessary sound attenuation." Skanska Opp'n, at 13 (quoting Mr. Dowdall's report). Mr. Dowdall's strict-liability view of engineering continues:

> Whether SmithGroup had in-house designers capable of reviewing and implementing the ASHRAE recommendations or it retained SM&W, SmithGroup, as the [Engineer of Record], should have designed the system to the appropriate noise levels, and it did not.

Skanska Opp'n, at 12-13. Notwithstanding the "conditions" of this project (including Skanska's budget limitations and Skanska's rejection of requests to re-engage an acoustic consultant), Mr. Dowdall contends that mechanical engineers hold an inescapable professional duty to design—for free—quiet HVAC systems. There is no basis for such contentions. More importantly, Mr.

Dowdall never even attempts to support the final inference necessary to prove Skanska's claims, which is to explain why SmithGroup should be required to *pay for the construction* (not just the design) of sound mitigation features, which exceed Skanska's construction budget.

Mr. Dowdall's analysis contradicts the terms of the Parties' contract, which are essential "conditions" informing the standard of care.  As shown in amended Section 3.5 of the Parties' contract, SmithGroup was required to prepare and submit to Skanska "Construction Documents at *80% level of completion* and other information and documents reasonably necessary to support [Skanska's] GMP Proposal."  Contract Exhibit PS-1 (ECF 1-1 page 43 of 46) (emphasis added).  Then, "[a]fter Owner's acceptance of the [Guaranteed Maximum Price] GMP Proposal, [Skanska] and [SmithGroup] will execute an amendment to this Agreement *to authorize the remainder of Basic Services contemplated by this Agreement and adjust [SmithGroup's] compensation accordingly*. ..."  *Id.*

This contract language confirms two things relevant to the conditions of this project: (1) Skanska's GMP budget was based on an incomplete, 80% design, which all parties knew did not yet include sound attenuation measures; and (2) design services *following* Owner's acceptance of the GMP were to be defined and authorized in a further contract amendment between Skanska and SmithGroup.

Both of these points contradict Mr. Dowdall's conclusion that SmithGroup held an absolute professional duty to design a quiet HVAC system.  Skanska Opp'n, at 13.  Mr. Dowdall conceded that absence of sound attenuation design in the 80% GMP set should be obvious to anyone reviewing the drawings.  Ex. XX, Dowdall Dep. 117:19-118:6.  Further, it was Skanska's own design-assist subcontractor, Southland, with professional engineers on staff, who recommended the cheaper, but louder, fan-coil system.  Skanska cannot claim to have been confused about what

was—and more importantly, was *not*—included in the 80% complete set of drawings Skanska's used for its GMP pricing.  The entire fan-coil concept was Southland's suggestion, and Skanska based its GMP pricing on drawings that obviously did not include sound attenuation.  From that point forward, adding sound attenuation to the design would necessarily increase the cost of construction, interfering with SmithGroup's parallel obligation to consider Skanska's budget when preparing the design.

Second, SmithGroup showed in its opening brief  the undisputed fact that *even the Owner* was concerned about HVAC noise at the GMP phase, so it is clear that noise was a concern to many people from the GMP pricing phase forward.  Skanska assured the Owner that further acoustic design analysis would be performed later in Phase 2 of the project.  *See*, SmithGroup Br. in Supp., at 31.  SmithGroup has also shown how Section 3.4 required SmithGroup to obtain pre-approval from Skanska before hiring any consultants to perform that analysis, and how SmithGroup was rebuffed every time it suggested Skanska should authorize re-engaging the acoustic consultant.  *Id.*, at 27.  Indeed, Skanska's responses to SmithGroup's requests suggested that Skanska felt it was too late to make changes to the HVAC design.  Ex. VV, Miller Dep. 51:6-51:9.  SmithGroup has also shown how Skanska drew down the fees allocated to Phase 2 acoustical analysis to instead pay for unrelated construction expenses.  SmithGroup Br. in Supp., at 31.

With all of that context in mind, the Parties' contract can only be interpreted to confirm that SmithGroup was *not* obligated to unilaterally incorporate additional sound attenuation details into the HVAC design during Phase 2 of the project, following Owner's approval of the GMP. Section 3.4 required SmithGroup to obtain Skanska's approval before hiring consultants, and amended Section 3.5 clearly states that following Owner's acceptance of Skanska's GMP, Skanska and SmithGroup would execute another contract amendment "*to authorize* the remainder of Basic

Services contemplated by this Agreement ..."   Section 3.1 required SmithGroup to consider Skanska's budget when making design decisions, as Skanska itself has argued throughout this litigation.  Skanska never authorized SmithGroup to design new sound attenuation details under any of these contract terms.  Instead, all of Skanska's actions towards SmithGroup during Phase 2 confirm that Skanska actively *discouraged* further acoustic analysis or any other changes to the HVAC design.

Mr. Dowdall's contention that SmithGroup should have designed sound attenuation features anyway, at its own expense, without authorization, as part of some unavoidable "responsibility, as the Designer," is unsupported by the actual contract and undisputed facts of this case.  Skanska Opp'n, at 13.  SmithGroup always had a competing contractual obligation not to unilaterally design elements of the building that would increase Skanska's construction cost, as Skanska has repeatedly argued.  Mr. Dowdall does not offer any reliable standard of care opinion about HVAC design because his bald conclusions contradict the actual "conditions" of the project, including terms of the parties' contract.

### D.  Skanska Lacks Essential Expert Opinion Testimony to Prove Any of Its Counterclaims at Trial.

To evaluate Skanska's claims against SmithGroup, the fact finder will be presented at trial with, at best: Mr. Dowdall's contentions discussed above, accompanied by Ms. Wagman's unnecessary opinion that the construction project was completed several years behind schedule, and Mr. Gaines' tally of expenses that Skanska claims to have incurred.  This is an incomplete presentation of evidence, reflecting a failure of proof that SmithGroup breached the standard of care, much less that SmithGroup *caused* any portion of 3 years of delay and $10 million of costs as Skanska alleges.  *See*, Skanska Opp'n, at 1.

This failure of proof is catastrophic.  For example, page 69 of the Secretariat Report

34

(purportedly drafted by Ms. Wagman) includes a chart dividing 1,148 total days of delay into six distinct "windows" of time associated with different project tasks.  Ex. BBB, Secretariat Report. 106 days of delay are then allocated to "Foundation Works," but Skanska has ***no expert to testify*** that SmithGroup's services relating to "Foundation Works" breached the standard of care, much less to explain how this window of delay (or any delay) was caused by SmithGroup's services.[3] 54 days of delay are allocated to "Foundation Works & Start of Structural Steel," but Skanska again has ***no expert to testify*** about that window either.  85 days of delay are allocated to "Curtainwall," yet Ms. Wagman testified that SmithGroup provided requested structural details for the curtainwall within only five (5) days of receiving the request, she has no opinions about structural engineering design, and she does not conclude that SmithGroup "caused" *any* days of curtainwall delay.  81 days of delay are allocated to "Ground Floor Finishes & HVAC Commissioning" and another 850 days to "HVAC Commissioning," but Ms. Wagman testified that the HVAC-related delay was caused by a myriad of issues, which she could not (or would not) untangle.

According to the written Secretariat report, somebody at Secretariat *assumes* that SmithGroup should be responsible for 1,033 of 1,148 total days of delay (90% of the project delay). That is not an expert *opinion* claimed by either Ms. Wagman or Mr. Gaines during their depositions.  Those 1,033 days allocated by "Secretariat" in the report to SmithGroup's services include, among other things, 100% of the 850 days associated with HVAC issues in window 6 (contradicting Ms. Wagman's testimony that she could not attribute specific days of HVAC delay to SmithGroup), 34 days associated with "slab edge design for ground floor curtainwall" in window 4 (contradicting Ms. Wagman's testimony that SmithGroup provided requested details in

---

[3]     "Foundation Works" pertains to the building's structure, but Skanska disclosed no structural engineer expert to opine on SmithGroup's structural design.

5 days or less), and 21 days of delay associated with "foundation design issues" in window 2 (a topic for which Skanska has no expert opinions at all). *Compare* Ex. BBB, Secretariat Report at 78 *with* Secretariat Report at 72. The Secretariat company, who employs Ms. Wagman and Mr. Gaines, is not an expert witness, and there is no basis for Skanska to continue quoting the Secretariat report as if it could be evidence supporting a genuine dispute of fact for trial, in direct contradiction of the deposition testimony of the actual experts. *See*, Skanska Opp'n, at 21-22, 24.

Further, SmithGroup previously explained the role of Ms. Tombros as Skanska's scheduling consultant during the project. SmithGroup Br. in Supp., at 39-40. As to foundation delay issues, for example, Ms. Tombros tracked whether the issues were Owner-caused (which would support an extension of the construction schedule), or due to some other cause (which might not support an extension). Ex. CCC, Tombros Dep. 42:18-44:8. Some foundation delay issues, such as rebar, were clearly Owner-driven. *Id.*, 35:18-36:17; 42:4-43:1. Other foundation issues, such as micropile design, were driven by unforeseen site conditions, but Ms. Tombros could not opine who—as between Skanska and SmithGroup—was responsible for verifying subsurface conditions. *Id.*, 32:3-33:14. Tombros' testimony confirms that there were many different causes of delay on the project, even for the foundation delay. Skanska failed to address this foundation delay topic *anywhere* in its opposition, while simultaneously arguing that the inadmissible Secretariat Report describes "critical path method ("CPM") delay analysis and opinions regarding Project delays in support of Skanska's delay claim." Skanska Opp'n, at 30.

These failures further emphasize the defects of Count II, which is plead so vaguely that both SmithGroup and the Court must speculate what "other errors & omissions" beyond the HVAC design Skanska *might* try to argue at trial. *See* SmithGroup. Br. in Supp., at 31-33. Because Skanska disclosed *no experts* to opine about structural engineering (pertaining to foundations or

36

curtainwall details), architecture (pertaining to design coordination and construction administration services), or any other professional services rendered by SmithGroup, Skanska lacks evidence to criticize SmithGroup's "other" services.

Skanska responds to this defect with more distraction. First, on page 18 of its opposition, Skanska retorts that Count II "alleges specific failures on the part of SmithGroup in its implementation of Design Services on the Project"—while ironically avoiding clarification of what those "specific failures" might be, much less identification of any expert opinions to support the allegations. On the following page, Skanska dodges in a different direction by arguing (without authority) that expert testimony isn't really necessary for Count II (notwithstanding Skanska's explicit allegation in Count II of a breach of the standard of care). Then in Footnote 7, Skanska searches for a procedural argument, contending that SmithGroup waived its ability to challenge Count II by not previously filing a Rule 12(b)(6) motion to dismiss.[4] None of these responses require a trial.

SmithGroup met its burden to show that Skanska lacks evidence to prove a breach of the applicable standard of care pertaining to HVAC design or any damages resulting thereof, which Skanska was unable to rebut in the manner required by Rule 56. Further, Skanska has not identified, much less supported, any *genuinely* disputed contention about SmithGroup's other design services to require a trial. Summary judgment should be granted in SmithGroup's favor as to the entirety of Skanska's Counterclaim.

## III.     SKANSKA FAILED TO PROFFER ANY EVIDENCE TO SUPPORT ITS CLAIM FOR "INDEMNITY"

---

[4]     The obvious point of the rules is to avoid an unnecessary trial on claims that cannot be proven, either because the party failed to state a legal claim (Rule 12(b)(6)), or because the party failed to muster sufficient evidence in discovery (Rule 56). Skanska's procedural analysis does not create a "genuine dispute of material fact" or any other reason to hold a trial on speculative claims and allegations. *See*, Fed. R. Civ. P. 56(a).

Skanska's arguments to support the "indemnity" claim alleged in Count IV underscore everything argued above. For example, on page 27 of Skanska's opposition, Skanska contends that it—Skanska—"attributes $325,000 [of a $650,000 settlement with ICON] to SmithGroup's design deficiencies that affected ICON's work." It is undisputed that ICON was Skanska's curtainwall subcontractor. As shown above, Skanska offers *no evidence* whatsoever to prove any breach of SmithGroup's standard of care pertaining to structural engineering or anything else related to the curtainwall. *See*, Kopnitsky Affidavit ¶ 8. An affidavit from one of Skanska's corporate officers is not *admissible evidence* to support any breach of the applicable standard of care, which can only be established through expert opinion testimony. See, Rule 56(c)(2). Contrary to Skanska's argument on page 27, Ms. Wagman's opinions provide *no support whatsoever* for contentions that the curtainwall issues had anything to do with SmithGroup's services.

Skanska cannot create a genuine dispute or avoid summary judgment by mischaracterizing deposition testimony, much less by submitting affidavits from its fact witnesses to declare how sincerely Skanska believes that SmithGroup is at fault. The only way Skanska could avoid summary judgment is by showing that it has necessary expert opinion evidence available to prove a breach of the standard of care at trial. Skanska failed to do that, so summary judgment should be granted to SmithGroup on the entirety of Skanska's counterclaim.

## IV. SKANSKA FAILED TO SUBSTANTIATE ANY DISPUTE OF MATERIAL FACT CONCERNING ITS BREACH OF CONTRACTUAL NOTICE OBLIGATIONS

Skanska failed to meet its burden to proffer sufficient evidence to support a genuine dispute of material fact that it either provided contractually required written notice of delay or was otherwise excused from the obligation. To argue that there is a dispute of fact about Skanska's own breach of contract requirements, Skanska invokes the untimely 2018 correspondence about DCW's HVAC concerns, which SmithGroup already addressed on pages 38-39 of its opening

brief.  The only other example of written notice that Skanska can muster is a *single e-mail*, dated November 9, 2017, in which a Skanska employee advises SmithGroup that ICON, the curtainwall subcontractor, requires an additional curtainwall structural connection detail.

The e-mail does ask SmithGroup to "review the structural requirements immediately" and suggests that "this will all but certainly be a delay to the project's critical path."  This detail is the same issue Ms. Wagman opined was addressed by SmithGroup in "five days or less."  *See,* Ex. WW, Wagman Dep. 170:8-170:14.  So the document confirms that when Skanska timely notified SmithGroup of potential design-related delay in writing, SmithGroup produced the requested detail in five days or less, exactly as the contract required.  *See,* Contract § 5.2.

Lacking any other examples of contractually required notice of delay, Skanska advances a new legal argument that "the Parties' course of conduct obviated the need for more formal notice."  Skanska Opp'n, at 28.  "To modify a contract by course of conduct, '[t]he course of conduct must evince a meeting of the minds' and 'must satisfy each element of a contract, including offer, acceptance, and consideration.'"  *Morris & Ritchie Ass., Inc. v. H&H Rock, LLC*, No. 1824, 2018 WL 679878, at *19 (Md. Ct. Spec. App. Jan. 30, 2018) (unreported).  "Although modification or waiver of a contract term generally is a question of fact ..., summary judgment is proper where no rational trier of fact could conclude that the terms of a contract were modified."  *Id.*

Skanska offers the Court *no evidence* to support any conclusion that the parties agreed to waive the contractual requirement for written notice of delay.  Instead, Skanska cited page 130 of Mr. Leier's deposition testimony, which confirms there is no genuine dispute on this issue:

> Q.    Do you have any recollection of—of notifying SmithGroup that SmithGroup's design—SmithGroup was delaying the progress of the work?
> A.    I don't remember.
> Q.    If you had become aware of some circumstance where the design team was delaying the progress of the work, would you have advice—made that—given that notice in writing to the design team, to SmithGroup?

> A.      I don't remember.
> Q.      Would it be your practice to advise whomever, whether it's an owner or a designer, is delaying you from prosecuting their work in writing so there's a record of it?
> A.      I would call and discuss it.
> Q.      And would you rely on a phone call to document that you were being delayed, either by the owner or the designer or sub or whoever it might be?
> A.      I would call and then if I remember, I would try to follow up.

Ex. DDD, Leier Dep. 130:14-131:10.   Mr. Leier then speculates that other Skanska project managers "*could*" have provided contractually required notice of delay.   *Id.*, at 131:11-131:22. Mr. Leier's speculation about how he (or other Skanska project managers) *might* have notified SmithGroup of potential delay without the contractually required writing is not evidence that Skanska *actually* notified  SmithGroup of potential delay in any manner, much less evidence that the parties agreed to waive the contractual requirement of a writing.   This testimony instead confirms that Skanska's fact witness *doesn't remember* relevant information.   That is not evidence, and there is no genuine dispute about whether Skanska provided contractually required notice.

There is also no genuine dispute about "whether the Parties' course of conduct obviated the need for more formal notice."   *Id.*, *see also*, *Harris v. Reston Hosp. Center, LLC*, 523 Fed. App'x 938, 946 (4th Cir. 2013) (affirming summary judgment where district court refused to consider opposing party's new legal theory, which was introduced for the first time to oppose summary judgment).   Skanska's claims against SmithGroup are premised upon a strict liability view of contract interpretation, so there is no reason to entertain Skanska's new—inconsistent— legal argument that *Skanska's* breaches should be overlooked based on some unsubstantiated course of conduct between the parties.

## OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT

### I.      RESPONSE TO SKANSKA'S STATEMENT OF FACTS

Few of the "facts" described by Skanska are *facts* at all, as opposed to legal contentions,

summaries of pleadings, summaries of discovery, or other immaterial context about this litigation. SmithGroup nevertheless responds as follows:

1.     SmithGroup incorporates by reference its own statement of undisputed facts, in its entirety.

2-3.     Undisputed.

4.     The fact is immaterial and supported only by an inadmissible hearsay from an expert report.

5.     The Parties' contract speaks for itself. SmithGroup disputes many of Skanska's interpretations of SmithGroup's contractual obligations. *See*, *e.g.*, *supra*, 18-21.

6.     As shown extensively, there is no competent evidence that SmithGroup it is responsible for project delays.

7.     SmithGroup's pleadings speak for themselves, and they are not material facts.

8.     SmithGroup's pleadings speak for themselves, and they are not material facts. Regardless of whether the pleadings reference project delay, SmithGroup has never alleged a "delay" claim.

9.     This legal conclusion is disputed. SmithGroup has not alleged any form of "delay" claim—it has instead alleged claims to recover unpaid fees for professional services rendered.

10.     The pleadings speak for themselves. Undisputed that Count III of Skanska's Counterclaim alleges a delay claim, which only emphasizes how SmithGroup never alleged a similar delay claim against Skanska in the Complaint.

11.     Based on discovery, SmithGroup understands Ms. Wagman to be one of Skanska's testifying experts. Disputed that the Secretariat report is competent evidence of anything.

12.     Disputed. The Secretariat report is not evidence, Ms. Wagman's testimony does not support Skanska's contentions that SmithGroup caused any project delays.

13-14.     Undisputed.

15.     Existence of the reports is not disputed. As covered above, the Secretariat reports do not

accurately describe Ms. Wagman's actual opinions.

16.     Existence of the reports is not disputed.  The reports are not evidence, and they speak for themselves.

17.     Existence of the reports is not disputed.  See prior responses and argument concerning the Secretariat reports.

18-21.  Undisputed.

22.     Mr. Helmes's testimony speaks for itself.  SmithGroup never alleged a "delay claim."

23.     Disputed.  SmithGroup never alleged any "delay claim," so it could not have disclosed experts to support a delay claim that does not exist.

24.     Mr. Shockey's testimony speaks for itself, which is not disputed.  SmithGroup does dispute interpretation of that testimony to describe a delay claim that was never alleged.

25.     Undisputed, with the qualification that a "labor cost report" in the context of professional services is distinguishable from construction "labor" that might be at issue in a delay claim.

26.     Undisputed.

## II.      SMITHGROUP NEVER ALLEGED A "DELAY" CLAIM

Skanska may have defenses to SmithGroup's fee claim, but lack of expert testimony about "delay" is not one of them.  Skanska's cross-motion for summary judgment is premised entirely on a misrepresentation that "it is undisputed that SmithGroup's claim for Extended CA Services is a delay claim ..."  Skanska Opp'n, at 32.  Based on that mischaracterization of SmithGroup's Complaint, Skanska argues that SmithGroup lacks necessary expert testimony about critical path method ("CPM") analysis to support its claims.

To the contrary, SmithGroup's Complaint alleges three distinct claims, none of which concern construction delay: (1) breach of contract, (2) quantum meruit, and (3) promissory

estoppel.   In each of those claims, SmithGroup alleges that Skanska directed SmithGroup to perform additional professional services, but Skanska did not pay for those services.  *See*, Compl. ¶¶ 16-17, 20-22, 24-26.  Delay to the project schedule may explain *why* Skanska requested the additional services, but the schedule itself is nothing more than immaterial context.

A construction delay claim is something entirely different from the fee claims alleged in SmithGroup's Complaint.  Construction delay often results in competing claims between a project owner and its general contractor about why the project was completed later than expected, whether there is any remedy to the owner for receiving the completed project later than the agreed date, whether the delay was caused by factors beyond the general contractor's control (such as weather) to excuse the delay, whether the delay was caused by owner resulting in compensable delay to the contractor, etc.  *E.g.*, Brunner & O'Connor on Construction Law § 15:121 (2021).

One way to sort through the morass of issues presented in a construction delay claim is to perform a critical path analysis, identifying "tasks that must be completed before work on other tasks can proceed."  *Baker DC, LLC v. Baggette Construction, Inc.*, 378 F. Supp. 3d 399, 411 (D. Md. 2019).  By first identifying what work was on the critical path, parties in a construction delay case can prove whether delay to that specific work resulted in broader delay to the project as a whole, or whether only that discrete task was delayed.  *Id.*, at 412.

No expert CMP analysis is necessary to prove SmithGroup's fee claim, which is distinguished by simple allegations that Skanska requested addition services from SmithGroup but failed to pay for them.  The entire concept of "delay" is irrelevant to SmithGroup's claims.  Skanska's inability to deliver this project on time is at best immaterial context to explain why Skanska *requested* the additional services from SmithGroup.  No CPM expert analysis is required to prove that Skanska failed to pay for the services it requested from SmithGroup.

The amount of fees owed by Skanska to SmithGroup can be proven instead based on simple fact evidence such as invoices, timesheets, and fact testimony as to the hourly rates the parties agreed to should Skanska request additional services.  None of the cases cited by Skanska support its summary judgment argument that expert testimony is required to prove any material allegation of the Complaint.  *Contra*, Skanska Opp'n, at 34-35.  SmithGroup certainly is not alleging complex damages such as the investment losses at issue in *Kirby v. Chrysler Corp.*, 554 F. Supp. 743 (D. Md. 1982).  *See*, Skanska Opp'n, at 34.  SmithGroup did not perform any construction work on this project, so it does not require expert testimony about MCCA "Factors Affecting Labor Productivity."  *Contra*, Skanska Opp'n, at 35 (citing the *Appeals of States Roofing Corp.* case).  None of the cases Skanska cited about construction delay claims are relevant to the issues presented by SmithGroup's Complaint.

Skanska's cross-motion for summary judgment should be denied.

## III.     THE DISTRICT OF MARYLAND HAS PREVIOUSLY HELD UNDER SIMILAR CIRCUMSTANCES THAT LACK OF CPM EXPERT TESTIMONY IS NO REASON TO GRANT SUMMARY JUDGMENT

The cases Skanska cited simply do not support its motion.  Skanska goes too far by arguing that "binding case law is limited" in Maryland on this issue.  Skanska Opp'n, at 32.

The District of Maryland clarified in 2019 that CPM "is a term of art, not a legal concept." *Baggette*, 378 F. Supp. 3d, at 411.  The Court then clarified that one of the primary cases cited in support of Skanska's cross-motion, *Mega Construction Co., Inc. v. United States*, "is not binding on this court."  *Id.*, at 412, *see also*, Skanska Opp'n, at 33.  The Court distinguished *Mega Construction* as being a claim asserted by a general contractor, who was responsible for "overseeing a large and complex federal project."  *Id.*  "Under those circumstances, where the general contractor must establish that the alleged delays set back the entire project, the value of

CPM analysis is easy to appreciate." *Id.*  The Court was not presented with any authority to suggest that a subcontractor, working under the general contractor, is similarly required to provide CPM evidence in a suit against the general contractor.  *Id.*

The facts of SmithGroup's complaint are on all fours with the Court's analysis in *Baggette*. SmithGroup was similarly contracted under Skanska, and SmithGroup has shown in its motion for summary judgment that Skanska, as general contractor, was the party responsible for establishing and maintaining the project schedule.  Skanska, like the general contractor in *Baggette*, has not offered *any authority* to suggest that SmithGroup's claims for nonpayment are ripe for summary judgment based on a lack of expert opinion testimony concerning any CPM analysis.  Instead, the cases cited by Skanska are irrelevant and not even binding on this Court.

Skanska's cross-motion for summary judgment should be denied.

## CONCLUSION

For the foregoing reasons, SmithGroup is entitled to summary judgment on each count of Skanska's Counterclaim, and Skanska's cross-motion for summary judgment should be denied. Trial should proceed solely on SmithGroup's claims for nonpayment against Skanska.

Dated: May 27, 2022                                    Respectfully submitted,


                                                       */s/*      Leslie Paul Machado_____

                                                       Leslie Paul Machado (Bar No. 14952)
                                                       Alison C. Duffy (Md. Bar No. 21002)
                                                       O'HAGAN MEYER, PLLC
                                                       2560 Huntington Avenue, Suite 204
                                                       Alexandria, Virginia 22303
                                                       (703) 775-8607 (phone)
                                                       (804) 403-7110 (facsimile)
                                                       lmachado@ohaganmeyer.com
                                                       aduffy@ohaganmeyer.com

                                                       Stephan F. Andrews (admitted *pro hac vice*)

James W. Walker (admitted *pro hac vice*)
O'HAGAN MEYER, PLLC
411 East Franklin Street, 5th Floor
Richmond, Virginia 23219
(804) 403-7100 (phone)
(804) 403-7110 (facsimile)
sandrews@ohaganmeyer.com
jwalker@ohaganmeyer.com

*Counsel for SmithGroup, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 27th day of March, 2022, I served the foregoing via electronic

mail to counsel for Skanska USA Building, Inc.


_/s/_      Leslie Paul Machado